IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MOHAMMED AL-ADAHI, *et al.*   )
)
*Petitioners*,   )
)
v.   )   Civil Action No. 05-280 (GK)
)
GEORGE W. BUSH, *et al.*,   )
)
*Respondents*.   )

**EXHIBIT A**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOHAMMED AL-ADAHI, et al., <br><br> Petitioners, <br><br> v. <br><br> GEORGE W. BUSH, et al., <br><br> Respondents. | Civil Action No: 05-280 (GK) |

Pursuant to 28 U.S.C. § 1746, I, JAY W. HOOD, hereby state that, to the best of my knowledge, information, and belief, the following is true, accurate, and correct:

1. I am a Major General in the United States Army, with 30 years of active duty service. I currently serve as Commander, Joint Task Force-Guantanamo, Guantanamo Bay, Cuba (JTF-GTMO). I have served in that position since March 2004. JTF-GTMO conducts detention and interrogation operations in support of the Global War on Terrorism, coordinates and implements detainee screening operations and supports law enforcement and war crimes investigations. Our detention mission is conducted in a humane manner that protects the security of both detainees and JTF personnel at GTMO. In my capacity as Commander, I am responsible for all aspects of JTF-GTMO operations. The information contained in this declaration is based on my personal knowledge or information supplied to me in my official capacity.

2. JTF-GTMO's role is to be responsible for the detention and interrogation of enemy combatants detained by the Department of Defense as a result of the ongoing Global War on Terrorism. The JTF's mission is to safely and effectively gain operational and strategic

1

intelligence that will help protect the United States and its allies from future terrorist activities. We continue to gain extraordinarily valuable strategic intelligence from the detainees who are at Guantanamo.

3. The detainees at Guantanamo include terrorists linked to most major al Qaida attacks, including the September 11, 2001, attacks on the United States; combatants who taught or received training on arms and explosives, surveillance and interrogation resistance techniques at al Qaida camps in Afghanistan and elsewhere; and individuals who continue to express their commitment to kill Americans and conduct suicide attacks if released. At Guantanamo there are members of al Qaida and other terrorist organizations who have sworn personal allegiance to Osama bin Laden; trained at al Qaida training camps in Afghanistan; participated in combat operations against the United States and Coalition forces; there are some who have sworn to join Abu Musab al-Zarqawi in attacks against U.S. forces in Iraq upon release from Guantanamo; there is an al Qaida member who designed a prototype shoe bomb for destroying airplanes and a magnetic mine for attacking ships; there is a detainee who recently threatened to arrange for the kidnapping and execution of US citizens living in Saudi Arabia; and there are some who on a daily basis threaten violence against the security force and their families.

4. As the Commander of JTF-GTMO, I am responsible for the safe, humane custody of all detainees under my charge. US law and DoD policy prohibit torture and cruel, inhuman, or degrading treatment of detainees. I do not under any circumstances permit torture or abuse of any nature of a detainee within our custody. The petitioner's motion alleging that Yemeni ISN 440 was "systematically tortured" to cause him to end a hunger strike is patently false. The

specific facts relating to Yemeni ISN 440's medical case are detailed in CAPT (Doctor) Stephen Hooker's declaration dated 1 March 2006. The use of enteral feeding procedures that follow Federal Bureau of Prison's standards in no way constitutes "torture." Additionally, any credible allegation of detainee abuse reported to the chain of command is thoroughly investigated in accordance with DoD policy and regulations.

5. Petitioner's allegation that Yemeni ISN 440 has been "imprisoned without any meaningful hearing at Guantanamo Bay" is also patently false. Detainees are afforded two types of hearings: a Combatant Status Review Tribunal ("CSRT") and an Administrative Review Board ("ARB"). (See attached exhibits on CSRT and ARB process) In the case of Yemeni ISN 440, his CSRT, an independent board of three officers, identified him as an unlawful enemy combatant on the battlefields of Afghanistan. Another independent board of officers (the ARB) determined that Yemeni ISN 440 still poses a threat to the US and our allies or interests and consequently recommended his continued detention.

6. The detainees at Guantanamo come from a variety of countries with varying ethnic and religious backgrounds. Many are radical Islamic jihadists or avowed members of terrorist organizations. Many of the detainees at Guantanamo have been specifically trained on the Manchester Manual. It is a training manual found by British agents in Manchester, England, at the home of al Qaida member Anas al-Liby. The manual specifically trains and encourages detainees to claim torture and abuse. (See attached.)

3

7. A review of the unclassified summary provided from Yemeni ISN 440's Administrative Review Board provides significant insight into his training and motivations. ISN 440 is a Yemeni citizen who traveled to Afghanistan in order to participate in jihad; trained at the al-Farouq al Qaida training camp in Afghanistan on the use of multiple automatic weapons and rocket propelled grenades; and then participated in combat opperations with the Taliban against coalition forces in Afghanistan. In short, he is a trained al Qaida terrorist, who has been taught to claim torture, abuse, and medical mistreatment if captured.

8. Despite the petitioner's motion to paint Yemeni ISN 440 as a docile and compliant detainee, Yemeni ISN 440 has displayed numerous instances of non-compliant, hostile behavior towards the guard force and medical staff. He has on numerous occasions failed to follow camp rules; failed to follow security guard force instructions; thrown food or water on a security force guard; and thrown spit and/or bodily fluids on a security force guards. Yemeni ISN 440 has also used provoking words and gestures, thrown food or water on another detainee, been in possession of contraband, made unauthorized communications, failed to return property, and participated in camp disturbances. Yemeni ISN 440 has, at times, engaged in extremely hostile behavior. Contrary to counsel's assertions, on 18 October 2005, Yemeni ISN 440 threatened both security and medical staff by using his intravenous ("IV") pole as a weapon to destroy lighting fixtures and ceiling tiles inside the Detention Hospital. During that incident, he ignored repeated demands to put the weapon down. On another occasion, on 14 September 2005, Yemeni ISN 440 removed the IV from his arm and attempted to throw the IV bag at the duty nurse.

4

9. As pointed out in the declaration of CAPT (Doctor) Stephen Hooker, JTF-GTMO personnel recognized that a certain portion of the detainees were taking affirmative steps to thwart the medical care that was being provided to them. On the advice of experts from the Federal Bureau of Prisons and in order to overcome the self-injurious behavior, constant efforts to bypass or limit medical care, and purging by detainees such as Yemeni ISN 440, we instituted Federal Bureau of Prisons hunger strike procedures for enteral feeding, including use of a restraint chair system. These procedures permit continuous monitoring through the feeding process and limited a detainee's ability to combat medical efforts to treat their chronic malnourishment. Since transitioning to the procedures used in other federal facilities, every detainee in our custody has gained weight and their medical condition has improved. In December 2005, Yemeni ISN 440's weight was as low as 98 pounds. Today he weighs more than 135 pounds.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true, accurate, and correct.

Dated: March 1, 2006

JAY W. HOOD
Major General, USA

5

# EXHIBIT A

Rights Afforded Detainees Under

## COMBATANT STATUS REVIEW TRIBUNALS
(consistent with Army Regulation 190-8)

1) The right to a review and consideration by a neutral decision-making panel composed of three commissioned military officers sworn to execute their duties faithfully and impartially;

2) The right to have tribunals make their decisions by majority vote, based on a preponderance of the evidence;

3) The right to attend all open portions of the proceedings;

4) The right to call witnesses on his behalf, if those witnesses are relevant and reasonably available;

5) The right to question witnesses called by the tribunal;

6) The right to testify on his own behalf if he desires;

7) The right to receive the assistance of an interpreter, when necessary; and

8) The right to freely to decline to testify.

**Additionally, Combatant Status Review Tribunals afford detainees opportunities that are simply not available under Army Regulation 190-8:**

1) The detainee is given the opportunity to receive assistance from a military officer to ensure he understands the process and the opportunities available, and to prepare for his hearing;

2) The Combatant Status Review Tribunals contain express qualifications to ensure the independence and lack of prejudgment of the tribunal;

3) The CSRT Recorder is obligated to search government files for evidence suggesting the detainee is not an enemy combatant;

4) In advance of the hearing, the detainee is provided with an unclassified summary of the evidence supporting his enemy combatant classification;

5) The detainee is allowed to introduce relevant documentary evidence; and

6) The result of every CSRT is automatically reviewed by a higher authority, which is empowered to return the record to the tribunal for further proceedings, if appropriate.

# EXHIBIT B

Protections Afforded Detainees Under the

# ADMINISTRATIVE REVIEW BOARD PROCESS

1) The opportunity for review by a neutral decision-making panel of three commissioned military officers sworn to execute their duties faithfully and impartially;

2) The opportunity for tribunals to make their assessments, in writing and by majority vote, on whether there is reason to believe the enemy combatant no longer poses a threat to the United States or its allies and any other factors bearing on the need for continued detention;

3) the opportunity to attend all open portions of the proceedings;

4) the opportunity to testify on his own behalf if he desires;

5) the opportunity to receive assistance of an interpreter, when necessary; and

6) the opportunity to receive assistance from a military officer to ensure he understands the process and to prepare for his hearing.

# TERRORIST TRAINING MANUAL

(Found in the apartment of a suspected al Qaeda member in Manchester, England, May 2000)

**Printed courtesy of the National Security Division's Operational Training Unit
FBI  Headquarters, November 2001**

Attached is a copy of a training manual found in May 2000 by British investigators in Manchester, England, while searching the apartment of suspected al Qaeda member Anas al-Liby, AKA Nazih al-Raghie, who, as of November 2000, is a fugitive. The Southern District of New York included this manual as evidence in the recent African embassy bombing trials, since it clearly outlines terrorist cell-members' goals and many of their operational techniques. Although the manual is somewhat dated (for example, it does not mention the Internet, which is used extensively by current terrorists for communicating with one another), and was apparently written for another part of the world (there are references to "polytheists"--presumably Hindus--and to the use of torture during interrogations, which would refer to oppressive regimes in the Middle East), it nevertheless contains much material that is relevant to terrorist cell members' behavior in Western Europe and the United States. Of particular interest are the sections on surveillance detection and evasion, how to maintain cover in foreign lands, and how to deal with arrest and interrogation. Most important, the manual provides insight into the general mindset of radical Islamic terrorists, and should prove useful to any law enforcement officer involved in counterterrorism investigations.

Table of Contents

| | | |
|---|---|---|
| **Dedication** | | 3 |
| **Introduction** | | 7 |
| First Lesson | General Introduction | 10 |
| Second Lesson | Necessary Qualifications and Character For Organization's Members | 14 |
| Third Lesson | Counterfeit Currency and Forged Documents | 21 |
| Fourth Lesson | Organization Military Bases: Apartments and Hiding Places | 24 |
| Fifth Lesson | Means of Communication and Transportation | 28 |
| Sixth Lesson | Training | 43 |
| Seventh Lesson | Weapons: Measures Related to Buying and Transporting Them | 46 |
| Eighth Lesson | Member Safety | 51 |
| Ninth Lesson | Security Plan | 56 |
| Tenth Lesson | Special Tactical Operations | 68 |
| Eleventh Lesson | Espionage: Information-Gathering Using Open Methods | 75 |
| Twelfth Lesson | Espionage: Information-Gathering Using Covert Methods | 84 |
| Thirteenth Lesson | Secret Writing and Ciphers and Codes | 99 |
| Fourteenth Lesson | Kidnapping and Assassination Using Rifles and Pistols | 116 |
| Fifteenth Lesson | Assassination Using Explosives | 139 |

**Sixteenth Lesson**      Assassination Using Poisons and Cold Steel           153

**Seventeenth Lesson**  Interrogation and Investigation                                  161

**Eighteenth Lesson**    Prisons and Detention Centers                                    176

**UK/BM-176 TO UK/BM-180 TRANSLATION**
**Lesson Eighteen**

PRISONS AND DETENTION CENTERS

IF AN INDICTMENT IS ISSUED AND THE TRIAL BEGINS, THE BROTHER HAS TO PAY ATTENTION TO THE FOLLOWING:

1. At the beginning of the trial, once more the brothers must insist on proving that torture was inflicted on them by State Security [investigators] before the judge.
2. Complain [to the court] of mistreatment while in prison.
3. Make arrangements for the brother's defense with the attorney, whether he was retained by the brother's family or court-appointed.
4. The brother has to do his best to know the names of the state security officers, who participated in his torture and mention their names to the judge. [These names may be obtained from brothers who had to deal with those officers in previous cases.]
5. Some brothers may tell and may be lured by the state security investigators to testify against the brothers [i.e. affirmation witness], either by not keeping them together in the same prison during the trials, or by letting them talk to the media. In this case, they have to be treated gently, and should be offered good advice, good treatment, and pray that God may guide them.
6. During the trial, the court has to be notified of any mistreatment of the brothers inside the prison.
7. It is possible to resort to a hunger strike, but it is a tactic that can either succeed or fail.
8. Take advantage of visits to communicate with brothers outside prison and exchange information that may be helpful to them in their work outside prison [according to what occurred during the investigations]. The importance of mastering the art of hiding messages is self evident here.
- When the brothers are transported from and to the prison [on their way to the court] they should shout Islamic slogans out loud from inside the prison cars to impress upon the people and their family the need to support Islam.
- Inside the prison, the brother should not accept any work that may belittle or demean him or his brothers, such as the cleaning of the prison bathrooms or hallways.
- The brothers should create an Islamic program for themselves inside the prison, as well as recreational and educational ones, etc.
- The brother in prison should be a role model in selflessness. Brothers should also pay attention to each others needs and should help each other and unite vis a vis the prison officers.

- The brothers must take advantage of their presence in prison for obeying and worshiping [God] and memorizing the Qora'an, etc. This is in addition to all guidelines and procedures that were contained in the lesson on interrogation and investigation. Lastly, each of us has to understand that we don't achieve victory against our enemies through these actions and security procedures. Rather, victory is achieved by obeying Almighty and Glorious God and because of their many sins. Every brother has to be careful so as not to commit sins and everyone of us has to do his best in obeying Almighty God, Who said in his Holy Book: "We will, without doubt, help Our messengers and those who believe (both) in this world's life and the one Day when the Witnesses will stand forth."
May God guide us.

[Dedication]

To this pure Muslim youth, the believer, the mujahid (fighter) for God's sake, I present this modest effort as a contribution from me to pave the way that will lead to Almighty God and to establish a caliphate along the lines of the prophet.

The prophet, peace be upon him, said according to what was related by Imam Ahmed: "Let the prophecy that God wants be in you, yet God may remove it if He so wills, and then there will be a Caliphate according to the prophet's path [instruction], if God so wills it. He will also remove that [the Caliphate] if He so wills, and you will have a disobedient king if God so wills it. Once again, if God so wills, He will remove him [the disobedient king], and you will have an oppressive king. [Finally], if God so wills, He will remove him [the oppressive king], and you will have a Caliphate according to the prophet's path [instruction]. He then became silent."

THE IMPORTANCE OF TEAM WORK:

1. Team work is the only translation of God's command, as well as that of the prophet, to unite and not to disunite. Almighty God says, "And hold fast, all together, by the Rope which Allah (stretches out for you), and be not divided among yourselves." In "Sahih Muslim," it was reported by Abu Horairah, may Allah look kindly upon him, that the prophet, may Allah's peace and greetings be upon him, said: "Allah approves three [things] for you and disapproves three [things]: He approves that you worship him, that you do not disbelieve in Him, and that you hold fast, all together, by the Rope which Allah, and be not divided among yourselves. He disapproves of three: gossip, asking too much [for help], and squandering money."

2. Abandoning "team work" for individual and haphazard work means disobeying that orders of God and the prophet and falling victim to disunity.
3. Team work is conducive to cooperation in righteousness and piety.
4. Upholding religion, which God has ordered us by His saying, "Uphold religion," will necessarily require an all out confrontation against all our enemies, who want to recreate darkness. In addition, it is imperative to stand against darkness in all arenas: the media, education, [religious] guidance, and counseling, as well as others. This will make it necessary for us to move on numerous fields so as to enable the Islamic movement to confront ignorance and achieve victory against it in the battle to uphold religion.
    All these vital goals can not be adequately achieved without organized team work. Therefore, team work becomes a necessity, in accordance with the fundamental rule, "Duty cannot be accomplished without it, and it is a requirement."
    This way, team work is achieved through mustering and organizing the ranks, while putting the Amir (the Prince) before them, and the right man in the right place, making plans for action, organizing work, and obtaining facets of power . . . . . .