IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MOHAMMED AL-ADAHI, *et al.*  )
                             )
*Petitioners*,               )
                             )
*v.*                         )   Civil Action No. 05-280 (GK)
                             )
GEORGE W. BUSH, *et al.*,    )
                             )
*Respondents*.               )

# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOHAMMED AL-ADAHI, et al., <br><br> Petitioners, <br><br> v. <br><br> GEORGE W. BUSH, et al., <br><br> Respondents. | Civil Action No: 05-280 (GK) |

Pursuant to 28 U.S.C. Section 1746, I, Stephen G. Hooker, MD, MPH, hereby state that, to the best of my knowledge, information, and belief, the following is true, accurate, and correct:

1. I am a licensed physician and a Captain in the United States Navy with 22 years Active Federal Commissioned Service. I currently am the Officer in Charge, Detention Hospital, Joint Task Force-Guantanamo, Guantanamo Bay, Cuba. I am directly responsible for the medical care provided to detainees and presently oversee the operation of the Detention Hospital that provides medical care to the detainees being held at Guantanamo.

2. I received my medical degree from the University of Mississippi, School of Medicine. I completed an internship at U.S. Naval Hospital, Jacksonville, Florida, a residency in Family Practice at U.S. Naval Hospital, Pensacola, Florida, and a residency in Preventive Medicine from the University of Washington, Seattle, Washington.

1

3. As the Officer-in-Charge of the Detention Hospital, I am the direct supervisor of the physicians and medical staff who provide medical care to the detainees. I have personal knowledge of the procedures that are in place for the operation of the Detention Hospital and I am responsible for ensuring that they are followed. Due to my responsibilities, I have personal knowledge of, or have received information concerning, the allegations made by petitioner's counsel in their emergency motion of February 24, 2006, for injunctive relief on behalf of Mr. Mohammed Bawazir.

4. There are procedures and/or protocols for providing medical care to detainees including those detainees who may be participating in a hunger strike. The framework for these procedures is set forth in the JTF-Guantanamo (JTF-GTMO) Joint Medical Group Standard Operating Procedures, the orders of the JTF Commander, Major General Jay Hood, and the orders of higher military and medical authorities. These procedures were generally set forth in the September 9, 2005 declaration of Major General Hood previously submitted in these cases. These orders and procedures establish the practices to be followed at all times by all medical personnel at the Detention Hospital and throughout JTF-GTMO.

5. The healthcare provided to the detainees being held at Guantanamo Bay rivals that provided in any community in the United States. Detainees receive timely, compassionate, quality healthcare and have regular access to primary care and specialist physicians. The care provided is the same as, if not better than, that afforded our active duty service members. This healthcare includes outpatient and inpatient treatment for both acute and chronic medical needs. The detainees also receive periodic health screening as dictated by their age, family history, and

existing medical conditions. Medical staff at the Detention Hospital and the Naval Base Hospital have treated detainees for a variety of medical conditions, including hepatitis, heart ailments, hypertension, combat wounds, diabetes, tuberculosis, appendicitis, inguinal hernia, leishmaniasis, malaria, and malnutrition. Examples of preventive medical services offered to the detainees include colonoscopy for colon cancer screening and blood tests to screen for diabetes, high cholesterol, and prostate cancer. The detainees have been immunized as per United States standards and continue to receive regular immunizations, as indicated. In addition to providing medical treatment, prescription drugs and preventive medical services, our medical staff has provided detainees with prescription eyeglasses and prosthetic limbs. As a result, the health of the detainee population has markedly improved since they arrived at Guantanamo Bay.

6. The Joint Medical Group staff consists of licensed, board-certified physicians of different specialties. Specifically in January 2006, the hospital staff consisted of approximately 145 professionally trained individuals. This staff included an anesthesiologist/intensive care specialist, 4 family physicians, 5 internal medicine physicians, a psychiatrist, a psychologist, a nurse practitioner, a physician's assistant, a licensed dietician, and a physical therapist. In addition, the staff included licensed medical/surgical nurses, corpsmen (formally trained Navy medical personnel akin to a "medic" in the Army), various technicians (lab, radiology, pharmacy, operating room, respiratory, physical therapy, information technology and biomedical repair), and administrative staff. From September 2005 to January 2006, additional board certified specialist physicians were brought in to evaluate detainees in custody at Guantanamo Bay (some of whom were on hunger strike). This included a cardiologist, pulmonologist, otolaryngologist, neurologist, and gastroenterologist. Other medical specialists specifically

3

involved in the care of the detainees on hunger strike included nutritionists, a wound care specialist, an endocrinologist, physical therapists, and behavioral health professionals, all of whom assisted in monitoring and providing specialized care, as needed.

7. The healthcare provided to the detainees is administered primarily in two locations. Outpatient medical care is provided 24 hours a day, seven days a week in the Camp Delta Clinic. This clinic functions as a full-service outpatient medical clinic with the capability of performing typical outpatient assessments, as well as routine X-rays. Inpatient medical care is performed primarily in the Detention Hospital. The Detention Hospital is a 20-bed facility that is comparable to a small community hospital in the United States. For medical procedures beyond the capability of the Detention Hospital, the detainees are transferred to the Naval Base Hospital at Guantanamo Bay. As noted above, we can and have requested that specialists be flown in to provide care to detainees when the medical need warrants it.

8. Detainees at Guantanamo Bay began a large and coordinated hunger strike on August 8, 2005. The number of hunger strikers increased and reached a peak of 131 on September 11, 2005. The numbers decreased for several months; and, then, they peaked again at 84 on December 25, 2005. By December 15, 2005, approximately two-thirds (19 of 29) of the hunger strikers being enterally fed had become significantly malnourished (less than 75% of their Ideal Body Weight) and were at great risk for serious complications. Each detainee was separately evaluated by physicians, a nutritionist, and other medical personnel to determine appropriate quantity of nutrients and fluids essential to saving their lives, preventing any permanent damage to vital organs, and improving their health. A forensic psychiatrist visited JTF-GTMO on

December 6-14, 2005, and evaluated our management of the hunger strike. He made over 30 recommendations. Three consultants from the Federal Bureau of Prisons, including a medical doctor and physician assistant who had experience in the treatment of hunger strikers, visited JTF-GTMO on 17-22 December 2005. They agreed with the assessment of the forensic psychiatrist and recommended that we adopt and implement the Federal Bureau of Prisons model for managing hunger strikes, including the utilization of the restraint chair system of feedings.

9. Over the period of the hunger strike (August 2005-February 2006), a total of 43 hunger strikers have been enterally fed. As of February 28, 2006, there are 5 hunger strikers at Guantanamo Bay, 3 of whom continue to be enterally fed.

10. It is the policy of the Department of Defense to support the preservation of life by appropriate clinical means, in a humane manner, and in accordance with all applicable laws and procedures. Medical professionals administer enteral feeding for hunger striking detainees in a humane and compassionate manner, and do so only when it becomes medically indicated. Medical professionals carefully assess each hunger-striking detainee's health by means of physical and psychological examinations, weight monitoring, personal observation and laboratory tests. When the preservation of health and life becomes necessary, a recommendation for enteral feeding is made through me to the Commander of the Joint Task Force, who then orders the necessary enteral feedings. JTF-GTMO medical professionals provide extensive counseling and detailed warnings to the detainees concerning the risks of failure to eat or drink when they begin a hunger strike, prior to commencing involuntary feeding, and periodically thereafter, if the detainee continues to participate in the hunger strike. Medical personnel

5

(including behavioral health professionals) continually remind detainees who persist in their hunger strike that continuation of the hunger strike could endanger their health or life.

11. No patient at the Detention Hospital receives any medical treatment, to include the insertion of nasogastric tubes and/or use of the restraint system during feeding through those tubes, unless medically necessary. When medically necessary, enteral tube feedings are conducted by dedicated medical professionals in a careful and compassionate manner using a medically appropriate protocol. The feeding process for hunger striking detainees is administered by physicians and credentialed registered nurses and is conducted in a humane manner. While medical corpsmen may assist in a procedure, none of the above-listed procedures are performed or have ever been performed by medical corpsmen, physician assistants or anyone other than physicians and credentialed registered nurses. This practice equals or exceeds the standard of care available at accredited hospitals in the United States.

12. The entire feeding and monitoring process using the restraint chair system lasts approximately 120 minutes or less. The process involves insertion of the feeding tube for each twice daily feeding and removal of the tube after each feeding. The detainee is placed in the restraint chair for insertion of the tube and the feeding. Contrary to the petitioner's allegations that Mr. Bawazir was denied the use of "bathroom facilities for several hours," detainees (including Mr. Bawazir) are offered and encouraged to use the restroom before and after each feeding process. Before inserting nasogastric tubes, a lubricant is always used. In all cases, a topical anesthetic such as lidocaine is offered; however, a patient may decline the anesthetic. The nose is lubricated with a sterile lubricant and, if accepted, a topical anesthetic to prevent pain

6

during insertion of a sterile tube. Sedation, which creates greater risks to the patient, has never been required to accomplish a nasogastric tube insertion. It is inserted down into the stomach slowly and directly. Medical personnel do not insert nasogastric tubes in any manner intentionally designed to inflict pain or harm on the detainee.

13. It takes about 20-30 minutes to insert the nasogastric tube and feed the detainee through the tube. The medical staff carefully monitors the process the entire time, adjusting the rate and amount of nutrients and fluids given, if there are any indications of discomfort to the detainee. All enterally fed detainees are offered or given medication that would make tolerance of the feeding easier, but the vast majority of feedings occur with no discomfort to the detainee. The comfort and safety of the detainee is a priority for the medical staff. The feeding formulas are the same formulas used in U.S. hospitals and include brand names such as Ensure®, Boost®, and Jevity®. Concentrated and fiber fortified formulas are used to reduce volume and enhance digestion, respectively, and to make the procedure as comfortable as possible. After the nutritional supplement is introduced, the detainee is observed for an additional 60-90 minutes to ensure he has tolerated the feeding and to permit digestion of the nutritional formula sufficient to thwart any later attempt to purge.

14. All detainees being enterally fed are assessed daily by a physician to ensure the feeding process is safely administered and being tolerated by the detainee. The protocol being used was developed from guidelines used by the U.S. Federal Bureau of Prisons. A Joint Medical Group professional closely monitors detainees' health to ensure they have the appropriate daily amounts of nutrition and hydration. Putting the tube in for each feeding and then removing it has reduced

the ability of detainees to purge their feeds and, hence, has led to appropriate weight gain and reduced metabolic disturbances. This procedure has also eliminated other complications caused by leaving the tubes in place. Presently, all detainees who are being enterally fed using this protocol are healthy and above 85% Ideal Body Weight.

15. Although JTF-GTMO follows the Federal Bureau of Prisons' model for managing hunger strikers, JTF-GTMO uses a smaller tube than that used by the Federal Bureau of Prisons when providing enteral feeds. A 12-French tube is used presently for most enteral feedings. The medical rationale for using a slightly larger tube (12-French versus 10-French) than that previously used when the feeding tube was left continually in place, was to provide the nutritional requirements as safely, comfortably, and expeditiously as possible. The difference in size between a 10-French (3.3 mm) tube and 12-French (3.96 mm) tube is barely discernible to the human eye. The 3.96 mm diameter tube allowed for easier delivery of the nutritional formula in a reduced amount of time. Consequently, this would lessen the total amount of time the detainee would be involved in the entire feeding process. Additionally, the slightly larger tube was safer and easier to place. Also, at least one of the nutritional formulas specifically recommended in the instructions on its label the use of the 12-French tubes, due to the viscosity of the formula and the tendency of the smaller tube to clog.

16. Like the United States Federal Corrections Facilities, the JTF-GTMO utilizes a restraint chair system. The restraint chair system is ergonomically designed for the detainee's comfort and protection. The seat and back are padded. The straps are ergonomically positioned so as to safely restrain the detainee, while mitigating the risk of circulation and neurological compromise.

Case 1:05-cv-00280-GK   Document 75-10   Filed 03/14/06   Page 10 of 15
Case 1:05-cv-00280-GK   Document 69   Filed 03/01/2006   Page 10 of 15

The goals of the restraint chair system are to provide the safest and most reliable method for the administration of nutritional requirements, eliminate purging of needed nutrients, and reduce the risk of physical harm to both the detainee and the staff. The restraint chair system has allowed us to provide the nutrition and fluids required to sustain health and maintain life compassionately and consistently. The detainee is constantly monitored while in the restraint chair; and the entire time the detainee is in the chair is approximately 120 minutes or less. Contrary to petitioner's counsel's assertions, the restraint chair system has never been utilized as a form of punishment at JTF-GTMO.

17. I have reviewed and am familiar with the medical records of Mr. Mohammed Bawazir. According to his medical records, Mr. Bawazir entered Guantanamo Bay at 126 pounds in May 2002 and his weight on October 30, 2002, was 130 pounds. His weight in June 2005 was 120 pounds. He began his hunger strike on approximately 11 August 2005. On August 15, 2005, he was counseled by a medical provider on the medical dangers of a hunger strike and advised to consume adequate food and water to preserve his health and life. He persisted in his hunger strike and was admitted to the Detention Hospital on September 1, 2005, for dehydration. At the time of admission to the Detention Hospital he weighed 106 pounds, which is 78.3% of his Ideal Body Weight. He was started on enteral feeds on September 4, 2005. The attached graph demonstrates the weight trend of Mr. Bawazir throughout his hunger strike and in his post-hunger strike period. The graph also demonstrates continued weight loss and a worsening malnourished state, despite clinically and nutritionally appropriate enteral feedings. The adequacy of the calories that were being provided to him and his failure to gain weight evidenced that he was purging his feedings.

18. Beginning in September 2005, enteral feedings were conducted with the feeding tube remaining in place. Despite pleas from concerned medical staff, detainees regularly resisted the efforts of the medical staff to provide the fluids and nutrition they needed to regain their strength and weight. Detainees regularly made efforts to sabotage the feeding process. Many used the feeding tube as a means of purging their nutrients and fluids. Some used the tube as a straw or siphon to remove recently introduced nutritional formulas. Some used its presence in the back of the throat to stimulate the gag reflex and thus induce vomiting of the feeds. The continual presence of the feeding tube was not without medical sequelae. Several detainees, including Mr. Bawazir, developed ear, nose, and throat problems when the tube was continuously in place. Mr. Bawazir was treated in mid October 2005, late November 2005, late December 2005, and early January 2006 with antibiotics for sinusitis. A board certified otolaryngologist (ENT) evaluated Mr. Bawazir on January 4, 2006, and specifically recommended "In- Out feed(s) if possible" because of the chronic and recurrent sinus symptoms. The patient's weight trend (see graph) demonstrated that his lowest body weight was 97 pounds on December 31, 2005, which is 71.7% of his Ideal Body Weight. However, he still weighed only 97.5 pounds on January 11, 2006, indicating he remained in a significantly malnourished state. Given the adequate calories that were being provided at this time and lack of weight gain, it was clear the detainee was purging feedings.

19. On December 1, 2005, Mr. Bawazir initially refused to take his enteral feeding as he had previously done, stating to the attending physician that he would have to be forcefully fed. When asked why, he responded that his lawyer told him to resist the feedings because it would

look better in court, if he had resisted and "force" was used to feed him. After pleading from the attending physician, he voluntarily took his enteral feeding. The attending physician clearly documented in his medical record (provided under this Court's order to petitioner's attorney) the detainee's request for force to be used to facilitate the feeding on this date.

20. Mr. Bawazir was at great risk for serious health complications and/or death, as indicated by his overall medical condition to include his declining weight, recurrent sinus infections, and significant state of malnutrition. Under the Joint Medical Group Standard Operating Procedures, medical restraints are allowed, if necessary for the placement of appropriate devices for resuscitation or feeding if the detainee has refused to voluntarily take food/fluids. This procedure was necessary to provide the required nutrition and fluids essential to maintaining Mr. Bawazir's life and improving his health. He was given 750 cc of nutrients and 500 cc of water twice a day. Contrary to the petitioner's attorney's declaration, Mr. Bawazir only received just over 1 liter per day through the feeding process; not the 8 bottles as alleged in the declaration. Mr. Bawazir also had four documented cases of clinical sinusitis while the tube was kept in place, as previously mentioned. Therefore, the removal of the feeding tube after each feeding made good clinical sense. Accordingly, he has not suffered from clinical sinusitis since the initiation of the "in and out" feedings.

21. I am also aware that at no time was Mr. Bawazir ever placed in solitary confinement as alleged in the petitioner's motion. There are no areas within the JTF-GTMO that meet the definition of solitary confinement. On January 16, 2006, he was moved to the Mental Health Ward in the detainee hospital, where he stayed for four days. At that time, the Mental Health

11

Ward was being used exclusively to house enterally fed hunger strikers; not mental health patients. Patients in the Mental Health Ward, including Mr. Bawazir while he was there, have unrestricted access to a toilet as necessary. Mr. Bawazir is currently in the general detainee population, being housed in an individual cell like other detainees in his cellblock. All of the locations at which Mr. Bawazir has been detained have multiple opportunities for daily human contact. He was never the only detainee in the Mental Health Ward or in his current cellblock. He has not been denied exercise or intellectual stimulation. He is able, and has been able, to communicate and visit with his attorneys. The temperature in the Mental Health Ward was never regulated to be "unbearably cold" while Mr. Bawazir was there as alleged in the petitioner's motion. I personally insist that facilities under my charge are kept at temperatures that are conducive for the retention of body heat and comfortable for the detainee. Mr. Bawazir also was permitted regular access to a toilet while in the Mental Health Ward. Great efforts have been made to create an environment that is conducive to the health and life of the detainees.

22. Mr. Bawazir has never been enrolled in Behavioral Health Services (BHS). However, he has been seen by BHS in the context of being a hunger striker. BHS regularly evaluates every individual that is identified as a hunger striker. BHS performs an initial assessment, routine follow-ups, and a final assessment when they are being removed from the hunger strike list. Mr. Bawazir was seen seven times between August 15, 2005, and January 23, 2006. He was uncooperative and refused assessment the majority of the time. However, on the 3 occasions when he allowed BHS to evaluate him, he never claimed that he was suicidal, and did in fact state that he was on hunger strike to "get medical treatment" versus attempting to cause bodily harm from starvation. He did, in fact, deny any suicidal or homicidal ideation during his final

12

evaluation on January 23, 2006. Mr. Bawazir is not currently receiving any Behavioral Health Services.

23. Medical records show that Mr. Bawazir ended his hunger strike on or about January 24, 2006. He continues to eat and is in good health, both mentally and physically. He is above his Ideal Body Weight (IBW) and out of any serious medical danger due to his prior, prolonged hunger strike. A staff physician last evaluated Mr. Bawazir on February 26, 2006. He continues to eat the nutritional meals regularly provided for him. His body weight remains at an ideal level. His present weight is 137.5 pounds (101% of his IBW). His physical health remains good and mentally he appears to be in high spirits. In fact, he is exercising and participating in recreational activities, including playing soccer.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true, accurate, and correct.

*Stephen G. Hooker*
**STEPHEN HOOKER, MD**
Captain, Medical Corps, U.S. Navy
Officer-in-Charge
JTF-Guantanamo Detention Hospital
Executed on: _1 March 2006_

13



440