**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MOHAMMED AL-ADAHI, <u>et</u> <u>al.</u>, | : |
| | : |
| Petitioners, | : |
| | : |
| v. | :   **Civil Action No. 05-280 (GK)** |
| | : |
| BARACK H. OBAMA, <u>et</u> <u>al.</u>,[1] | : |
| | : |
| Respondents. | : |
| | : |

<u>**MEMORANDUM OPINION**</u>

Petitioners Mohammad Ali Abdullah Bawazir (ISN 440) and Zahir Omar Khamis Bin Hamdoon (ISN 576) have been detained at the United States Naval Base at Guantanamo Bay, Cuba, since shortly after the terrorist attacks of September 11, 2001.  They both have habeas corpus petitions pending before the Court.  Petitioners bring this action against Respondents in order to enjoin certain treatment that they are undergoing as a result of the voluntary hunger strikes they have undertaken to protest their lengthy detentions without judicial scrutiny of the legality of such detentions.

The matter is before the Court on Petitioners' Renewed Emergency Motion for Injunction Against Further Torture of Mohammed Bawazir ("Renewed Emergency Mot.") [Dkt. No. 234].[2]  Upon

---

[1]     Former President George W. Bush was named as the original lead respondent in this case.  Pursuant to Federal Rule of Civil Procedure 25(d), the Court automatically substitutes his successor, President Barack H. Obama, as the new lead respondent.

[2]     On January 22, 2009, Petitioner Hamdoon requested [Dkt. No. 258] to Join Petitioner Bawazir's Motion, and the request was
(continued...)

consideration of the Motion, Opposition, Reply, supplemental filings, oral argument, and the entire record herein, and for the reasons set forth below, Petitioners' Renewed Emergency Motion is **denied.**

**I.   BACKGROUND**

   **A.   Procedural Background**

On February 7, 2005, five detainees (including Bawazir and Hamdoon) filed a petition for habeas corpus [Dkt. No. 1] in the above-captioned case.  The Court's jurisdiction to consider these petitions underwent a series of challenges.  Eventually, the Supreme Court confirmed that non-citizen detainees at Guantanamo Bay alleged by the Government to be enemy combatants do have the Constitutional right to petition federal courts for habeas relief in order to challenge the legality of their detention.  See Boumediene v. Bush, 128 S.Ct. 2229 (2008).

While these issues were being litigated, Petitioners' counsel sought greater access to their clients, as they became concerned over reports of hunger strikes at Guantanamo Bay.[3]  See Pets.' Mot. to Compel Access to Counsel and Information Related to Medical Treatment (Sept. 20, 2005) [Dkt. No. 49].  After briefing and oral

_____

   [2](...continued)
granted.  See Minute Order, Jan. 26, 2009.

   [3]    The Government designates detainees as hunger-strikers after they have missed nine consecutive meals.  Decl. of Captain Bruce C. Meneley, M.D. (Aug. 22, 2008) ("August Meneley Decl."), at ¶ 12 (Ex. F to Gov's Opp'n (Jan. 23, 2009)).

argument, the Court entered an Order [Dkt. No. 62] that required Respondents to "provide notice to Petitioners' counsel within 24 hours of the commencement of any forced feeding of their clients," and to provide medical records for those detainees being force-fed. Order (Oct. 25, 2005).

In the wake of that Order, Petitioner Bawazir asked the Court on February 28, 2006 [Dkt. No. 68] to provide non-habeas relief to improve the conditions under which he was being held at Guantanamo Bay.  See Emergency Mot. for Preliminary Inj. Against Further Torture of Mohammed Bawazir ("Original Emergency Mot.") [Dkt. No. 68].  On March 9, 2007, Petitioner's counsel learned of additional evidence of hunger-striking, and renewed their Original Emergency Motion. [Dkt. No. 96].  The two Emergency Motions were denied without prejudice on March 10, 2008, pending resolution of the jurisdictional issue presented in Boumediene, which was then pending in the Supreme Court.  See Order (Mar. 10, 2008) [Dkt. No. 123].

On January 8, 2009, Petitioner filed a Renewed Emergency Motion seeking injunctive relief.  The Motion was supplemented on January 9, 2009 [Dkt. No. 236] and January 22, 2009 [Dkt. No. 257]. The Government filed Oppositions on January 12, 2009 [Dkt. No. 239] and January 23, 2009 [Dkt. No. 260].  On January 22, 2009, Petitioner Hamdoon joined Petitioner Bawazir's Motion.  On January 26, 2009, the Court held a lengthy motions hearing.

-3-

B.    **Factual Background**

On January 7, 2009, counsel for Petitioner Bawazir learned that Respondents had resumed force-feeding their client in November of 2008.[4]  In the same week, on January 12, 2009, counsel learned that Petitioner Hamdoon had been force-fed since January 6, 2009; in addition, Hamdoon had undergone forced-feeding in the period between November 8 and December 21, 2008.  See Pet. Hamdoon's Mot. to Join, at 1-2.  Petitioners' counsel did not receive, in a timely fashion, the notice or medical records to which they were entitled under the Court's Order of October 25, 2005.[5]

Parties do not dispute that Respondents' method for forced-feeding is to strap a hunger-striking detainee into a restraint-chair, with straps tightly restraining his arms, legs, chest, and

---

[4]    It is unclear exactly when this round of forced-feeding began.  In his Renewed Emergency Motion, Petitioner says that the enteral feeding resumed on November 18, 2008, see Renewed Emergency Mot., at 2.  After speaking directly to Petitioner Bawazir, counsel filed a motion to join Petitioner Hamdoon; in that Motion, they report that Respondents resumed enteral feeding on November 14, 2008.  Pet. Hamdoon's Mot. to Join, at 1.  The Court's independent review of the medical records provided as Exhibit A at oral argument indicate that forced-feeding dated back to at least November 16, 2008.  See Exhibit A, Progress Notes for ISN 440, Nov. 16, 2008 (ISN 440 (12 Jan 2008) 001896-99).

[5]    Incredible as it sounds, the Government admitted it had no formal system in place for tracking court orders, and simply relied on receiving emails from individual lawyers working at the Department of Defense or at the Department of Justice to issue reminders to comply with the orders.  See Decl. of Commander Don A. Martin ("Martin Decl."), at ¶ 4-5 (Ex. H to Gov's Opp'n (Jan. 23, 2009)); see also Oral Arg. (Jan. 26, 2009) (telephonic testimony of Commander Martin).

forehead, and to administer a nutritional formula via a feeding tube inserted through one nostril.  The process of administering the formula usually takes approximately one hour.  <u>See</u> Renewed Emergency Mot., at 2; Gov's Opp'n (Jan. 23, 2009), at 8-9 (citing August Meneley Decl., at ¶ 4).

Parties do not agree on the need to restrain these Petitioners in such a restraint-chair.  Moreover, at times, they have disagreed about whether the feeding tube should be left in place between enteral feedings.[6]

In response to Petitioners' claims, Respondents recite the circumstances that led to the restraint-chair policy, including a history of resistance by detainees and assaults against staff, and the consideration of several other less restrictive methods of force-feeding the hunger-strikers.  <u>See</u> Gov's Opp'n (Jan. 23, 2009), at 4-8.  In doing so, they cite to several sworn declarations made by staff at Guantanamo Bay, attesting to the need to use restraints and their policy of using such restraints in a "safe and humane manner."  Gov's Opp'n (Jan. 23, 2009), at 9; <u>see, e.g.,</u> Supplemental Decl. of Major General Jay W. Hood ("Supp. Hood. Decl.") (Ex. 3 to Gov's Supp. Memo. in Opp'n to Pet.'s Original

---

[6]     After briefing this issue and requesting that the Court order the nasal-gastric tube to remain in place between feedings, <u>see</u> Renewed Emergency Mot., at 2-3; Proposed Order, Petitioners withdrew this request at oral argument, <u>see</u> Oral Arg. (Jan. 26, 2009), presumably because they recognized that leaving the tube in place was causing its own set of medical problems, i.e., sinusitis, bacterial infection, irritation, etc.

Emergency Mot. (Mar. 13, 2006) [Dkt. No. 74]); Decl. of Captain
Bruce C. Meneley, M.D. ("Meneley Decl.") (Ex. E to Gov's Opp'n
(Jan. 23, 2009)); Martin Decl.   Respondents maintain that the
restraint-chair policy is necessary to keep both detainees and
staff as safe as possible during enteral feeding, that the feeding
is not any more painful than required, and that the feeding tube is
removed from Petitioner Bawazir and re-inserted twice a day because
leaving it in between feeding has caused him sinus infections and
discomfort.   Gov's Opp'n (Jan. 23, 2009), at 10-12.

Petitioner Bawazir represents that he is compliant with
enteral feeding, and therefore the restraint-chair is unnecessary.
Renewed Emergency Mot., at 2-3.   Compounding the pain and upsetting
nature of this excessive treatment, Petitioners maintain, is the
fact that military personnel have begun to administer the enteral
feeding rather than medical personnel.   Id. (citing Decl. of Ramzi
Kassem (Ex. A and B to Pets.' Supp. to Renewed Emergency Mot. (Jan.
9, 2009)); see also Decl. of Kristin B. Wilhelm (Ex. A to Pet.
Hamdoon's Mot. to Join).

Further, the parties agree that both Petitioners suffered
medical problems (although not necessarily related to the forced-
feeding) that required additional treatment: Petitioner Bawazir
suffered from sinusitis and hemorrhoids, while Petitioner Hamdoon
suffered from tonsilitis.   Oral Arg. (Jan. 26, 2009).   Petitioner
Bawazir alleges that hunger-striking detainees are denied medical

treatment "unless and until they end their hunger strike."  Pet. Hamdoon's Mot. to Join, at 3.  The Government insists that medical care is not withheld punitively, and has provided Petitioners' counsel with their medical records, maintained by Guantanamo Bay staff, to disprove that allegation.  Ex. A and B to Oral Arg. (Jan. 26, 2009).

## II.  STANDARD OF REVIEW

Courts may grant a preliminary injunction only if the movant "demonstrate[s] (1) a substantial likelihood of success on the merits, (2) that he would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction."  Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001).  These factors must be balanced against one another in determining if an injunction will be granted. See CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995) ("In deciding whether to grant an injunction, the district court must balance the strengths of the requesting party's arguments in each of the four required areas.").

Recently, the Supreme Court has refined what the movant's burden is in meeting this standard.  The Court stressed that the party seeking the injunction must show that success on the merits and irreparable harm are likely, not merely possible.  See Winter

v. Natural Res. Def. Counsel, ___ U.S. ___, 129 S.Ct. 365, 375
(2008); Munaf v. Geren, ___ U.S. ___, 128 S.Ct. 2207, 2219 (2008).
Preliminary injunctive relief, such as that which is requested
here, the Court emphasized, "is an 'extraordinary and drastic
remedy.'" Munaf, 128 S.Ct. at 2219; see Winter, 129 S.Ct. at 379.
Further, the Winter Court gave particular weight, albeit in a
different factual context, to the fact that "[courts] give great
deference to the professional judgment of military authorities
concerning the relative importance of a particular military
interest." Winter, 129 S.Ct. at 377 (internal citation omitted).

## III. ANALYSIS

The Court wishes to emphasize, at the very beginning of its
analysis, how seriously it has weighed the allegations made by
Petitioners.  The detainees at Guantanamo Bay have waited many long
years (some have waited more than seven years) to have their cases
heard by a judge so that the legality of their detention could be
adjudicated in a court of law.  During that time they, like all
prisoners, have remained at the mercy of their captors.  From all
accounts -- those presented in classified information the Court has
had access to, in affidavits of counsel, and in reports from
journalists and human rights groups -- their living conditions at
Guantanamo Bay have been harsh.  There have been several episodes
of widespread protests by the detainees, and many of them have
engaged in hunger strikes of both short-term and very long-term (5

years and more) duration.  Many detainees have complained of brutal treatment, lack of medical care, and long placements in solitary confinement.  To this Court's knowledge, none of these allegations, or the Government's denials, have been fully tested and subjected to the rigors of cross-examination in open court.  They may never be.

Despite being painfully aware of this situation, the Court must -- if it is to carry out its obligation to faithfully follow the rule of law -- apply the well-established legal principles set forth above that govern Petitioners' request for injunctive relief. The first requirement, that the moving party demonstrate a substantial likelihood of success on the merits, is the most weighty.  For the reasons spelled out in this Opinion, Petitioners cannot succeed on the merits of their claims:  this Court lacks jurisdiction and therefore does not have the authority to grant the relief they request.

## A.  Petitioners' Claims Are Unlikely to Succeed on the Merits Because the Court Lacks Jurisdiction and Because the Government Has Not Acted with "Deliberate Indifference."

As noted, courts are instructed to balance the four prongs of the preliminary injunction standard in making their decisions.  The first prong, however, weighs more heavily than the others and has been described as the most significant.  See Katz, 246 F.3d at 688 (citing to Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996) for proposition that "[l]ikelihood of

success is the main bearing wall of the four-factor framework.").[7]
While each prong of the preliminary injunction standard will be
addressed, the Court places particular weight on the first because
of the substantial likelihood that Petitioners will not succeed on
the merits, as well as the relative weakness of their arguments on
the third and fourth factors.  For the reasons discussed below,
Petitioners have not demonstrated that they are likely to prevail
on the merits of their claims.

> **1.   The Military Commissions Act of 2006 Denies
> Jurisdiction to Rule on Petitioners' Conditions of
> Confinement Claim.**

Section 7 of the Military Commissions Act of 2006 ("MCA"),
Pub. L. 109-366, Oct. 17, 2006, 120 Stat. 2600, amends 28 U.S.C.A.
§ 2241.  This section of the MCA deals with the right of enemy
combatants to bring habeas corpus petitions, and to ask for relief
related to their conditions of confinement; § 2241(e)(1), its first
sub-section, was the provision under review in <u>Boumediene</u>.  The
amendment to its second sub-section, § 2241(e)(2), strips federal
courts of jurisdiction as to "any other action against the United
States . . . relating to any aspect of the detention, transfer,
treatment, trial, or conditions of confinement."  Petitioners seek
an injunction to alter the conditions under which they are force-

---

[7]      For example, in <u>Katz</u>, the court explained that "[g]iven
the inadequacy of [Dr. Katz]'s prospects for success on the merits,
there may be no showing of irreparable injury that would entitle
him to injunctive relief."  246 F.3d at 688 (internal citation and
quotations omitted).

fed and provided medical treatment.  The relief they seek clearly falls under § 2241(e)(2).  <u>See</u> <u>In re Guantanamo Bay Detainee Litigation</u>, 577 F.Supp.2d 312, 314 (D.D.C. 2008) (Hogan, J.) (finding that request for blanket and pillow in cell "directly 'relat[es]' to Petitioner's 'detention, . . . treatment, . . . or conditions of confinement,'" under § 2241(e)(2)).  If this section of the MCA remains valid after the decision in <u>Boumediene</u>, the Court has no jurisdiction to decide this Motion.

Petitioners challenge the validity of § 2241(e)(2) by arguing that the Supreme Court ruled all of Section 7 of the MCA unconstitutional in <u>Boumediene</u>.  Their challenge must fail.  Although the Court, <u>infra</u>, resolves the question of jurisdiction by reference to the explicit language of <u>Boumediene</u>, case law, and canons of statutory interpretation, the issue is not absolutely clear-cut.  However, any difficulty resolving the jurisdictional issue only argues in favor of denying Petitioners' request.  <u>See</u> <u>Munaf</u>, 128 S.Ct. at 2219 (noting that difficult jurisdictional issues make "success more <u>unlikely</u> due to potential impediments to even reaching the merits") (emphasis in original).

<u>Boumediene</u> struck down as unconstitutional § 2241(e)(1), which denied detainees the right to habeas corpus review in federal court. <u>See</u> 128 S.Ct. at 2240 (holding that appellate review of detainees' status not "adequate and effective substitute for habeas corpus").  In doing so, the Supreme Court, in clear and direct

language, refused to address "the reach of the writ with respect to claims of unlawful conditions of treatment or confinement." <u>Id.</u> at 2274. Those are precisely the claims which Petitioners raise in the pending Motion.

In addition to the Supreme Court's own language, there is a presumption that when a court invalidates a statute as unconstitutional, it does so on grounds drawn as narrowly as possible. <u>See</u> <u>Ayotte v. Planned Parenthood of Northern New England</u>, 546 U.S. 320, 329 (2006) ("[W]e try not to nullify more of a legislature's work than is necessary . . . ."). Rather than using expansive language in striking down § 2241(e)(1), the <u>Boumediene</u> Court went out of its way to include the limiting language quoted above. Consequently, this Court must follow the lead of the Supreme Court and "refrain from invalidating more of the statute than is necessary whenever an act of [C]ongress contains unobjectionable provisions separable from those found to be unconstitutional." <u>Alaska Airlines, Inc. v. Brock</u>, 480 U.S. 678, 684 (1987) (internal alterations and quotations omitted).

Finally, the Court finds persuasive the analysis of other judges in this District who have also considered the issue. Three judges have now ruled that <u>Boumediene</u> did not invalidate § 2241(e)(2). <u>See</u> <u>In re Guantanamo Bay Detainee Litigation</u>, 570 F.Supp.2d 13, 17-19 (D.D.C. 2008) (Urbina, J.) (rejecting under <u>Alaska Airlines</u> argument that court could invalidate § 2241(e)(2)

under <u>Boumediene</u>); <u>In re Guantanamo Bay Detainee Litigation</u>, 577 F.Supp.2d at 313 (Hogan, J.) (noting "long-standing rule of severability" applies); <u>Khadr v. Bush</u>, ___ F.Supp.2d ___, 2008 WL 4966523, at *6-8 (D.D.C. 2008) (reasoning that narrowing language in <u>Boumediene</u> "supports the conclusion that the Supreme Court meant only to invalidate subsection (e)(1)").

Petitioners, in arguing to the contrary, read <u>Boumediene</u> to invalidate both § 2241(e)(1) and § 2241(e)(2), and invoke our Court of Appeals' recent decision in <u>Bismullah v. Gates</u>, ___ F.3d ___, 2009 WL 48149 (D.C. Cir. 2009), to support their statutory interpretation. <u>See</u> Pets.' Supplemental Memo. in Further Support of Mot. (Jan. 22, 2009) ("Pets.' Jurisdiction Memo.") [Dkt. No. 257], at 4 n.2. Although there is one sentence in <u>Boumediene</u> which could be read to support Petitioners' position, <u>see</u> 128 S.Ct. at 2240 ("Therefore § 7 of the Military Commissions Act of 2006 (MCA), 28 U.S.C.A. § 2241(e) (Supp.2007), operates as an unconstitutional suspension of the writ."), the thrust of the opinion clearly deals with the Constitutionality of § 2241(e)(1) and its suspension of the writ of habeas corpus. <u>See</u> <u>id.</u> at 2244-47 (discussing history of writ as representing "freedom from unlawful restraint" and "vital instrument for the protection of individual liberty"); 2262 (discussing holding with reference to "privilege of habeas corpus" and ability to "challenge the legality of . . . detention"); 2265-67 (striking down Congress' efforts to substitute another remedy

for habeas corpus after engaging in jurisdiction-stripping under § 2241(e)(1)).

Thus, even though the one sentence Petitioners rely upon could have been drafted more narrowly to explicitly cover only § 2241(e)(1), the Court concludes that the Supreme Court's direct disavowal of reaching any conclusion about the validity of § 2241(e)(2), Boumediene, 128 S. Ct. at 2274, must overcome any ambiguity in that sentence.[8]

Further, the circumstances in Bismullah are distinguishable from this case.  In Bismullah, the Court of Appeals inquired into Congressional intent to enact both § 2241(e)(1), which stripped district courts of habeas jurisdiction, as well as § 1005(e)(2) of the Detainee Treatment Act ("DTA"), Pub.L. 109-148, 119 Stat. 2739, which gave the Court of Appeals "exclusive" jurisdiction to review administrative trials at Guantanamo Bay.  Bismullah, 2009 WL 48149, at *3.  Once Boumediene struck down § 2241(e)(1), the Court of Appeals was faced with the question of whether Congress would have enacted the DTA provision had it known that its efforts to strip habeas jurisdiction in § 2241(e)(1) were unconstitutional.  Id. at *2.

---

[8]     As is well known, much of the Guantanamo Bay litigation has raised profound questions about the meaning of our Constitution and the powers of all three branches of government.  Much of that litigation has taken place under enormous time pressures. Occasionally, a sentence in a written opinion, even from the Supreme Court, may slip through that is not quite as tightly crafted as, from hindsight, might be desirable.

The Court of Appeals held that had Congress known that the jurisdiction-stripping was unconstitutional, i.e., that district courts could not be denied the jurisdiction to review habeas claims, then it would not have also provided for the "largely duplicative process" of appellate review. Id. at *6. The Court of Appeals overcame the presumption of severability in part because the restoration of habeas jurisdiction undercut the intent of Congress to give the Court of Appeals exclusive jurisdiction over a detainee's challenge to his detention. See id. at *3 ("Therefore, DTA review, by opening an avenue of relief alongside the writ of habeas corpus, can no longer 'function in a manner consistent with the intent of Congress.'" (internal citation omitted)).

Here, on the other hand, the two provisions of § 2241(e) do not flow from a common Congressional intent, i.e., limiting judicial review of detention. Rather, § 2241(e)(1) dealt with challenges to the legal justification for detention, whereas § 2241(e)(2) deals with challenges to "aspect[s]" of that detention, namely the conditions of such detention. The two sub-sections address separate and distinct topics, and thus reflect a statutory scheme unlike the one considered in Bismullah where one section (§ 1005(e)(2)) was meant to complement another

(§ 2241(e)(1)).[9]   In other words, unlike the duplicative and contradictory scheme that the Bismullah Court analyzed, there is reason to believe that the "legislature [would] have preferred what is left of [this] statute to no statute at all[.]"  Ayotte, 546 U.S. at 330.

### 2.   Even Assuming this Court Has Jurisdiction, Petitioners Likely Cannot Show that They Were Treated with "Deliberate Indifference."

The Supreme Court has held that "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."  Farmer v. Brennan, 511 U.S. 825, 828 (1994).  To determine whether an official acted with such indifference, courts look to the official's subjective awareness of the risk.  Id. at 847 ("[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.").  Additionally, courts facing these issues must be mindful of the limits of their

---

[9]   Nonetheless, the reasoning in Bismullah does apply to a related area of analysis.  Petitioners maintain that Congress' apparent contemplation and rejection of a severability clause in the MCA represents "further proof of the fact that § 2241(e)(1) is not severable from § 2241(e)(2)."  Pets.' Jurisdiction Memo., at 4. Bismullah relies on Alaska Airlines, 480 U.S. at 686, in observing that, "[t]he Congress's failure to include a non-severability clause does not create a presumption of severability, any more than the absence of a severability clause implies non-severability." 2009 WL 48149, at *4.

expertise in evaluating prison policies.  A regulation that "impinges on inmates' constitutional rights" may still be valid if "it is reasonably related to legitimate penological interests." Turner v. Safely, 482 U.S. 78, 79 (1987).

At oral argument, the parties agreed that for a court to intervene in conditions of confinement decisions, the actions of the prison staff must demonstrate "deliberate indifference" to the detainee's well-being.  Oral Arg. (Jan. 26, 2009); see O.K. v. Bush, 344 F.Supp.2d 44 (D.D.C. 2004).  Petitioners do not in this most recent round of motions make an explicit argument that their treatment amounts to a Constitutional violation, but their past arguments on similar facts, as well as their current allegations of severe mistreatment, suggest as much.  See Original Emergency Mot., at 10-12; Renewed Emergency Mot., at 3 (arguing that alleged Government action "would constitute torture").  Assuming, then, that a Constitutional violation is being asserted, the Court must determine whether there is a likelihood that their alleged mistreatment at the hands of the Respondents represents "'deliberate indifference' to the detainee's 'serious medical needs.'" O.K., 344 F.Supp.2d at 61 (internal citations omitted).

Courts considering similar cases have found that force-feeding hunger-strikers, or the use of a restraint-chair, does not in and of itself sink to the level of deliberate indifference.  See Grand Jury Subpoena John Doe v. United States, 150 F.3d 170, 172 (2d Cir.

1998) ("[force-feeding] order does not violate a hunger-striking prisoner's constitutional rights"); <u>Fuentes v. Wagner</u>, 206 F.3d 335, 345 (3d Cir. 2000) (reasoning that restraint-chair not per se violation of Eighth Amendment, but can rise to that level if used with "sufficiently culpable state of mind").

Without resolving all factual disputes before the Court, it is clear that Respondents' treatment of these Petitioners does not approach "deliberate indifference."  Respondents are acting out of a need to preserve the life of the Petitioners rather than letting them die from their hunger strikes.  The use of the restraint-chair has been determined to be necessary to achieve that end.  It is standard policy to use the restraints on all hunger-striking detainees, <u>see</u> August Meneley Decl., at ¶ 13, with less restraint used for those who, like Petitioner Bawazir, are compliant, <u>see</u> Oral Arg. (Jan. 26, 2009).[10]  Use of the chair has been vetted by officials from the Bureau of Prisons, is overseen by professional medical staff, and was initiated by Respondents only after using less restrictive measures that were met with resistance from detainees.  <u>See</u> Supp. Hood Decl., at ¶¶ 7-10.

Although there is evidence that Petitioners were kept in the restraint-chair for a longer period than Respondents admit to, <u>see, e.g.</u>, Oral Arg. (Jan. 26, 2009); August Meneley Decl., at ¶13

---

[10]   Because Petitioner Bawazir has become compliant, Respondents use only five of the six restraints which are available.  Oral Arg. (Jan. 26, 2009).

("This [feeding] process normally lasts less than an hour."); Restraint Observation Sheet for ISN 440, Jan. 7, 2009 (ISN 440 (12 Jan 2008) 001601) (Petitioner Bawazir in chair from 7:34 a.m. to 9:35 a.m.); Restraint Observation Sheet for ISN 576, Dec. 8, 2008 (ISN 576 000153) (Petitioner Hamdoon in chair from 8:10 a.m. to 10:01 a.m.), such extended periods of force-feeding and restraint do not in and of themselves reflect deliberate indifference.  See Fuentes; see also Birdine v. Gray, 375 F.Supp.2d 874 (D.Neb. 2005).

Petitioners charge that use of the restraint-chair despite their compliance with enteral feeding, and the withholding of medical treatment to prevent hunger-striking, run afoul of the Constitution.  The "withholding charge," however, is belied by the extensive medical records -- entered as exhibits at oral argument by the Respondents -- documenting treatment Petitioners have been given.  Although the care provided may not at all times have risen to the level of care provided at Johns Hopkins Hospital or the Mayo Clinic, it was responsive to complaints, was consistently administered, resolved many of those complaints, and does not appear to have been withheld punitively.  Based on the existing record, it cannot be said that Respondents' medical treatment of Petitioners constituted deliberate indifference.  See, e.g., Chronological Record of Medical Care for ISN 576, Jan. 5, 2009 (ISN 576 000043) (refusing medical treatment); JTF-GTMO Medication Administration Records for ISN 576, Nov. 2008 (ISN 576 000067-73)

-19-

(detailing feeding records and prescriptions); Medical Record for ISN 440 (ISN 440 (12 Jan 2008) 001900) (detailing medical treatment).[11]

As noted, the restraint-chair is used as a matter of policy to protect staff and detainees; restraints are lessened for compliant detainees like Bawazir. Oral Arg. (Jan. 26, 2009). Petitioners insist that the use of the chair on a compliant detainee amounts to such an unnecessary and painful restriction that it is tantamount to torture.[12] See Oral Arg. (Jan. 26, 2009); Renewed Emergency Mot., at 2. Resolution of this issue requires the exercise of penal and medical discretion by staff with the appropriate expertise, and is precisely the type of question that federal courts, lacking that expertise, leave to the discretion of those who do possess such expertise. See, e.g., Bell v. Wolfish, 441 U.S. 520, 562 (1979) ("[T]he inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution . . . ."); Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754 (3d Cir.

---

[11]     It should be noted that on a number of occasions, Petitioners refused either the diagnostic examinations they needed or the medical treatment that was offered.

[12]     Curiously, neither party devotes any serious attention in their pleadings to the definition of "torture" and whether the conduct in question meets that definition. Given the parties' avoidance of the issue, as well as the conclusion that the Court lacks jurisdiction, it is not necessary to reach the issue.

1979) (refusing to "second-guess" medical judgment of prison doctors).

### B. Petitioners Have Not Shown They Would Suffer Irreparable Harm if an Injunction Is Not Granted.

To prevail on this factor, Petitioners must demonstrate not merely a possibility of irreparable injury, but that such an injury is "<u>likely</u> in the absence of an injunction." <u>Winter</u>, 129 S.Ct. at 375 (emphasis in original).

Petitioners do not allege that use of the restraint-chair poses a risk of death or grave danger or permanent injury to Petitioners. Oral Arg. (Jan. 26, 2009). In advancing the best interests of their clients, they urge in the strongest possible terms that the conditions of their clients' confinement are painful, unnecessary, and must be improved. It remains the case, however, that the treatment of these two Petitioners -- namely, the use of a restraint-chair for forced-feeding -- does not in and of itself demonstrate that irreparable injury is likely. Short of establishing this, Petitioners cannot prevail on this factor.[13]

Additionally, Respondents have demonstrated that they are delivering the regular medical care that the declarations attest to. <u>Cf.</u> Meneley Decl., at ¶¶ 6-12. In the medical records entered

---

[13] The Court does not minimize what Petitioners are suffering. It is impossible to fully assess the extent of any such suffering they may be experiencing without exposing them to the searchlight of in-person testimony and cross-examination. However, they have chosen to express their protest by engaging in a hunger strike. It is the obligation of the Government to keep them alive.

as exhibits at oral argument, Petitioners' medical requests and treatment appear to have been contemporaneously reduced to writing. They contain detailed records of each enteral feeding as well as "Chronological Records of Medical Care." The records appear to reflect attention to medical requests and vital health information. See, e.g., Daily Vital Signs and Calorie Count (2008) (ISN 440 (12 Jan 2008) 001930-33; ISN 576 000364-368). For instance, the records document Petitioner Bawazir's complaints of hemorrhoids-related pain, as well as his refusal to undergo evaluation for that condition. See Chronological Record of Medical Care (ISN 440 (12 Jan 2008) 001905). At oral argument, counsel for Respondents outlined the treatment that Petitioner Hamdoon has received for throat pain. Oral Arg. (Jan. 26, 2009).

Given the strength of the other three factors which must be balanced when considering issuance of a preliminary injunction -- particularly the weakness of the first factor discussed above -- Petitioners' arguments on irreparable harm do not entitle them to the extraordinary remedy of injunctive relief.

**C.   The Government May Well Suffer Substantial Injury If the Injunction Is Granted.**

Respondents have demonstrated, based on prior experience, that significant harm could befall medical and security staff at Guantanamo Bay if the injunction is granted. As noted, military authorities implemented the feeding protocols in order to prevent long-term harm to the detainees; the protocols also responded to a

concern for the safety of medical personnel implementing the forced feeding. According to unchallenged factual representations made by the Government, some hunger-striking detainees, including Petitioners, have been assaultive to medical staff and guards during attempts to feed them enterally. See id. It was reasonable and professionally responsible for Respondents to have consulted with officials from the Bureau of Prisons in implementing security policies to minimize this danger. See Supp. Hood Decl., at ¶ 7-8. An injunction that interferes with the restraint-chair protocols for these Petitioners -- however compliant they may be at the moment -- could endanger medical staff in the future if Petitioners become combative or assaultive.

In addition, the possibility that granting the injunction could provide other detainees with a roadmap of how to evade the restraint-chair policy. In such a scenario, the medical staff would be left in the same position as it was before any restraints were used: vulnerable to concerted efforts by detainees to use the forced-feeding as an opportunity to inflict harm on medical and military personnel. See Gov's Opp'n (Jan. 23, 2009), at 6 (outlining detainee resistance by referring to declarations of Guantanamo Bay personnel). The restraint-chair is used to keep both the detainee and the staff as safe as possible. Any order to prohibit its use could upset the balance of security that

Respondents have worked -- and, unlike the Court, have been trained -- to achieve.

   **D.   The Public Interest Would Not Be Furthered by Issuance of an Injunction.**

   In light of the previous discussion, the Court concludes that Petitioners have failed to demonstrate that barring the use of a restraint-chair for them would further the public interest.

## IV.   CONCLUSION

   For the reasons set forth above, the fact that Petitioners cannot satisfy one of the pre-requisites to the granting of a preliminary injunction, namely, that there is a substantial l]ikelihood of success on the merits, far outweighs all other considerations.  Accordingly, their Renewed Emergency Motion [Dkt. No. 234] is hereby **denied.**


February 10, 2009                 /s/_____
                                  Gladys Kessler
                                  United States District Judge


**Copies via ECF to all counsel of record**