UNCLASSIFIED//FOR PUBLIC RELEASE.

FILED WITH THE
COURT SECURITY OFFICER
CSO:
DATE:



## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOHAMMED AL-ADAHI, et al., | : |
| | : |
| | : |
| Petitioners, | : |
| | : |
| v. | : Civil Action No. 05-280 (GK) |
| | : |
| BARACK H. OBAMA, et al., | : |
| | : |
| Respondents. | : |
| | : |

### MEMORANDUM OPINION

Petitioner Mohammed Al-Adahi ("Al-Adahi" or "the Petitioner") has been detained since 2002 at the United States Naval Base at Guantanamo Bay Cuba. Respondents ("the Government") argue that his detention is justified under the Authorization for the Use of Military Force, Pub. L. No. 107-40 § 2(a), 115 Stat. 224, 224 (2001) ("AUMF"), which grants the Executive the power to detain individuals engaged in certain terrorist activities. The Petitioner disagrees, and has, along with four other petitioners, filed a petition for a writ of habeas corpus [Dkt. No. 1].

The matter is before the Court on Cross-Motions for Judgment on the Record [Dkt. Nos. 373 and 379].[1] Upon consideration of the

---

[1]     Two of the five Petitioners, ████████████ and ████████████ did not file Motions for Judgment on the Record.  Two others, ████████████ did file such a Motion, but their cases were stayed during Al-Adahi's Hearing.  Order (June 25, 2009) [Dkt. No. 430].

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

2 ▮▮▮▮▮▮

Motions, the Oppositions, extensive oral argument and accompanying exhibits, and the entire record herein, Al-Adahi's habeas corpus petition and Motion are hereby **granted**.

## I.   BACKGROUND

### A.   Procedural History

Petitioner filed his habeas corpus petition on February 7, 2005.  After filing, there was extensive preliminary litigation regarding the Court's jurisdiction to entertain detainees' petitions, the applicability of various statutes, and the appropriate procedures to be used.

After more than six years of litigation, the most important legal issue was resolved by the Supreme Court in Boumediene v. Bush, 553 U.S. __, 128 S.Ct. 2229 (2008).  The Court ruled that detainees at Guantanamo Bay, none of whom are citizens of the United States, are entitled to bring habeas petitions under Article I of the Constitution, and that the federal district courts have jurisdiction to hear such petitions.

The Court did not define what conduct the Government would have to prove, by a preponderance of the evidence, in order to justifiably detain individuals -- that question was left to the District Courts.  Id. at 2240 ("We do not address whether the President has the authority to detain these petitioners nor do we hold that the writ must issue.  These and other questions regarding

-2-

2 ███████

the legality of the detention are to be resolved in the first instance by the District Court."). Nor did the Supreme Court lay down specific procedures for the District Courts to follow in these cases.

Boumediene was, however, definitive on at least two points: first, that the detainees are entitled to a prompt hearing, 128 S.Ct. at 2275 ("The detainees in this case are entitled to a prompt habeas corpus hearing."), and second, that the District Courts are to shape the contours of those hearings, id. at 2276 (finding that balancing protection of the writ and the Government's interest in military operations, "and the other remaining questions[,] are within the expertise and competence of the District Court to address in the first instance.").

In an effort to provide the prompt hearings mandated by the Supreme Court, many of the judges in this District agreed to consolidate their cases before former Chief Judge Thomas Hogan, for purposes of streamlining procedures for, and management of, the several hundred petitions filed by detainees. See Order (July 1, 2008) [Civ. No. 08-442, Dkt. No. 1]. On November 6, 2008, after extensive briefing from Petitioners' counsel and the Government, Judge Hogan issued a Case Management Order ("CMO") to govern the proceedings. This Court adopted, in large part, the provisions of that Order, while modifying it somewhat, as noted in Appendix A to

-3-

2 █████████

Dkt. No. 283.

Much pre-hearing activity has taken place under this Court's Case Management Order.  The Government has filed the exculpatory evidence, automatic discovery, and additional discovery required under the CMO.  The Government filed its Factual Return for Al-Adahi on August 1, 2005, and amended it on September 29, 2008.  The Petitioner responded by filing Traverses on July 3, 2008, July 7, 2008, and October 10, 2009.  After a period of extensive discovery, both parties filed substantial briefs accompanied by extensive exhibits.

On April 10, 2009, the Court set June 22, 2009, as the date for the "merits hearing" on the Cross-Motions for Judgment on the Record for all three Petitioners who planned to go forward in challenging their detention.  Al-Adahi's  case, including the Petitioner's live direct and cross-examination on June 23, 2009, was presented to the Court over a four-day period.  On June 25, Petitioners 6 █████████ instructed their counsel to not proceed with litigating their Motions.  6 █████████ cases were then stayed until October 1, 2009.  Order (June 25, 2009).

## II.  STANDARD OF REVIEW

The Government bears the burden of establishing that detention is justified.  See Boumediene, 128 S.Ct. at 2270; Hamdi, 542 U.S.

-4-

2 █████

507, 533-34 (2004).   It must do so by a preponderance of the

evidence.   Order, Appendix A at § II.A (Feb. 12, 2009) [Dkt. No.

283-2]; see also Basardh v. Obama, 612 F. Supp. 2d 30, 35 n.12

(D.D.C. 2009).

Initially, the Government took the position that Article II of

the Constitution and the AUMF granted the President the authority

to detain individuals.   See Gherebi v. Obama, 609 F. Supp. 2d 43,

53 n.4 (D.D.C. 2009).   The Government asserted, "[a]t a minimum, .

. . the ability to detain as enemy combatants those individuals who

were part of, or supporting, forces engaged in hostilities against

the United States or its coalition partners and allies."   Resp't's

Statement of Legal Justification For Detention at 2 [Dkt. No. 205].

Since the change in administration, the Government has

abandoned Article II as a source of detention authority, and relies

solely on the AUMF.   Gherebi, 609 F. Supp. 2d at 53 n.4.   Further,

it no longer uses the term "enemy combatant."   Its refined position

is:

> [t]he President has the authority to detain persons that
> the President determines planned, authorized, committed,
> or aided the terrorist attacks that occurred on September
> 11, 2001, and persons who harbored those responsible for
> those attacks.   The President also has the authority to
> detain persons who were part of, or substantially
> supported, Taliban or al-Qaida forces or associated
> forces that are engaged in hostilities against the United
> States or its coalition partners, including any person
> who has committed a belligerent act, or has directly
> supported hostilities, in aid of such enemy armed forces.

2 ▮▮▮▮▮▮

Resp't's Revised Mem. Regarding the Gov's Detention Authority Relative to Detainees Held at Guantanamo Bay at 3 [Dkt. No. 306].

In Gherebi, Judge Reggie B. Walton of this District Court ruled that the Government has the authority to detain individuals who were part of, or substantially supported, al-Qaida and/or the Taliban, provided that those terms "are interpreted to encompass only individuals who were members of the enemy organization's armed forces, as that term is intended under the laws of war, at the time of their capture."  Gherebi, 609 F. Supp. 2d at 70-71.

In Hamlily v. Obama, 616 F. Supp. 2d 63 (D.D.C. 2009), Judge John Bates of this District Court concluded that under the law of war, the Government has the authority to detain individuals who were "part of . . . Taliban or al Qaida forces," or associated forces.  Id. at 74.  The court went on to rule that the Government does not have the authority to detain those who are merely "substantial supporters" of those groups.  Id. at 76.  While the Court has great regard for the scholarship and analysis contained in both decisions, the Court concludes that Judge Walton's opinion presented a clearer approach, and therefore will adopt his reasoning and conclusion.[2]

---

[2]      The Court agrees with Judge Bates' comment that the determination of who was a "part of" the Taliban/al-Qaida, under Judge Walton's approach, rests on a highly individualized and case-specific inquiry; as a result, the "concept [of substantial support] may play a role under the functional test used to

-6-



## III. ANALYSIS

### A.   Evidentiary Presumptions

As a preliminary matter, some attention must be given to the nature of the evidence that has been presented in this case, and how the Court, as fact-finder, will go about evaluating that evidence.  In attempting to meet its burden, the Government has provided evidence in the form of classified intelligence and interview reports that it believes justify the Petitioner's detention.  The reports contain the statements of Petitioner, as well as statements made by other detainees, that the Government argues demonstrate the Petitioner's status as a member or substantial supporter of al-Qaida and/or the Taliban.[3]

The Government requested that a rebuttable presumption of authenticity be granted to all the exhibits it intends to

_____

determine who is 'part of' a covered organization," and the difference in the two approaches "should not be great."  Hamlily, 616 F. Supp. 2d at 76.

[3]    Petitioner argues that the Government's evidence should be excluded under the Geneva Conventions, because the evidence was collected in violation of various articles of the Third Geneva Convention.  Pet.'s Resp. to Resp't's Mot. for J. and Supporting Mem. at 4 ("Pet.'s Opp'n") [Dkt. No. 402].  Parties briefed this issue further in the weeks following the Merits Hearing [Dkt. Nos. 435, 441, and 442].  Assuming for the moment that the evidence can be admitted consistent with the Geneva Conventions, the Court's consideration of that evidence leads to the conclusion, as discussed below, that Al-Adahi is not justifiably detained. Therefore, it need not and does not reach the question of whether the interrogation reports must be excluded.

-7-

2 ███████

introduce.[4]  Petitioner objected to this request. See Pets.' Joint
Opp'n to the Government's Memo. and Supplement Regarding
Presumptions, Hearsay and Reliability of Intelligence Information
at 3-10 ("Pets.' Presumptions Memo.") [Dkt. No. 400]; Pet. Mohammed
Al-Adahi's Brief in Support of Entry of Judgment at 3 ("Pet.'s
Mot.") [Dkt. No. 373]. Given the Government's representations that
the specific documents included in its case against Petitioner, as
well as the documents provided to Petitioner's counsel in
discovery, have all been maintained in the ordinary course of
business, the Court will presume, pursuant to Fed. R. Evid. 803(6),
that its documents are authentic.  As provided for in the Case
Management Order, the Government's exhibits will be granted a
rebuttable presumption of authenticity and will be deemed authentic
in the absence of any rebuttal evidence to the contrary.

The Government has also requested that a rebuttable
presumption of accuracy be granted to all the exhibits it intends
to introduce.  The Petitioner objected to this request as well.
See Pets.' Presumptions Memo. at 3-10.  This request is denied for
several reasons.

First, there is absolutely no reason for this Court to presume

---

  4  Ordinarily, "the requirement of authentication requires
that the proponent, who is offering a writing into evidence as an
exhibit, produce evidence sufficient to support a finding that the
writing is what the proponent claims it to be."  2 K. Broun,
McCormick on Evidence § 221 (6th ed.).

2

that the facts contained in the Government's exhibits are accurate.
Given the extensive briefing and oral argument presented by counsel
during the discovery phase of this case, as well the exhibits
submitted at the merits trial, it is clear that the accuracy of
much of the factual material contained in those exhibits is hotly
contested for a host of different reasons ranging from the fact
that it contains second-level hearsay to allegations that it was
obtained by torture to the fact that no statement purports to be a
verbatim account of what was said.

Second, given the fact that this is a bench trial, the Court
must, in any event, make the final judgment as to the reliability
of these documents, the weight to be given to them, and their
accuracy.  Those final judgments will be based on a long, non-
exclusive list of factors that any fact-finder must consider, such
as:  consistency or inconsistency with other evidence, conditions
under which the exhibit and statements contained in it were
obtained, accuracy of translation and transcription, personal
knowledge of declarant about the matters testified to, levels of
hearsay, recantations, etc.[5]

Denial   of   the   Government's   request   for   a   rebuttable

---

[5]     While the Supreme Court did suggest in Hamdi that a
rebuttable presumption "in favor of the Government's evidence"
might be permissible, 542 U.S. at 534, it did not mandate it.  In
Boumediene, the Court clearly left it to the District Courts to
craft appropriate procedures.  Boumediene, 128 S.Ct. at  2272.



presumption of accuracy does not mean, however, that the Government must present direct testimony from every source, or that it must offer a preliminary document-by-document foundation for admissibility of each exhibit. As the Supreme Court noted in <u>Hamdi</u>, 542 U.S. at 533-34, hearsay may be appropriately admitted in these cases because of the exigencies of the circumstances.

Finally, while parties always retain the right to challenge the admissibility of evidence, the Court will be guided by the Federal Rules of Evidence, in particular Rule 402, providing that "[a]ll relevant evidence is admissible." Once all evidence is admitted into the record, the Court will then, in its role as fact-finder, evaluate it for credibility, reliability, and accuracy in the manner described above.

**B.   Mosaic Theory**

The Government advances several categories of allegations which, in its view, demonstrate that the Petitioner was detained lawfully. Above all, its theory is that each of these allegations -- and even the individual pieces of evidence supporting these allegations -- should not be examined in isolation. Rather, "[t]he probity of any single piece of evidence should be evaluated based on the evidence as a whole," to determine whether, when considered "as a whole," the evidence supporting these allegations comes together to support a conclusion that shows the Petitioner to be

2

justifiably detained.  Gov's Mot. For J. Upon the Administrative R.

and Mem. in Supp. at 6 (internal citation omitted) ("Gov's Mot.")

[Dkt. No. 379].  While the Government avoids an explicit adoption

of the mosaic theory, it is, as a practical matter, arguing for its

application to the evidence in this case.  Cf. Ali Ahmed v. Obama,

613 F. Supp. 2d 51, 55-56 (D.D.C. 2009).

The Court understands from the Government's declarations, and

from case law,[6] that use of this approach is a common and well-

established mode of analysis in the intelligence community.  This

may well be true.  Nonetheless, at this point in this long, drawn-

out litigation the Court's obligation is to make findings of fact

and conclusions of law which satisfy appropriate and relevant legal

standards  as  to  whether  the  Government  has  proven  by  a

preponderance of the evidence that the Petitioner is justifiably

detained.  The kind and amount of evidence which satisfies the

intelligence community in reaching final conclusions about the

value of information it obtains may be very different from, and

certainly cannot determine, this Court's ruling.

Even using the Government's theoretical model of a mosaic, it

must be acknowledged that the mosaic theory is only as persuasive

---

[6]    See, e.g., McGehee v. Casey, 718 F.2d 1137, 1149 (D.C.
Cir. 1983) (recognizing that the "mosaic-like nature of
intelligence gathering" requires taking a "broad view" in order to
contextualize information) (internal citations and quotations
omitted).

-11-



as the tiles which compose it and the glue which binds them together -- just as a brick wall is only as strong as the individual bricks which support it and the cement that keeps the bricks in place. Therefore, if the individual pieces of a mosaic are inherently flawed or do not fit together, then the mosaic will split apart, just as the brick wall will collapse.

A final point must be kept in mind. One consequence of using intelligence reports and summaries in lieu of direct evidence is that certain questions simply cannot be answered, i.e., there are no deposition transcripts to consult and few if any witnesses are available for cross-examination. Despite the fact that Petitioner testified via video-conference from Guantanamo Bay, and was cross-examined by the Government,[7] sizeable gaps may appear in the record and may well remain unfilled; each party will attempt to account for these deficiencies by positing what they think are the most

---

[7] Petitioner's testimony was closed to the public. However, the Government was ordered to conduct expedited classification reviews of the testimony transcript so that it could be released on the public docket. Order (June 19, 2009) [Dkt. No. 423]. The Government complied, and the transcripts were made available to the public on June 26, 2009 [Dkt. No. 431]. The Government also was ordered to videotape the testimony and maintain a redacted copy of the tape. Order (June 19, 2009). On July 23, 2009, the Government provided notice that it did not comply with this order, citing "oversight and miscommunication" as reasons that the testimony was not videotaped. Notice Regarding the Court's June 19, 2009 Order (July 23, 2009) [Dkt. No. 446]. The following day, Petitioner filed a Motion for Sanctions [Dkt. No. 447], which is pending at this time.

2 ███████

compelling logical inferences to be drawn from the existing evidence. Accordingly, that existing evidence must be weighed and evaluated as to its strength, its reliability, and the degree to which it is corroborated. In any event, the Government always bears the ultimate burden of showing by a preponderance of the evidence that Petitioner's detention is lawful. Just as a criminal defendant need not prove his innocence, a detainee need not prove that he was acting innocently. In sum, the fact that the Petitioner may not be able to offer neat answers to every factual question posed by the Government does not relieve the Government of its obligation to satisfy its burden of proof.

### C.    Government Allegations

In narrowing the issues for trial, parties focused on six broad factual areas that were in dispute. The Court then heard arguments on the existence and extent of (1) Petitioner's familial ties, (2) his stay at al-Qaida and/or Taliban guesthouses, (3) his military training at Al Farouq and service as an instructor there, (4) his employment as a bodyguard for Usama Bin Laden, (5) his other activities in Afghanistan (including his escape from the country and later arrest), and, finally, (6) the overall credibility of Petitioner's version of his travels from his home in ██████ to Pakistan, Afghanistan, and his flight back to Pakistan.

### 1.    Familial Ties and Travel to Afghanistan

-13-

2 ██████████

There is no question that the record fully supports the
Government's allegation that Petitioner had close familial ties to
prominent members of the jihad community in Afghanistan.   JE 28;[8]
JE 55; JE 18; JE 40; Tr. at 11, 17 (June 23, 2009).   ███████████ b(1), b(6)
█ b(1), b(6) ████████████████████████████████████████████████████
█ b(1), b(6) ████████████████████████████████████████     Tr. at 11
(June 23, 2009).   Although the Government alleges that Al-Adahi has
presented inconsistent and therefore unreliable reasons for this
trip, the record shows that  b(1), b(6) ████████████████████████████
█ b(1), b(6) ████████████████████████████████████████████████████████
█ b(1), b(6) ████████████████████████     Tr. at 22 (June 23, 2009); JE
13 (citing Amani's back problems and visit to husband as reasons
for trip); JE 15 at 1 (same); JE 33 at 2, 5  b(1) ██████████████████
█ b(1) ████████ .   The two reasons are hardly inconsistent with each
other.

From her home in  b(1), b(6) ███████████  had entered into an arranged
marriage with b(1), b(6) ████████████████████████████████ .   She and her
brother, Petitioner, then traveled to Kandahar to unite the
recently wedded couple and to attend a celebration of the

───────────────────

[8]     Parties submitted two volumes of Joint Exhibits, which
comprise the vast majority of evidence presented during trial.
Unless otherwise indicated, citations to "JE" refer to the universe
of Joint Exhibits.

███████████

marriage.[9] Tr. at 9 (June 24, 2009).

███ appears to have been a prominent man in Kandahar. ██
████████
████████ JE 28 at 3; Tr. at 15-16 (June 24, 2009) (Al-Adahi

"believe[d]" that ██ fought the Soviets, but was not told that

by ██ himself).   The Government alleges that ██ was

involved at a high level in al-Qaida operations, ████████
████████ see JE 18 at 4-5; JE 40 at 1

(alleged to be Bin Laden bodyguard); Gov. Mot. at 9-10.[10]  Further,

████████████████████████
is described as being "among the jihad personnel from ██ " JE 55

at 4.   It is not clear if this description is based on statements

from ██ or █████████████████.   Al-

Adahi "doubts" that ██ was a Bin Laden bodyguard, but

acknowledges that he was "from mujahidin [sic]."  Tr. at 21 (June

23, 2009).

---

[9]   The celebration attended by Petitioner Bin Laden's house
was for men only.  The women celebrated at another venue.  Tr. at
11 (June 24, 2009).

[10]  ████████████████
████████
████                           ████████
████
he is described as "one of the jihad personnel," JE 55 at 2.
Further, ████████
████████                          JE 40 at 1; JE 18
at 4-5.



The Government suggests that their travel pattern mimics that of other al-Qaida-recruited jihadists who were traveling into Afghanistan to participate in battle against the United States. Gov. Mot. at 11 (describing arrangements as "highly unusual" and suggestive of "a degree of secrecy and operational tradecraft"); id. at 14-15.   To buttress its argument, it points to the [redacted] The Government infers that these arrangements indicate Al-Adahi's willingness to be recruited by al-Qaida, as well as [redacted] status as a member of that organization. Gov. Mot. at 11, 13.

The inference that [redacted] was affiliated with al-Qaida is strongly supported by the circumstances of the wedding celebration

---

[11]   The exact details of this exchange are not totally clear, but the overall narrative remains the same.  See Tr. at 14-15 (June 23, 2009); JE 28 at 4; JE 33 at 3.

2 ███████

that took place. It is undisputed that Usama Bin Laden, the founder and leader of al-Qaida, hosted and attended ⁶██████ wedding reception in Kandahar, Tr. at 11 (June 24, 2009); JE 51 at 2-3. At the celebration at Bin Laden's compound, as he was escorted around the event by a friend of ⁶██████ Al-Adahi was introduced briefly to Bin Laden. Tr. at 11 (June 24, 2009); Tr. at 17, 20-21 (June 23, 2009); JE 51 at 4.

A few days later, Al-Adahi met Bin Laden again and the two chatted briefly about religious matters in Yemen. Tr. at 20-21 (June 23, 2009); JE 49 at 4. In his testimony, the Petitioner insisted that such a meeting with Bin Laden was common for visitors to Kandahar. Tr. at 24-25 (June 24, 2009); JE 49 at 5. The Government interprets the access to Bin Laden, as well as the relationship to b(1), b(6) and b(1), b(6) brother, an alleged bodyguard for Bin Laden, as part of the evidence that "Al-Adahi was part of the inner circle of the enemy organization al-Qaida." Resp't's Opp'n to Pet. (ISN 33) Mohammed Al-Adahi's Br. in Supp. of Entry of J. at 3 ("Gov. Opp'n") [Dkt. No. 408].

The Government concedes that Al-Adahi's family situation is not, in and of itself a basis for his detention. What the Government argues is that the existence of these family connections to Bin Laden strengthen other, more serious allegations, such as Petitioner's training and service as a bodyguard. These

2

connections, according to the Government, demonstrate that Al-Adahi
was an al-Qaida insider whose brother-in-law was facilitating his
rise up the ranks of the al-Qaida organization.

While it is true that Petitioner's familial ties to Usama Bin
Laden may suggest that he had access to the leadership of al-Qaida,
such associations cannot prove that he was a member of al-Qaida's
"armed forces." Gherebi, 609 F. Supp. 2d at 70-71. Accordingly,
his relationship to b(1), b(6) and attendance at the wedding must not
distract the Court from its appropriate focus--the nature of Al-
Adahi's own conduct, upon which this case must turn.

    2.   **Guesthouse Stay**

The Government claims that Al-Adahi stayed at al-Qaida and/or
Taliban guesthouses during his stay in Afghanistan in 2001. It
points specifically to his admission that he stayed at the al-
Nebras guesthouse for one night. Tr. at 23 (June 23, 2009); JE 27;
JE 52. In addition, the Government points to Al-Adahi's own
statements in arguing that b(1), b(6) home was a guesthouse that
sheltered mujahideen and men involved in Al-Wafa. Gov. Mot. at 12-
13; JE 28 at 3; JE 16 at 1; JE 19 at 2. Al-Wafa was a Specially
Designated Global Terrorist Entity that ostensibly operated as a
charity. Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23,
2001); JE 6 at 1.

Petitioner counters that 6 home was not identified by

██2███████

the Government in its background declaration as being a guesthouse

operated by either al-Qaida or the Taliban.  <u>Cf.</u> JE 5.

Significantly, there is credible evidence in the record

demonstrating that Petitioner stayed in ██b(1), b(6)█ home, which

appears to have been a separate structure from any guesthouse that

██b(1), b(6)██ may have operated.  JE 27 at 3. ██b(1), b(6)███████████

██b(1), b(6)████████████████████████████████████████

██b(1), b(6)████████████████████████████████

██████████████████████████████████ JE 33 at 4.

Other than this admission about al-Nebras and the argument

about his brother-in-law's home, the Government points only to the

██b(1), b(6)███████████████████████████████████████████

██b(1), b(6)████████████████████████

█████████████████████████████████ JE 39 at 3.  The

allegation was based on ██b(1), b(6)███████████████████

██b(1), b(6)█████████ ¹² <u>Id.</u> at 1, 3. ██b(1)██████████

██b(1)██████████████████████████████████████

██b(1)████████████████████████████████████

█████████████████████████████████████ <u>Id.</u> at 3.

The guesthouse evidence, like that of Al-Adahi's family

_____

¹²    The first page of the interrogation report containing
this identification indicates that ██6████ was shown a ██2██████
of ██2██      JE 39 at 1.  Al-Adahi is ██C2██    On page three of
the report, ██6█████ goes on to describe the person ██2██ in a
██2█████  marked "[ISN 33]." <u>Id.</u> at 3. ██6█████ is not mentioned
again in the rest of the report.  This confusion over ISN numbers
██5, 6███████████████████████████████████████████

2 ███████████

connections, is offered as a tile in the Government's mosaic.  The

Government recognizes that in this case the guesthouse evidence is

not in itself sufficient to justify detention.  The Court credits

Al-Adahi's repeated admissions of his one-night stay at al-Nebras,

but cannot rely on ██████████ vague and uncorroborated statement

about his meeting with Al-Adahi at an unnamed Kandahar guesthouse

and his questionable ████ identification of Al-Adahi.[13]

### 3.   Al Farouq

The Government's central accusation -- that Al-Adahi attended

al-Qaida's Al Farouq training camp in or around August of 2001 --

is not disputed by Petitioner; in fact, he admitted to it during

his testimony.  Tr. at 23-24 (June 23, 2009) (admitting attendance

at Al Farouq for one week).  The critical issues that divide

parties are the significance of Petitioner's brief attendance, and

whether or not Al-Adahi served as an instructor at Al Farouq.

### a.   Attendance at Al Farouq

---

[13] ██████████ credibility has been called into question by this
Court and other courts in this District.  See Ali Ahmed v. Obama,
05-cv-1678, classified mem. op. at 13-14 (D.D.C. May 4, 2009) [Dkt.
No. 211].  On May 22, 2009, the Government submitted a memorandum
and voluminous appendix of exhibits in an effort to rehabilitate
██████████ reliability as a witness.  The Court reviewed the
Government's submission, and agrees that ██████████ cannot be written
off as unreliable in all instances; however, his troublesome record
1, 5 ████████████████████████████████████████
████████████████████████████████████████████



Again, there is no dispute that Al-Adahi trained at Al Farouq for somewhere between seven and ten days.  Id.; JE 26 at 4 (ten days); JE 52 at 2 (about seven days); JE 27 at 3 (seven days). During several interrogations,[14] Al-Adahi gave detailed descriptions of the training regimen and layout of the camp, identified other detainees as trainers (including █████████, JE 26 at 5; JE 52 at 2,

---

[14]    Petitioner's counsel argues that all ex parte statements made by Petitioner must be excluded from the record.  Pet.'s Mot. at 18-20.  They maintain that because Petitioner was represented by counsel as of February 7, 2005, and all interrogations after that date were not consented to by counsel, Constitutional and ethical rules require that evidence from those interrogations be excluded. Id.

The Court concludes that the ex parte statements are admissible for the following reasons.  First, under Supreme Court and Court of Appeals precedent, only defendants in the criminal context can claim Sixth Amendment protections.  Montejo v. Louisiana, 129 S.Ct. 2079, 2085 (2009) (stating that Sixth Amendment "guarantees a defendant the right to have counsel at all 'critical' stages of the criminal proceedings.") (emphasis added); United States v. Sutton, 801 F.2d 1346, 1365 (D.C. Cir. 1986) (finding that right to counsel attaches "only after the initiation of 'adversary judicial criminal proceedings,' e.g., formal charge, preliminary hearing, indictment, information, or arraignment."). Petitioner is not involved in a criminal proceeding, and thus the Sixth Amendment does not apply.  Cf. Coleman v. Balkcom, 451 U.S. 949, 954 (1981) (Marshall, J., dissenting from denial of certiorari).

Second, Petitioner argues that the Government's conduct amounts to a violation of ethical rules.  The interrogators in this case were not the attorneys representing the Government in habeas litigation; rather, they were agents conducting an investigation. There is no evidence that Government attorneys controlled or guided interrogations of Al-Adahi.  Consequently, there were no ethical violations.  See United States v. Lemonakis, 485 F.2d 941, 956 (D.C. Cir. 1973); Sutton, 801 F.2d at 1366.

█

and admitted that he received training while there.

His motives for going to Al Farouq cannot be determined with the same certainty.  In his testimony, Al-Adahi claims that he sought general weapons training and "Islamic education."  Tr. at 23-24 (June 23, 2009).  After having attended his sister's wedding reception, and with time off from his job in ███ and having no particular plans about what to do next, he portrayed himself as being willing to explore the region and try something new.  The Government attempted to link Al-Adahi's attendance to his alleged ideological conviction in jihad against the United States. However, Al-Adahi resisted being portrayed as a supporter of war against America, and repeatedly denied "support[ing] these acts [of jihad]."  Tr. at 19 (June 24, 2009); see id. at 17-21.

Al-Adahi claims that he pursued training at Al Farouq to satisfy "curiosity" about jihad, and because he found himself in Afghanistan with idle time. JE 26 at 5; cf. Tr. at 22-23 (June 23, 2009) (stating that he did not know about Al Farouq until he arrived at al-Nebras, and attended camp to learn about Islam and weapons).  It is important to observe that Al-Adahi's understanding of the term "jihad" does not seem to equate to war against the United States.  See Tr. at 21 (June 23, 2009).  For instance, in a

b(1)

█

[REDACTED] JE 26 at 5; see JE 28 at 3 (where Petitioner explains mujahideen to mean "those that fought against the Russians and then later fought with the Taliban against Massoud).

Petitioner insists that he did not attend the camp to become part of jihad, and that the circumstances of his departure support this position. After seven to ten days at Al Farouq, the camp leaders expelled Al-Adahi for failing to comply with the rules. Tr. at 24 (June 23, 2009); JE 52 at 2. [REDACTED] JE 26 at 4-5. In Petitioner's view, any affiliation with or substantial support of al-Qaida that could have been established based on his attendance at Al Farouq was destroyed by this expulsion. Pet.'s Mot. at 44.

The Government counters that the circumstances of his departure, in addition to his attendance, actually help justify detention. Al-Adahi was ordered to leave, and returned to Kandahar to stay with [REDACTED] again. He did so despite the fact that, according to Al-Adahi himself, individuals expelled from Al Farouq for rules violations were generally considered spies, and severely punished. JE 26 at 4; JE 52 at 2-3. Suspected spies, the Government infers from another detainee's experiences, were treated harshly. See Al Ginco v. Obama, No. 05-cv-1310, 2009 WL 1748011, at *3 (D.D.C. June 22, 2009) (describing Government's concession



that suspected spy was imprisoned and tortured by Taliban). In this case, Al-Adahi was spared punishment because of his relationship with his brother-in-law ███████. See JE 52 at 2.

The Government argues that the clemency extended to Al-Adahi demonstrates that he continued to be a member of the organization, and was being protected by his powerful brother-in-law ███████. See JE 52 at 2 (reporting that prior to expelling Petitioner, camp leadership notified ███████ Al-Adahi, it notes, was even permitted to return to Kandahar and stay with ███████ who allegedly housed al-Qaida fighters. This, the Government argues, demonstrates that the organization had not turned its back on Petitioner at all, much less in the brutal way that it had expelled and tortured Ginco. However, even if Al-Adahi's expulsion was handled with uncommon leniency because of ███████ status, this fact demonstrates at most that Al-Adahi was being protected by a concerned family member; it most certainly is not affirmative evidence that Al-Adahi embraced al-Qaida, accepted its philosophy, and endorsed its terrorist activities.

For these reasons, under the analysis in <u>Gherebi</u>, Petitioner cannot be deemed a member of the enemy's "armed forces." <u>See</u> <u>Gherebi</u>, 609 F. Supp. 2d at 68-69. Al-Adahi was expelled from Al Farouq after seven to ten days at the camp; as discussed below, the Government has not established that he did anything to renew

-24-

2 ███████████

connections with al-Qaida and/or the Taliban.   He did not, by virtue of less than two weeks' attendance at a training camp from which he was expelled for breaking the rules, occupy "some sort of 'structured' role in the 'hierarchy' of the enemy force."   Id.

Finally, Petitioner's demonstrated unwillingness to comply with orders from individuals at Al Farouq shows that he did not "'receive[] and execute[] orders' from the enemy's combat apparatus."   Id. at 69.   Al-Adahi attended the camp briefly, and was expelled for his refusal to take orders.   Therefore, Petitioner's admission that he trained at Al Farouq is not sufficient to carry the Government's burden of showing that he was a part, or substantial supporter, of enemy forces.   Cf. Al Ginco, 2009 WL 1748011, at *4 (relationship with al-Qaida may be "vitiated" by intervening events); id. at *5 ("To say the least, five days at a guesthouse . . . combined with eighteen days at a training camp does not add up to a longstanding bond of brotherhood.").

### b.   Instructor at Al Farouq

The Government relies on a statement from one other detainee, as well as several pieces of circumstantial evidence, to argue that Al-Adahi not only attended Al Farouq, but also served as a trainer at the camp.

As its most direct piece of evidence supporting this claim,

-SECRET-

the Government points to a statement made by ██████ [b(1), b(2), b(6)] ██████ [b(1), b(2), b(6)] that he could identify ISN 33 by his kunya, ██████ [6] because ██████ [b(1)] ██████ [b(1)] [15] JE 29 at 1; JE 38 at 5.   A significant problem with this testimony is that there is no other evidence placing Al-Adahi in Afghanistan prior to July of 2001. ██████ [b(1), b(6)]

██████ [b(1), b(6)] Id.   Additionally, when he was later shown [1] ██████ ISN 33, █[6] claimed the man's name was █[6]██████ whose kunya is █[6]██████ JE 101 at 2;   cf. JE 104 at 2 (reporting that detainee uninvolved in this case had a Saudi uncle named[6]██████ who clearly was not same man as Al-Adahi).   The Government claims this is simply a mis-identification.   When coupled with the early-2000 date given by █[6]██ in an earlier statement, the mis-identification casts serious doubt on the accuracy of his statements.

Petitioner insists that his only travel out of █[1]██ occurred in July of 2001, when he escorted his sister to Kandahar.   In

---

[15]   In August of 2003, █[6]██ provided a physical description of █[6]██ who he claimed was a "chief trainer."   JE 102 at 1. ██████ [1, 6]

-26-

█2██████

support of this position, he presents documents from █1██

█1███████████████ JE 71, where he had worked for about 20 years

before departing for Afghanistan, JE 13 at 1.   The documents

purport to show that Al-Adahi requested six months of non-paid

leave on July 9, 2001.   Id. at Attachment B.[16]   They also purport

to show that he was on the company's payroll in June of 2000 and

April of 2001, id. at Attachments C, E; that he was eligible for an

annual bonus for 2000, id. at Attachment D; and that he appeared on

a list of employees whose staff allowances were not subject to

retirement deduction in 2000, id. at Attachment F.   Each document

was signed, and many were stamped.   Id.

   Petitioner has represented that they are authentic documents,

based chiefly on the declaration of █6█████████ an employee at the

National Organization for Defending Rights and Freedoms ("HOOD").

Pet.'s Ex. ("PE") 2.█6█████ reports that he delivered counsel's

request for these documents to the █1████████████████ via a

relative of Al-Adahi's, and then emailed counsel the documents

contained in Joint Exhibit 71.   PE 2 at 2.

   The Government objects to the reliability of the documents.

It points out several mis-translations of key dates, including one

---

   [16]   In what appears to be the only instance in the record
where Al-Adahi veered from his story that he intended to spend an
extended period of time in Afghanistan, he told interrogators in
2006 that "he was only to stay one day [in Afghanistan] and return
to █1█████" JE 25 at 2.

2 ███████

where the company cut ties with Al-Adahi because of his inclusion on a February 2001 list of Guantanamo Bay detainees.  JE 71 at Attachment A.  Because the facility was not detaining suspects in the War on Terror at that point, the Government argues that the accuracy of the documents cannot be relied upon.

The ███████████████ evidence is problematic for a number of reasons.  First the Petitioner, has not asked for and does not start with a presumption of authenticity for the documents he produces.  Second, there are gaps in the chain of custody of these documents.  Third, it is unclear who entered the information contained in them, and whether such information was entered contemporaneously.  Fourth, they contain factual and/or translation errors--such as the statement about the February 2001 list of Guantanamo Bay detainees--that raise serious doubts about their accuracy.  In short, they do not prove that Petitioner was not in Afghanistan in early 2000 when b(1), b(6) says he was.

Despite this conclusion, it is still difficult to credit b(1), b(6) assertion that Al-Adahi was at Al Farouq in January or February 2000.  Al-Adahi's consistent statements to interrogators, as well as his in-person testimony during this proceeding, all place him in Afghanistan no earlier than July of 2001.  The Government has presented no evidence other than b(1), b(6) comment to contradict this timeline.  Instead, it suggests that Al-Adahi is

-28-



unreliable and manipulative at times, and therefore his statements cannot be accepted as to the commencement of his time in Afghanistan.

This argument is difficult to credit in full. The Government relies heavily on Al-Adahi's inculpatory admissions.   It cannot have it both ways, i.e., when he says something that supports the Government's position he should be believed, but when he says something that contradicts the Government's position he is a liar. Finally, it is an assertion that is not backed up by facts: there is no evidence in the record that Al-Adahi was involved in activity related to al-Qaida and/or the Taliban before July of 2001. Without more, the Court cannot rely on ▮▮▮▮ statement.[17]

Further undermining the reliability of ▮▮▮▮ comments, the record contains evidence that ▮▮▮▮ suffered from "serious psychological issues."   JE 29 at 1; Pet.'s Mot. at 17-18.   The Government itself has expressed skepticism about the value of ▮▮▮▮ statements, and noted his attempts to manipulate other detainees into undermining intelligence efforts.   PE 4.   For all these reasons, the Court concludes that his identification of Al-

_____

[17]   It bears mentioning that ▮▮▮ retracted his allegations against Al-Adahi in two separate documents.   JE 81; JE 82.   The recantations are somewhat generic, and inconsistent with each other.   Their main impact is not to prove one version of ▮▮▮▮ account right or wrong, but to suggest that his statements about Al-Adahi are scattered, difficult to interpret, and not probative of anything.

2 ███████

Adahi as a trainer is not reliable independent evidence that Petitioner occupied that role.

The Government maintains that ██████ testimony is accurate when it is considered in light of Al-Adahi's intimate knowledge of Al Farouq's operations and recruits. In several intelligence reports, ███████████████████████████ JE 52 at 3; JE 26 at 5, ████████████████████████████ JE 52 at 2, ███████████████████████ <u>id.</u> at 1-2, ████████ ████████████████████████████ <u>id.</u> at 3. This knowledge, the Government argues, could only be possessed by a person who was entrusted with a supervisory role in the camp.

The Government is not correct. Al-Adahi's detailed knowledge of camp routine could well have been developed during his seven-to-ten-day stay there. Similarly, the information that he provided about other recruits could have come from conversations with them about their prior travels and future plans. For instance, the fact that he was familiar with the routines followed by the Africans may prove only that Al-Adahi was observant; moreover, all of Al-Adahi's descriptions were of their training habits only, which he could have observed from afar. <u>Id.</u> Though the Africans did not speak Arabic, Petitioner had access to them at "the mosque, chow hall area and sometimes at fitness training," where non-verbal communication could have taken place. <u>Id.</u> The Government's

corroborative evidence on this point is highly speculative, and does not confirm ▓ dubious allegation.

For all these reasons, the Court finds that the Government has not established that Al-Adahi was a trainer at Al Farouq.

### 4.   Bodyguard for Usama Bin Laden

To establish its allegation that Al-Adahi was a bodyguard for Bin Laden, the Government makes an argument similar to its contention that Petitioner was an instructor at Al Farouq.   It offers what it calls "direct" evidence from another detainee that Al-Adahi did security work for Bin Laden, and attempts to substantiate that evidence by pointing to Al-Adahi's familiarity with other Bin Laden bodyguards.   The Government does not meet its burden on this point.

The principal evidence to support this allegation comes in the form of ▓

JE 35 at 1-2.

JE 35 at 1-2.



Id. There is absolutely no other mention in the record of Petitioner's involvement with a Taliban prison, except for his denial of this accusation during his testimony. Tr. at 31-32 (June 23, 2009).

Although the intelligence reports do not mention whether [b(1), b(2), b(6)] accounts are lengthy and detailed, which are two important indicia of reliability. Nonetheless, the witness himself suffers from serious credibility problems that undermine the reliability of his statements. JE 57 at 1-4 (outlining psychological problems and self-harm incidents); JE 75 (independent assessment of medical records); JE 76 at 3, 5 [b(1), b(6)] report of torture by Taliban, and emotional problems brought on by father); JE 91 (containing

-32-

████████

August 2005 admission by ███ that he lied in past, and promise that he will not lie again).  What is equally worrisome is that before ███ made the above statements, interrogators had expressed concern that he was being manipulated by another detainee.  JE 87 at 2; before being placed next to that detainee, ███ had never made any of the claims that he made to interrogators, including the accusation against Al-Adahi.  Id.

Further, the Government's corroborative evidence does little to compensate for the deficiencies specified above.  There is evidence in the record that ███████████████ See JE 15 at 1; JE 35 at 1. Similarly, there is evidence that Al-Adahi had a Casio watch when captured, JE 45 at 3, which the Government argues is a telling piece of al-Qaida paraphernalia.  Gov Mot. at 16-17.

The Government asks the Court to infer that because ███ ███████████ at some point during his stay in Afghanistan, ███████████ is credible. That confirmed detail, in turn, would strengthen the reliability of ███████████.  The inference simply does not make sense--or in the words of a noted legal philosopher, "that dog

-33-

▬▬▬▬▬

won't hunt."[18]

A seemingly stronger argument is made by reference to Al-Adahi's description of other Bin Laden bodyguards. In a 2008 interrogation, Petitioner provided biographical sketches of a number of men who he claimed were Bin Laden bodyguards. JE 51. In all, he provided similar information for 12 bodyguards. Id. at 4-8. In the Government's view, this familiarity with Bin Laden's protectors suggests that Al-Adahi knew these men well, and worked closely with them. It argues that such a conclusion, if true, would corroborate ▮▮▮▮ account.

The Government's position has some appeal. Al-Adahi does provide factual details about the other bodyguards that, on the surface, seem to indicate more than a passing familiarity with the men. For instance, one man, ▮▮▮▮▮▮ had "fat thighs but was quick." Id. at 6. Another knew how to read, write, and speak English. Id. at 5. These are the sort of personal details that one does not usually learn about during a casual meeting; rather, they suggest a closer relationship.

The Court ultimately cannot credit this evidence as sufficient corroborative information to help carry the Government's burden. Upon careful analysis, the biographical sketches of the alleged

---

[18]    Needless to say, ▮▮▮▮▮▮▮▮ are hardly unique items, even in Afghanistan.

bodyguards are not as significant as the Government portrays them to be. First, it is not clear from the intelligence report which parts of the sketches were provided by Petitioner and which were conclusions inserted by intelligence officials. Second, in many cases, Al-Adahi (if he was the source of all of the information) knew no more than a man's hometown, general familial relationships, and physical attributes. Given the length of his stay with ██████ and the fact that he met some of the men on more than one occasion, he could have assembled this information, along with the more idiosyncratic descriptions above, based on informal interactions with them, especially since so many of them were from Taiz. It need not be the case that the <u>only</u> reason Al-Adahi could have come across this evidence was because he shared bodyguard duties with them.

Because ██████ account of Al-Adahi's activities is undermined severely by the witness's psychological problems and checkered history of reliability, the account cannot stand on its own to carry the Government's burden. The Government's use of speculative evidence about ██████ does little to shore up ██████ statements. Finally, Petitioner's familiarity with other bodyguards does not, without more, compel the conclusion that he knew the men as a result of his service as a Bin Laden bodyguard.

-35-

## 5.   Post-Training Activities

Following his brief period of training, the Government contends that Petitioner engaged in activities that demonstrate a continued commitment to al-Qaida.  The Government marshals pieces of circumstantial evidence to support its allegations that after training, Al-Adahi fought for al-Qaida, stayed in the company of al-Qaida fighters, and then was arrested on a bus while fleeing from Afghanistan to Pakistan with al-Qaida soldiers.

First, the Government alleges that Al-Adahi participated in battle as an al-Qaida fighter.  The Government has no statements or confessions to support its allegation that Al-Adahi fought; rather, it builds its case by pointing to inconsistencies in Al-Adahi's versions of the events that led up to his capture, as well as inferential evidence that suggests terrorist conduct.   In the absence of any affirmative evidence of this allegation, the Government argues that Al-Adahi's travel pattern during September of 2001 closely tracked the location of several battles involving al-Qaida forces.   See Gov. Opp'n at 3-4.  Cf. JE 4 (detailing location of battles); PE 5.

The Government argues that Al-Adahi's "cover story"--that he was fleeing Afghanistan as quickly as possible after bombing of the region--rings hollow.  It points to his general lack of credibility in other areas, including his explanation of an injury that he

suffered while fleeing, to cast doubt on his version of events.
Also, the Government notes Bin Laden's edict that men must stay in
Afghanistan and wage jihad as evidence of Petitioner's reason for
staying in the country and fighting.  JE 55 at 4.

The Government pointed to several accounts Petitioner offered
about how he suffered an injury to his arm and leg before being
captured.  However, each account included the same central detail
that he sustained the injury after falling from a motorcycle in
Kandahar.  <u>See</u> JE 13 at 2; JE 33 at 6; JE 15 at 2; JE 14 at 1.  One
version of the story blames the accident on driving too fast and
hitting a cart, JE 15 at 2; a second version involves ███ b(1)
███ b(1) ███, JE 33 at 6; in a third
telling, Al-Adahi fell off of the vehicle while attempting to flee
Kandahar, JE 13 at 2.  Yet another version has Petitioner slipping
off the motorcycle.  JE 14 at 1.  According to the Government's
reasoning, these slight variations, together with his "diplomatic"
expulsion from Al Farouq and arrest on a bus with Taliban fighters,
indicates that his motorcycle "cover story" conceals the truth that
he was injured in battle.  <u>See</u> Gov. Mot. at 20.

It is correct that some minor details in the motorcycle story
are not described identically in each interrogation, and this may
cast doubt on precisely how Al-Adahi was injured.  Nonetheless, the
Government provides only speculation to resolve that doubt,

contending that his travel pattern and association with Taliban fighters mean that Petitioner took up arms.   Such a serious allegation cannot rest on mere conjecture, with no hard evidence to support it.[19]

Unable to prove the more serious allegation of actual participation in combat, the Government cannot rely solely on what is only associational evidence about Al-Adahi's stay at ███ and arrest in the company of individuals rumored to be part of the Taliban.   Such evidence is not sufficient to carry the Government's burden.

First, the Government appears to pin its associational evidence that Petitioner was captured while traveling in the company of Taliban fighters on a statement made by Al-Adahi that "[a]fter his capture, [he] heard that there were members of the Taliban on the bus."   JE 14 at 2 (emphasis added).[20]   This second-level hearsay suggests that Al-Adahi did not know the passengers' identity before boarding, and that the information was passed on to him by an unknown source.   Second, it is not clear what type of

---

[19]    It must be emphasized that the Government had no evidence from anyone who claimed to have seen or claimed to have even heard that Al-Adahi was involved in combat activities.

[20]    During an earlier bus ride, from Kandahar to Khost, Al-Adahi reported that he rode with "wounded Taliban soldiers."   JE 14 at 3.   He departed that bus at Khost and boarded a bus for Miram Shah.   He was captured during or after this bus ride.

███████

bus--public or private--Petitioner boarded in fleeing Afghanistan;
moreover, there is no evidence that he sought to join or was
already part of a band of fighters fleeing the region.  See JE 14
at 2 (describing bus trip and arrest on bus).  Further, when he was
arrested on the bus by Pakistani authorities,[21] ██████████
██████████████████████████████████████████. and was unarmed.
JE 98 at 1; JE 33 at 7.  He appeared to be attempting to escape the
chaos of that time by any means that he could.

   The Government's allegations regarding Al-Adahi's post-
training activities are significant because they provide context to
Petitioner's admission about training.  In short, his conduct after
training at Al Farouq does not demonstrate that Al-Adahi took any
affirmative steps to align himself with al-Qaida.  The record shows
that he returned to ██████ house for a few weeks, attempted to
flee Kandahar, injured himself and received treatment, and then
again made efforts to escape Afghanistan.  The Government offered

-------------------------------------------

[21]     In another recounting of his story, Al-Adahi boarded the
bus from Khost, and headed toward Miram Shah with Arabs and
Pakistanis (the same groups he said were on the bus in JE 98).  JE
14 at 3.  However, the arrest took place in a "large, modern city,
with a large market area;" Petitioner had walked there after
leaving the bus several hours earlier.  Id.  He stated that he had
his passport with him. ██████████████████████████████
████████████████████████████████████████████████████
██████████  This inconsistency simply cannot be resolved.  The
underlying fact of his arrest by the Pakistani military, however,
is not in dispute.  Cf. JE 14 at 3; JE 13 at 2.

no substantive evidence that he continued on a course of substantial support for al-Qaida. Instead, it appears that once his break with the group was initiated by al-Qaida, Al-Adahi accepted his expulsion and never attempted thereafter to become a member or supporter of al-Qaida, or to further its activities in any way.

## IV. CONCLUSION

When all is said and done, this is the evidence we have in this case. Al-Adahi probably had several relatives who served as bodyguards for Usama Bin Laden and were deeply involved with and supportive of al-Qaida and its activities. One of those relatives became his brother-in-law by virtue of marriage to his sister, ▮▮▮▮ Al-Adahi accompanied his sister to Afghanistan so that she could be with her husband and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮. The wedding celebration was held in Bin Laden's compound and many of his associates attended. At that celebration, Petitioner was introduced to Bin Laden, with whom he had a very brief conversation. Several days later, the Petitioner had a five-to-ten-minute conversation with Bin Laden.

Thereafter, Petitioner stayed at an al-Qaida guesthouse for one night and attended the Al Farouq training camp for seven to ten days. He was expelled from Al Farouq for failure to obey the rules. This training represents the strongest basis that the

-40-

████

Government has for detaining Al-Adahi.  However, under the AUMF and the standards described in <u>Gherebi</u>, Petitioner's brief attendance at Al Farouq and eventual expulsion simply do not bring him within the ambit of the Executive's power to detain.

After his expulsion, Al-Adahi returned to the home of his sister and brother-in-law for several weeks and then traveled to other places in Afghanistan because he had no other obligations. Like many thousands of people, he sought to flee Afghanistan when it was bombed shortly after September 11, 2001.

There is no reliable evidence in the record that Petitioner was a trainer at Al Farouq, that he ever fought for al-Qaida and/or the Taliban, or that he affirmatively provided any actual support to al-Qaida and/or the Taliban.  There is no reliable evidence in the record that Petitioner was a member of al-Qaida and/or the Taliban.  While it is tempting to be swayed by the fact that Petitioner readily acknowledged having met Bin Laden on two occasions and admitted that perhaps his relatives were bodyguards and enthusiastic followers of Bin Laden,  such evidence-- sensational and compelling as it may appear--does not constitute actual, reliable evidence that would justify the Government's detention of this man.  For these reasons, and the reasons set forth above, the Court **grants** the petition for a writ of habeas corpus.

Mindful of the limitations on the scope of the remedy in this situation, see Kiyemba v. Obama, 555 F.3d 1022, 1024 (D.C. Cir. 2009), the Court further orders the Government to take all necessary and appropriate diplomatic steps to facilitate Petitioner's release forthwith.   Further, the Government is directed to comply with any reporting requirements mandated by the Supplemental Appropriations Act, Pub. L. No. 111-32, 123 Stat. 1859 (2009), if applicable, to facilitate Petitioner's release, and to report back to the Court no later than September 18, 2009, as to the status of that release and what steps have been taken to secure that release.

August __, 2009

/s/_____
Gladys Kessler
United States District Judge


Copies to: Attorneys of Record via ECF