UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED WITH THE
COURT SECURITY OFFICER
CSO:
DATE:

MOHAMMED AL-ADAHI, et al.,          :
                                    :
                                    :
        Petitioners,                :
                                    :
    v.                              :        Civil Action No.  05-280 (GK)
                                    :
BARACK H. OBAMA, et al.,            :
                                    :
        Respondents.                :
                                    :

## MEMORANDUM OPINION

Petitioner Suleiman Awadh Bin Agil Al-Nahdi ("Al-Nahdi" or "the Petitioner") has been detained since 2002 at the United States Naval Base at Guantanamo Bay, Cuba. Respondents ("the Government") argue that his detention is justified under the Authorization for the Use of Military Force, Pub. L. No. 107-40 § 2(a), 115 Stat. 224, 224 (2001) ("AUMF"), which grants the Executive the power to detain individuals engaged in certain terrorist activities. The Petitioner disagrees, and has, along with four other petitioners, filed a petition for a writ of habeas corpus [Dkt. No. 1].[1]

---

[1]    To date, one of the five petitions has been decided on the merits:  Mohammed Al-Adahi's petition and Motion for Judgment on the Record were granted by this Court on August 17, 2009 [Dkt. No. 459].   The Government filed an appeal on September 21, 2009, and the Petitioner cross-appealed other aspects of the Order on October 5, 2009 [Dkt. Nos. 463, 473].   On December 22, 2009, Muhammad Ali Abdullah Bawazir's petition was dismissed without prejudice after he chose not to proceed with a Merits Hearing scheduled for January 2010 [Dkt. No. 526].  Two other Petitioners-- Fahmi Salem Al-Assani and Zahir Omar Khamis Bin Hamdoun--have filed

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

The matter is before the Court on Cross-Motions for Judgment on the Record [Dkt. Nos. 494 and 499]. On December 22, 2009, Petitioners filed a Supplemental Brief ███████████ ██████████████████████████ and the Government responded [Dkt. Nos. 527 and 539]. Upon consideration of the Motions, the Oppositions, extensive oral argument and accompanying exhibits, and the entire record herein, Al-Nahdi's habeas corpus petition and Motion are hereby **denied**.

I. **BACKGROUND**

A. **Procedural History**

Petitioner filed his habeas corpus petition on February 7, 2005. After filing, there was extensive preliminary litigation regarding the Court's jurisdiction to entertain detainees' petitions, the applicability of various statutes, and the appropriate procedures to be used.

After more than six years of litigation, the most important legal issue was resolved by the Supreme Court in Boumediene v. Bush, 553 U.S. __, 128 S. Ct. 2229 (2008). The Court ruled that detainees at Guantanamo Bay, none of whom are citizens of the United States, are entitled to bring habeas petitions under Article

---

Motions for Judgment on the Record. On October 7, 2009, Hamdoun's petition was stayed for 120 days [Dkt. No. 476]. On January 7, 2010, a Merits Hearing was held on Al-Assani's petition and Motion, which are addressed in a separate opinion.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

I of the Constitution, and that the federal District Courts have jurisdiction to hear such petitions.

The Court did not define what conduct the Government would have to prove in order to justifiably detain individuals--that question was left to the District Courts. Id. at 2240 ("We do not address whether the President has the authority to detain these petitioners nor do we hold that the writ must issue. These and other questions regarding the legality of the detention are to be resolved in the first instance by the District Court."). Nor did the Supreme Court lay down specific procedures for the District Courts to follow in these cases.

Boumediene was, however, definitive on at least two points: first, that the detainees are entitled to a prompt hearing, 128 S. Ct. at 2275 ("The detainees in this case are entitled to a prompt habeas corpus hearing."), and, second, that the District Courts are to shape the contours of those hearings, id. at 2276 (finding that balancing protection of the writ and the Government's interest in military operations, "and the other remaining questions[,] are within the expertise and competence of the District Court to address in the first instance.").

In an effort to provide the prompt hearings mandated by the Supreme Court, many of the judges in this District agreed to consolidate their cases before former Chief Judge Thomas Hogan in

-3-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

order to streamline procedures for, and management of, the several hundred petitions filed by detainees. See Order (July 1, 2008) [Civ. No. 08-442, Dkt. No. 1]. On November 6, 2008, after extensive briefing from Petitioners' counsel and the Government, Judge Hogan issued a Case Management Order ("CMO") to govern the proceedings. This Court adopted, in large part, the provisions of that Order, while modifying it somewhat, as noted in Appendix A to Dkt. No. 283.

Much pre-hearing activity has taken place under this Court's Case Management Order. The Government has filed the exculpatory evidence, automatic discovery, and additional discovery required under the CMO. The Government filed its Factual Return for Al-Nahdi on August 1, 2005, and amended it on October 30, 2008. The Petitioner responded by filing Traverses on July 2, 2008, July 9, 2008, and November 3, 2008. After a period of extensive discovery, both parties filed substantial briefs accompanied by extensive exhibits.

On December 16, 2009, the Court set January 4, 2010, as the date for the "Merits Hearing" on the Cross-Motions for Judgment on the Record for all three Petitioners who planned to go forward to challenge their detention. On December 22, 2009, Petitioner Bawazir's case was dismissed without prejudice after he instructed his counsel to not proceed with litigating his Motion. Order

-4-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

(December 22, 2009). Al-Nahdi's case, including the Petitioner's live direct and cross-examination on January 5, 2010, was presented to the Court over a two-day period. Al-Assani's case was presented to the Court on January 7, 2010.

## II. STANDARD OF REVIEW

The Government bears the burden of establishing that detention is justified. See Boumediene, 128 S. Ct. at 2270; Hamdi, 542 U.S. 507, 533-34 (2004). It must do so by a preponderance of the evidence. Order, Appendix A at § II.A (Feb. 12, 2009) [Dkt. No. 283-2]; see also Al-Bihani v. Obama, 590 F.3d 866, 878 (D.C. Cir. 2010); ████ v. Obama, ██████████████████████████

Initially, the Government took the position that Article II of the Constitution and the AUMF granted the President the authority to detain individuals. See Gherebi v. Obama, 609 F. Supp. 2d 43, 53 n.4 (D.D.C. 2009). The Government asserted, "[a]t a minimum, . . . the ability to detain as enemy combatants those individuals who were part of, or supporting, forces engaged in hostilities against the United States or its coalition partners and allies." Resp't's Statement of Legal Justification For Detention at 2 [Dkt. No. 205].

Since the change in administrations, the Government has abandoned Article II as a source of detention authority, and relies solely on the AUMF. Gherebi, 609 F. Supp. 2d at 53 n.4. Further, it no longer uses the term "enemy combatant." Its refined position

-5-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

is:

> [t]he President has the authority to detain persons that
> the President determines planned, authorized, committed,
> or aided the terrorist attacks that occurred on September
> 11, 2001, and persons who harbored those responsible for
> those attacks. The President also has the authority to
> detain persons who were part of, or substantially
> supported, Taliban or al-Qaida forces or associated
> forces that are engaged in hostilities against the United
> States or its coalition partners, including any person
> who has committed a belligerent act, or has directly
> supported hostilities, in aid of such enemy armed forces.

Resp't's Revised Mem. Regarding the Gov's Detention Authority

Relative to Detainees Held at Guantanamo Bay at 3 [Dkt. No. 306].

In Gherebi, Judge Reggie B. Walton of this District Court

ruled that the Government has the authority to detain individuals

who were part of, or substantially supported, al-Qaida and/or the

Taliban, provided that those terms "are interpreted to encompass

only individuals who were members of the enemy organization's armed

forces, as that term is intended under the laws of war, at the time

of their capture." Gherebi, 609 F. Supp. 2d at 70-71. However, in

Hamlily v. Obama, 616 F. Supp. 2d 63 (D.D.C. 2009), Judge John

Bates of this District Court concluded that, under the law of war,

the Government has the authority to detain individuals who were

"part of . . . Taliban or al Qaida forces" or associated forces,

but not the authority to detain those who are merely "substantial

-6-

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

supporters of those groups."[2]  Id. at 74, 76.  As Judge Urbina succinctly stated, "the crux of the distinction between the two approaches lies in whether the government has the authority to detain individuals who substantially supported enemy forces and/or directly supported hostilities against the United States.  Judge Walton has concluded that the government does have this authority, . . . while Judge Bates has held that it does not."  Hatim v. Obama, No. 05-1429, 2009 WL 5191429, at *3 (D.D.C. Dec. 15, 2009) (citations omitted).  This Court concluded that, "[w]hile [it] has great regard for the scholarship and analysis contained in both decisions, . . . Judge Walton's opinion presented a clearer approach," and adopted the reasoning and conclusion in Gherebi. Al-Adahi v. Obama, No. 05-280, 2009 WL 2584685, at *3 (D.D.C. Aug. 21, 2009).

Recently, the Court of Appeals considered the scope of the President's detention authority under the AUMF and related statutes in Al-Bihani v. Obama, 590 F.3d at 870-75.[3]  The Court of Appeals

---

[2]      The Court agrees with Judge Bates' comment that the determination of who was a "part of" the Taliban and/or al-Qaida, under Judge Walton's approach, rests on a highly individualized and case-specific inquiry; as a result, the "concept [of substantial support] may play a role under the functional test used to determine who is 'part of' a covered organization," and the difference in the two approaches "should not be great."  Hamlily, 616 F. Supp. 2d 63, 76 (D.D.C. 2009).

[3]      To the extent that Gherebi or Hamlily are inconsistent with the analysis set forth in Al-Bihani, the decision of the Court

-7-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

rejected Al-Bihani's argument "that the war powers granted by the AUMF and other statutes are limited by the international laws of war," and held that the sources courts must look to are "the text of relevant statutes and controlling domestic caselaw." Id. at 871-72.

The Court of Appeals then examined the various "relevant statutes," including the AUMF, the 2006 Military Commissions Act, Pub.L. No. 109-366, 120 Stat. 2600 (codified in part at 28 U.S.C. § 2241 & note), and the 2009 Military Commissions Act, Pub.L. No. 111-84, tit. XVIII, 123 Stat. 2190, 2575-76. It concluded that a lawfully detained person could be defined as "an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners" or "an individual 'substantially support[ing]' enemy forces." Id. at 872 (internal quotation omitted). The Court made clear that this two-pronged definition (membership and substantial support) included "those who are part of forces associated with Al Qaeda or the Taliban or those who purposefully and materially support such forces in hostilities against U.S. Coalition partners." Id. Finally, the Court concluded that "both prongs are valid criteria that are independently sufficient" to justify detention. Id. at 874.

---

of Appeals controls.

-8-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

## III. ANALYSIS

A. 

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~



The separate question of whether the petitioner poses a threat to the United States' national security is one the district courts have not found determinative, or even relevant, in ruling on the merits of habeas petitions. See Awad v. Obama, 646 F. Supp. 2d 20, 24 (D.D.C. 2009); Anam v. Obama, No. 04-1194, 2010 WL 58965, at *14 (D.D.C. Jan. 6, 2010) (denying petition for habeas corpus despite explicit finding that petitioner "does not currently pose a threat

-10-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

to the security of the United States"). <u>See also</u> <u>Al-Bihani</u>, 590 F.3d at 870-75 (not considering whether petitioner posed future threat in upholding district court's denial of the writ).

Arguing that the threat posed by petitioner is relevant to this Court's inquiry, Petitioner points to language in the Supreme Court's decision in <u>Hamdi</u> that "[t]he purpose of detention is to prevent captured individuals from returning to the field of battle and taking up arms once again." <u>Hamdi</u>, 542 U.S. at 518. ████

████████████████████████████████████

████████ However, the <u>Hamdi</u> Court made clear that, under the AUMF, the President possesses "[t]he authority to detain for the duration of the relevant conflict . . . based on longstanding law-of-war principles." <u>Id.</u> at 521. Thus, the President is authorized to detain Petitioner for the duration of the conflict in Afghanistan, even if Petitioner poses no threat of returning to the field of battle. <u>See</u> Transcript of Oral Ruling at 12-13, <u>Anam v. Obama</u>, No. 04-1194 (D.D.C. Dec. 14, 2009); <u>Awad v. Obama</u>, 646 F. Supp. 2d 20, 24 (D.D.C. 2009); <u>but see</u> ██ <u>v. Obama</u>, ██ ████████████████████████ (concluding that "the AUMF does not authorize the detention of individuals beyond that which is necessary to prevent those individuals from rejoining the battle").

████████████████████████████████████

-11-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET



In short, the question of whether Petitioner poses a threat is not relevant under the AUMF to this Court's review of his continued detention.

-12-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

███████████████████████████████████████████

## B.   Evidentiary Presumptions

As a preliminary matter, some attention must be given to the nature of the evidence that has been presented in this case, and how the Court, as fact-finder, will go about evaluating that evidence.   In attempting to meet its burden, the Government has provided evidence in the form of classified intelligence and interview reports that it believes justify the Petitioner's detention.   The reports contain the statements of Petitioner, as well as statements made by other detainees, that the Government argues demonstrate the Petitioner's status as a member or substantial supporter of al-Qaida and/or the Taliban.[4]

The Government requested that a rebuttable presumption of

---

[4]      Petitioner argues that the Government's evidence should be excluded under the Geneva Conventions, because the evidence was collected in violation of various articles of the Third Geneva Convention.   Pet.'s Response to Gov's Mot. for J. on the Record at 6-7.   The parties previously had briefed this issue in the weeks following Petitioner Al-Adahi's Merits Hearing [Dkt. Nos. 435, 441, 442, and 481].   The Court agrees with the Government that the evidence need not be excluded.   Section 5 of the Military Commissions Act of 2006 ("MCA"), Pub. L. 109-366, § 5, Oct. 17, 2006, 120 Stat. 2631 (codified at 28 U.S.C. § 2241 & note), which was not altered by the MCA of 2009, precludes Petitioner from relying on the Geneva Conventions "as a source of rights."   In addition, this Circuit held in Al-Bihani, 590 F.3d at 875, that "[t]he AUMF, DTA, and MCA of 2006 and 2009 do not hinge the government's detention authority on . . . compliance with international law . . . ." Petitioner therefore cannot rely on the Geneva Conventions to carve out an exclusionary rule for evidence.

-13-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

authenticity be granted to all the exhibits it intends to introduce.[5] Petitioner objected to this request. See Pets.' Joint Opp'n to the Government's Memo. and Supplement Regarding Presumptions, Hearsay and Reliability of Intelligence Information at 3-10 ("Pets.' Presumptions Memo.") [Dkt. No. 400]. In its Order granting Petitioner Al-Adahi's petition for a writ of habeas corpus, the Court ruled that, "[g]iven the Government's representations that the specific documents included in its case against Petitioner, as well as the documents provided to Petitioner's counsel in discovery, have all been maintained in the ordinary course of business, the Court will presume, pursuant to Fed. R. Evid. 803(6), that its documents are authentic." Al-Adahi v. Obama, 2009 WL 2584685, at *3. As provided for in the CMO, the Government's exhibits will be granted a rebuttable presumption of authenticity and will be deemed authentic in the absence of any rebuttal evidence to the contrary.

In Petitioner Al-Nahdi's case, the Government also requested that a rebuttable presumption of accuracy be granted to all the exhibits it intended to introduce. The Petitioner objected to this request as well. See Pets.' Presumptions Memo. at 3-10. This

---

[5]     Ordinarily, "the requirement of authentication requires that the proponent, who is offering a writing into evidence as an exhibit, produce evidence sufficient to support a finding that the writing is what the proponent claims it to be."   2 K. Broun, McCormick on Evidence § 221 (6th ed.).

-14-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

request is denied for several reasons.

First, there is absolutely no reason for this Court to <u>presume</u> that the facts contained in the Government's exhibits are accurate. The accuracy of much of the factual material contained in those exhibits is hotly contested for a host of different reasons, ranging from the fact that it contains second-level hearsay, to allegations that it was obtained by torture, to the fact that no statement purports to be a verbatim account of what was said.

Second, given the fact that this is a bench trial, the Court must, in any event, make the final judgment as to the reliability of these documents, the weight to be given to them, and their accuracy. Those final judgments will be based on a long, non-exclusive list of factors that any fact-finder must consider, such as: consistency or inconsistency with other evidence, conditions under which the exhibit and statements contained in it were obtained, accuracy of translation and transcription, personal knowledge of declarant about the matters testified to, levels of hearsay, recantations, etc.[6]

Denial of the Government's request for a rebuttable presumption of accuracy does not mean, however, that the Government

---

[6]     While the Supreme Court did suggest in <u>Hamdi</u> that a rebuttable presumption "in favor of the Government's evidence" might be permissible, 542 U.S. at 534, it did not mandate it. In <u>Boumediene</u>, the Court clearly left it to the District Courts to craft appropriate procedures. <u>Boumediene</u>, 128 S. Ct. at 2272.

-15-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

must present direct testimony from every source, or that it must offer a preliminary document-by-document foundation for admissibility of each exhibit. As the Supreme Court noted in Hamdi, 542 U.S. at 533-34, hearsay may be appropriately admitted in these cases because of the exigencies of the circumstances. See also Al-Bihani v. Obama, 590 F.3d at 879-80.

Finally, while parties always retain the right to challenge the admissibility of evidence, the Court will be guided by the Federal Rules of Evidence, in particular Rule 402, providing that "[a]ll relevant evidence is admissible." Once all evidence is admitted into the record, the Court will then, in its role as fact-finder, evaluate it for credibility, reliability, and accuracy in the manner described above. Id.

### C.   Mosaic Theory

The Government advances several categories of allegations which, in its view, demonstrate that the Petitioner was detained lawfully. Above all, its theory is that each of these allegations --and even the individual pieces of evidence supporting these allegations--should not be examined in isolation. Rather, "[t]he probity of any single piece of evidence should be evaluated based on the evidence as a whole," to determine whether, when considered "as a whole," the evidence supporting these allegations comes together to support a conclusion that shows the Petitioner to be

-16-

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

justifiably detained.  Gov's Mot. for J. Upon the R. and Mem. in

Supp. at 6 (internal citation omitted) [Dkt. No. 499].  While the

Government avoids an explicit adoption of the mosaic theory, it is,

as a practical matter, arguing for its application to the evidence

in this case.  Cf. Hatim v. Obama, No. 05-1429, 2009 WL 5191429, at

*3 n.1; Ali Ahmed v. Obama, 613 F. Supp. 2d 51, 55-56 (D.D.C.

2009).

The Court understands from the Government's declarations, and

from case law,[7] that use of this approach is a common and well-

established mode of analysis in the intelligence community.  This

may well be true.  Nonetheless, at this point in this long, drawn-

out litigation the Court's obligation is to make findings of fact

and conclusions of law which satisfy appropriate and relevant legal

standards  as  to  whether  the  Government  has  proven  by  a

preponderance of the evidence that the Petitioner is justifiably

detained.  The kind and amount of evidence which satisfies the

intelligence community in reaching final conclusions about the

value of information it obtains may be very different from, and

certainly cannot determine, this Court's ruling.

Even using the Government's theoretical model of a mosaic, it

---

[7]    See, e.g., McGehee v. Casey, 718 F.2d 1137, 1149 (D.C.
Cir.  1983)  (recognizing  that  the  "mosaic-like  nature  of
intelligence gathering" requires taking a "broad view" in order to
contextualize  information)  (internal  citations  and  quotations
omitted).

-17-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

must be acknowledged that the mosaic theory is only as persuasive as the tiles which compose it and the glue which binds them together -- just as a brick wall is only as strong as the individual bricks which support it and the cement that keeps the bricks in place. Therefore, if the individual pieces of a mosaic are inherently flawed or do not fit together, then the mosaic will eventually split apart, just as the brick wall will eventually collapse.

A final point must be kept in mind. One consequence of using intelligence reports and summaries in lieu of direct evidence is that certain questions simply cannot be answered, i.e., there are no deposition transcripts to consult and few if any witnesses are available for cross-examination. Despite the fact that Petitioner testified via video-conference from Guantanamo Bay, and was cross-examined by the Government,[8] sizeable gaps may appear in the record and may well remain unfilled; each party will attempt to account for these deficiencies by positing what they think are the most compelling logical inferences to be drawn from the existing

---

[8]    Petitioner's testimony was closed to the public. However, the Government was ordered to conduct expedited classification reviews of the testimony transcript so that it could be released on the public docket. Order (December 16, 2009) [Dkt. No. 514]. The Government complied, and the transcripts were made available to the public on January 29, 2010 [Dkt. No. 543]. The Government also was ordered to videotape the testimony and maintain a redacted copy of the tape.

-18-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

-SECRET-

evidence. Accordingly, that existing evidence must be weighed and evaluated as to its strength, its reliability, and the degree to which it is corroborated. In any event, the Government always bears the ultimate burden of showing by a preponderance of the evidence that Petitioner's detention is lawful. Just as a criminal defendant need not prove his innocence, a detainee need not prove that he was acting innocently. In sum, the fact that the Petitioner may not be able to offer neat answers to every factual question posed by the Government does not relieve the Government of its obligation to satisfy its burden of proof.

D. **Legal Standard Governing Petitioner's Knowledge and Intent**

Petitioner relies heavily on the argument that, assuming arguendo that he was recruited through an al-Qaida network to train in Afghanistan, the Government has not proved by a preponderance of the evidence that he knew that the facilitators, guesthouses, and training camp that he encountered along the way were associated with al-Qaida. Instead, Petitioner argues, he decided to travel to Afghanistan to receive military training for its own sake and/or to help the Palestinian cause, and would not have gone if he had known he was being recruited to join al-Qaida. Pet.'s Mot. for J. on the Record at 4 [Dkt. No. 494] ("Pet.'s Mot.").

This argument raises the important question of what level of knowledge or intent is required under the relevant caselaw. Given

-19-

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

how central this question is to Petitioner's defense, the Court will address the legal standard first,[9] before evaluating the evidence offered by the Government to prove its allegations.

Under the standard adopted in this Circuit, the President may detain persons who were part of, or substantially supported, Taliban or al-Qaida forces or associated forces. Al-Bihani, 590 F.3d at 871-74. Although there is no explicit scienter requirement, the District Court in Hamlily concluded that this framework "does not encompass those individuals who unwittingly become part of the al Qaeda apparatus." Hamlily, 616 F. Supp. 2d at 75. Instead, "some level of knowledge or intent is required," at least under the membership prong. Id.

First, given the tenor of some of Petitioner's arguments it bears emphasis that the Government is not required to prove that Petitioner had reason to know specifically that Coalition forces would enter the conflict in Afghanistan, or that Petitioner had the specific intent to fight against the United States or its allies. See, e.g., Pet.'s Mot. at 1-2, 10. Instead, the knowledge or intent that must be shown relates to Petitioner's decision to

---

[9] On January 6, 2010, at the end of the Merits Hearing, the parties were ordered to file supplemental briefs on the knowledge and intent issues and the degree, if any, to which Al-Bihani addressed them. Order (Jan. 6, 2010) [Dkt. No. 531]. Unfortunately, the Court of Appeals had no occasion in the Al-Bihani opinion to address the issues of knowledge and intent.

-20-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

-SECRET-

become a part of or to substantially support al-Qaida and/or the Taliban. Thus, even a recently recruited, low-ranking Taliban or al-Qaida member who had no reason to suspect the United States' entrance into the conflict is detainable, so long as the decision to "function[] or participate[] within or under the command structure of the organization" was made with some knowledge or intent, and so long as the individual was functioning or participating within the command structure at the time of capture. Gherebi, 609 F. Supp. 2d at 68-69.

Second, the Government need not show that a petitioner knew or intended from the moment his journey began that it would end in al-Qaida and/or Taliban membership. See Pet.'s Supp. Brief at 6 [Dkt. No. 537]. It is both possible and probable that an individual would obtain such knowledge or form such intent over the course of a journey, as training and indoctrination are undertaken and political views are crystallized. The fact that an individual may have been initially motivated to travel abroad for innocent reasons, or that an individual's knowledge or intent was less than clear at the inception of his journey, does not defeat the Government's case. Instead, it is sufficient for the Government to prove by a preponderance of the evidence that, at some point before capture, it is more likely than not that Petitioner knew he was becoming or intended to become a part of or substantial supporter

-21-

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

of al-Qaida and/or the Taliban.

Finally, as this Circuit has explained, albeit in the criminal context, "[e]xcept in extraordinary circumstances, [] intent cannot be proved by direct evidence," and "it is therefore not only appropriate but also necessary for the [fact-finder] to look at 'all of the circumstances.'" United States v. Haldeman, 559 F.2d 31, 115-16 (D.C. Cir. 1976); see also United States v. Rhodes, 886 F.2d 375 (D.C. Cir. 1989) (citation omitted). The Government need not always have direct evidence of a petitioner's knowledge that an organization is, or is associated with, al-Qaida and/or the Taliban, or of a petitioner's intent to become a part of or to substantially support such an organization. In such cases, an inference of knowledge or intent may be drawn from indirect and circumstantial evidence. See, e.g., Anam, 2010 WL 58965, at *11.

**E. Government Allegations**

In narrowing the issues for trial, the parties focused on five broad factual areas that are in dispute. The Court then heard arguments and evidence about the existence and extent of (1) Petitioner's decision to travel to Afghanistan with the aid of al-Qaida facilitators, and about the trip itself; (2) Petitioner's stay at al-Qaida guesthouses; (3) Petitioner's knowing attendance at al-Qaida's Al Farouq training camp and subsequent travel to Tora Bora pursuant to a military order from al-Qaida's Al Farouq

-22-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

leadership; (4) Petitioner's guarding of rear-echelon positions at

Tora Bora while under al-Qaida's command, and subsequent injury by

Coalition bombs while retreating with al-Qaida forces; and (5)

Petitioner's participation in hostilities against the United States

or its allies.[10]

        **1. Decision to Travel to Afghanistan with the Aid of al-Qaida Facilitators and Travel to Afghanistan**

        **a. Decision to Travel to Afghanistan**

While the parties are mainly in agreement about <u>how</u> Petitioner

traveled to Afghanistan, as discussed further below, they dispute

<u>why</u> he chose to make the trip. Al-Nahdi stated in an interrogation

that he decided to travel to Afghanistan to receive training "as

outlined in a fatwa he heard issued by Sheik Hammoud al-Oqalah."

JE 3 at 2; JE 1 at 3.[11] The Government argues that, given the

---

[10] In preparation for the Merits Hearing, Petitioner identified as a factual issue in dispute "[w]hether Mr. al-Nahdi ever participated in hostilities against the United States or its allies." Pet.'s Stmt. of Main Issues in Dispute ¶ 5 [Dkt. No. 516]. However, the Court of Appeals' subsequent decision in <u>Al-Bihani</u> has made clear that the legal standard governing the President's detention authority under the AUMF is whether Petitioner was a member or substantial supporter of al-Qaida and/or the Taliban. <u>Al-Bihani</u>, 590 F.3d at 870-74. While participation in hostilities is certainly relevant to the legal inquiry into membership and/or substantial support, it is not controlling. Thus, this issue has been incorporated into the broader discussion in this section of whether Petitioner was a member or substantial supporter of al-Qaida and/or the Taliban.

[11] Parties submitted two volumes of Joint Exhibits, which comprise the vast majority of evidence presented during trial. Unless otherwise indicated, citations to "JE" refer to the universe

-23-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

timing of Petitioner's decision, the fatwa he heard was more likely than not a fatwa known to have been issued by al-Oqalah which called on Muslim men to fight alongside the Taliban. JE 35 at 3. That fatwa is alleged to have been circulating in Saudi Arabia, where Petitioner undisputedly spent two months in 2001 in order to see the "holy places". Gov's Stmt. of Material Facts Not in Dispute ("Gov's Stmt. of Undisputed Facts") ¶ 5.

Petitioner responds that the Government has offered no direct evidence that this fatwa was the one Al-Nahdi heard, rather than one calling simply for military training. He notes that he stated in an interrogation that the fatwa called on him to train. JE 2 at 3. However, at the Merits Hearing the Government represented that there was no evidence--and indeed there is no evidence in the record--that a fatwa directing its listeners to merely train, and not to both train and fight, was ever issued. Thus, given that Petitioner named al-Oqalah as the author of the fatwa, and that a fatwa from al-Oqalah directing listeners to fight with the Taliban regime was circulating in Saudi Arabia at the time Petitioner concedes he was in that country and heard a fatwa, the Court finds that it is more likely than not that the fatwa heard by Petitioner called on Muslims to fight, and not just to train.

Petitioner also relies on other, somewhat contradictory

of Joint Exhibits.

-24-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

statements in the record to show that his motivation was simply to train. Al-Nahdi stated in interrogations that he went to Afghanistan to receive basic training to "help with the Palestine issue" because, as explained in the fatwa, it was "the duty of all Muslims to receive basic military training." JE 1 at 3; JE 2 at 3; see also JE 39. However, at his Administrative Review Board ("ARB") proceeding, he stated that he went "to defend [his] country," but also that there was "no direct reason" for his going there. JE 6 at 2-3. Given that it was in Petitioner's interest to deny wanting to fight with the Taliban, such contradictory and vague statements do not adequately rebut the Government's evidence on this point. Cf. Hamdi, 542 U.S. at 534 (concluding that the Constitution is not offended by a burden-shifting scheme in which, once the government puts forth credible evidence, the onus shifts to the petitioner to rebut that evidence). The Government also persuasively argues that Petitioner's claimed motivation makes little sense, as it is undisputed that Al-Nahdi had undergone a month of Kalashnikov and physical fitness training--the kind of training he received in Afghanistan--with the Yemeni military when he joined the provincial Military Police in the 1990s. Gov's Stmt. of Undisputed Facts ¶ 3. But see Anam, 2010 WL 58965, at *9 (finding both parties' narratives regarding petitioner's intent to receive training "lacking").

-25-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

### b. Travel to Afghanistan

The next issue involves the details of Al-Nahdi's trip to Afghanistan. The parties mainly dispute the extent to which Petitioner knew that the well-worn route he traveled was associated with al-Qaida, although there is also some dispute as to whether the individuals who facilitated Al-Nahdi's travel were associated with al-Qaida and/or the Taliban.

It is undisputed that Al-Nahdi traveled to Afghanistan in 2001 with the assistance of ▇▇▇▇▇ a man he was put into contact with by a preacher at Al-Nahdi's mosque, ▇▇▇▇▇▇▇▇ paid for Al-Nahdi's bus trip from his home in Al-Mukalla, Yemen to Sanna, Yemen. In Sanna, Al-Nahdi met Petitioner ▇▇▇▇ and another Yemeni man, both of whom would travel to Afghanistan with him. Al-Nahdi also met with ▇▇▇▇ who made Al-Nahdi's travel arrangements and paid for his airplane ticket to Karachi, Pakistan. Gov's Stmt. of Undisputed Facts ¶¶ 12-15.

The Government contends that ▇▇▇ was an al-Qaida recruiter, pointing to evidence in the record that (1) these arrangements fit a general pattern of recruiting in the region for al-Qaida and the Taliban, and (2) ▇▇▇ arranged for Al-Nahdi to meet up with a known al-Qaida facilitator in Pakistan. Petitioner responds that the Government has offered no direct evidence connecting either ▇▇▇▇▇▇ to al-Qaida, and that in any event the analysis

-26-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

should turn on Al-Nahdi's knowledge of any such connection.

Once in Pakistan, Al-Nahdi, ████████ and the third Yemeni man followed ████ instructions to wait for a contact person who would identify them through a "challenge and pass" system, i.e. the contact person would approach and say ████████ and wait for Al-Nahdi to respond ████████    Id. ¶¶ 16-18.[12] After satisfying the challenge and pass, the three men were taken to a guesthouse in Karachi run by a man whom the Government contends is a known al-Qaida facilitator--████████[13]--and then

---

[12]    Petitioner disputes ¶ 17 of the Government's Statement of Undisputed Facts, which describes the challenge and pass system used at the Karachi airport, as a mischaracterization of statements attributed to Al-Nahdi.    Pet.'s Response to the Gov's Stmt. of Undisputed Facts [Dkt. No. 511].    However, no such argument was made at the Merits Hearing.    Without any indication of how or why Petitioner's statements are being mischaracterized by the Government, and given that the Government has produced the original intelligence report containing the summary of Al-Nahdi's statements regarding the challenge and pass system, JE 24 at 2-3, the Court will credit ¶ 17 as accurate.

[13]    Petitioner argues that any admissions made by ████████ ████ are unreliable because he was rendered to Jordan and tortured before arriving at Guantanamo.    Pet.'s Response to Gov's Mot. for J. on the Record at 12 n.6.    As this Court explained in Mohammed v. Obama, No. 05-1347, 2009 WL 4884194, at *22-27 (D.D.C. Dec. 16, 2009) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)), courts apply a "totality of the circumstances" test, considering "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators" in determining whether prior coercion carries over into a second confession.    However, Petitioner has presented no information on the extent of torture suffered by Riyadh or its impact on his statements. Without such information, the Court is not prepared to reject the Government's evidence as unreliable.    Cf. id. Therefore, the Government's evidence stands as unrebutted and must

-27-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

to a second guesthouse in Quetta, Pakistan. From the guesthouse in Quetta, the three men traveled by taxi to the Afghanistan border, where the Government alleges, based on information given by Petitioner ██████████ that they evaded a border checkpoint by riding on motorcycles and reconnected with the taxi on the Afghanistan side of the border. JE 14 in ISN 554's Merits Hearing at 3.

The clandestine nature of Petitioner's travel to Afghanistan, as well as the unlikeliness, in one of the poorest areas of the world, of one stranger offering another a generous sum of money[14] to travel abroad to receive military training, suggest not only that Al-Nahdi was being recruited by al-Qaida, but also that he suspected as much at the time. However, the Court need not answer whether the Government has met its burden to prove that Al-Nahdi more likely than not knew at this point that he was associating with al-Qaida since, as discussed below, there is little doubt that Petitioner became aware of the al-Qaida connection after arriving at the Al Farouq training camp.

---

be accepted as credible.

[14]   In addition to having his airplane ticket to Pakistan paid for, Petitioner admitted in an interrogation that Abdal Khalik gave him the equivalent of $300-400 for his travels. JE 24 at 4. Given that Yemen is one of the poorest countries in the world, this would have been an extremely generous amount of money, exceeding the annual income of an average Yemeni man. See Decl. of Dr. Sheila Carapico, Pet.'s Ex. 2 ¶ 19.

-28-

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

## 2.   Guesthouse Stay

The Government produced evidence that Al-Nahdi stayed in three guesthouses during the period in question: 1) Riyadh the Facilitator's guesthouse in Karachi, Pakistan; 2) a guesthouse in Quetta, Pakistan; and 3) the al-Nebras guesthouse in Afghanistan. The parties do not dispute that Al-Nahdi stayed at the Karachi and al-Nebras guesthouses, although Petitioner's stay in Quetta is disputed.   More significantly, Petitioner disputes whether any of the three guesthouses were al-Qaida safehouses and, even if they were, whether he knew it.

The Government argues that these guesthouses differed from those typically frequented by young Yemeni men traveling abroad, which resemble youth hostels.   <u>See</u> Decl. of Dr. Sheila Carapico, Pet.'s Ex. 2 ¶ 4 (describing typical guesthouse).



Significantly, Al-Qaida

-29-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

safehouses were not open to the public, but were restricted to individuals who either had connections to al-Qaida or had been brought there by al-Qaida supporters.  JE 20 at 3.

Upon arriving in Karachi, Pakistan, Al-Nahdi was taken, as noted earlier, to a guesthouse run by a man he identified as ▮▮▮▮▮▮▮▮  When shown a photograph of ISN ▮▮▮▮-another Guantanamo Bay detainee known as ▮▮▮▮▮▮▮▮▮▮▮▮ who is alleged to have assisted al-Qaida recruits traveling to Afghanistan[15]-- Petitioner positively identified him as the man who ran the Karachi guesthouse.  In addition, Petitioner stated in interrogations that he stayed there for five to seven days without having to pay any money, that he did not leave the house to go outside because he was warned not to, and that the other guests were afraid to speak to one another or to share their names because they had not yet been given their "aliases".  JE 4 at 1; JE 24 at 3-4.

The Government argues that Petitioner next traveled to Quetta by bus, using the money that Abdal Kalik had given him in Yemen. In Quetta, he stayed at what the Government contends was an "Afghan safehouse".  JE 24 at 4; Gov's Stmt. of Undisputed Facts ¶ 25.  The Government relies on information given by Petitioner ▮▮▮▮▮▮▮

---

[15]    ISN 1547 admitted at his ARB to having facilitated travel to Afghanistan for those "trying to get into Afghanistan," and to having had close connections to Usama bin Bin Laden.  JE 10 at 2-3.

-30-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

whom Al-Nahdi admits was his companion at the time, that they were escorted by a man named Omar to a guesthouse in Quetta, where they rested for two hours before continuing their journey. JE 14 in ISN 554's Merits Hearing at 3.

From Quetta, it is undisputed that Petitioner crossed the border into Kandahar, Afghanistan, where he stayed at the al-Nebras guesthouse. Petitioner stated that this guesthouse was run by a man named ████████████ Gov's Stmt. of Undisputed Facts ¶¶ 26-27. The parties do not dispute that Al-Nahdi's passport was taken at the guesthouse, or that Petitioner was shown a film about jihad in Bosnia and Chechnya there. Id. ¶¶ 29-30.

The Government introduced evidence that the al-Nebras guesthouse was where foreign fighters were sent before attending training at al-Qaida's Al Farouq training camp, id. ¶ 28, and that passports were taken in order to establish greater control over recruits, JE 20. The Government also points to Petitioner's statements in interrogations that he did not leave the house during his stay at al-Nebras, which lasted about a week, and that he was taken from al-Nebras directly to Camp Al Farouq. JE 24 at 4; JE 1 at 2. Finally, the Government relies on statements by Petitioner ████████████ that al-Nebras is also the safehouse where Petitioner stayed for a night after leaving Al Farouq and before arriving in Tora Bora. JE 2 at 3; JE 21 in ISN 554's Merits Hearing.

-31-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

Again, the evidence indicates that Petitioner was being carefully guided from place to place in a secretive manner. Given the unusual manner in which guests were treated and behaved, it appears more likely than not that the Karachi and al-Nebras guesthouses, if not the Quetta guesthouse, were al-Qaida safehouses. See also Anam, 2010 WL 58965, at *9.

Merely staying at an al-Qaida safehouse is typically insufficient to satisfy the detention standard. See Ali Ahmed, 613 F. Supp. 2d at 65 (finding guesthouse stay insufficient to justify detention); but see Al-Bihani, 590 F.3d at 873 n.2 (suggesting in dicta that the "military's reasonable belief" of a non-citizen's guesthouse stay alone would "overwhelmingly" justify the government's detention). However, in this case the fact that Petitioner willingly stayed in houses where he was advised not to go outside, where he was afraid to share his real name with other guests, where his passport was taken and held, and where he was shown jihadist videos strengthens the inference that Al-Nahdi knew he was associating with al-Qaida, and, in turn, the inference that he was intentionally taking steps to join al-Qaida's ranks. Cf. Transcript of Oral Ruling at 37-39, Anam v. Obama, No. 04-1194 (D.D.C. Dec. 14, 2009); Razak Ali v. Obama, No. 09-745, 2009 WL 4030864, at *3-4 (D.D.C. Nov. 19, 2009).

-32-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

### 3. Attendance at Al Farouq and Subsequent Travel to Tora Bora

The Government's accusation that Al-Nahdi attended al-Qaida's Al Farouq training camp in 2001 is not disputed by Petitioner; he admitted to it in his testimony. Transcript of Merits Hr'g Testimony of Suleiman Al-Nahdi at 17, Al-Adahi v. Obama, No. 05-280 (Jan. 5, 2010) ("Tr. (Jan. 5, 2010)"). He also admitted in his testimony that he saw Usama Bin Laden at the camp and heard him speak about jihad. Id. at 20. However, Petitioner claims that he did not know of Al Farouq's al-Qaida affiliation during the approximately twenty to thirty days he spent there, and that he would not have gone if he had known. Id. at 19.

Petitioner also disputes the Government's allegation that he left Al Farouq pursuant to a military order from al-Qaida leadership. Instead, Petitioner argues he left the camp of his own accord and traveled with a group to Tora Bora in an effort to leave the country. Id. at 21-23.

#### a. Attendance at Al Farouq

According to Government experts, Al Farouq was al-Qaida's "primary Afghan basic-training facility, providing ideological indoctrination and [weapons and other] training." Gov's Stmt. of Undisputed Facts ¶ 31. Petitioner spent about twenty to thirty days at Al Farouq, receiving Kalashnikov and physical fitness training from his trainer, Johaina. Id. at ¶¶ 33-38. In a 2▮

-33-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

2 ▓▓▓▓▓▓ interrogation, Al-Nahdi stated that he knew the camp was run by al-Qaida, although he has denied this in subsequent interrogations and proceedings.[16] Compare JE 3 at 3, with JE 5, JE 2 at 3, JE 6 at 3. Petitioner has consistently admitted to having heard Usama Bin Laden speak at a mosque at Al Farouq approximately two weeks before the September 11, 2001 attacks. He does not dispute that Bin Laden gave a speech on jihad, "providing encouragement to the camp members during their training and for the jihad." Gov's Stmt. of Undisputed Facts ¶¶ 42-45.

Even if the evidence leading up to Al-Nahdi's attendance at Al Farouq is insufficient to establish that he knew he was associating with al-Qaida, the Court finds that it is far more likely than not that he fully understood it by the time he was at Al Farouq. It is simply not credible that he would have attended the camp, which provided ideological indoctrination, for twenty to thirty days without realizing with whom he was dealing. The fact that Petitioner heard Usama Bin Laden--who, as the Government points out, was by this time notorious for his role in the October 12, 2000 USS Cole bombing off the coast of Yemen--speak about jihad at

---

[16] In interrogations, Al-Nahdi once denied having known anything about al-Qaida until after his arrest, and once denied having known anything about al-Qaida besides what he learned in a single newspaper article. JE 5, JE 2 at 3. Before the Combatant Status Review Tribunal, he simply stated that he "didn't know at first that [al Qaida] [] ran the camp," but "found out afterwards." JE 6 at 3.

-34-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

Al Farouq resolves any remaining doubt, especially in light of the particular manner in which Al-Nahdi was guided to the camp.[17] Cf. Transcript of Oral Ruling at 48-50, Anam v. Obama, No. 04-1194 (D.D.C. Dec. 14, 2009) (concluding petitioner had to have known Al Farouq was an al-Qaida training camp).

### b.   Travel to Tora Bora

The Court finds that it is more likely than not that Petitioner knew he was associating with al-Qaida by the time of his stay and training at Al Farouq, and was thereby demonstrating his support for it.   The next disputed factual issue is whether a preponderance of the evidence establishes his membership in or substantial support of al-Qaida.   While Petitioner's guesthouse stays and training at Al Farouq alone might well suffice to justify detention, the Government makes even stronger allegations of membership and substantial support.   One of the Government's key allegations is that Al-Nahdi left Al Farouq to go to Tora Bora pursuant to an order given by the al-Qaida leadership in anticipation of the United States' retaliation for the September 11, 2001 attacks.   As noted above, Petitioner disputes this characterization of the events, arguing that he left the camp simply because he wanted to leave Afghanistan.

---

[17]   Petitioner's vague and inconsistent statements about his knowledge of al-Qaida's connection to Al Farouq further confirm the unreliability of his denials.

-35-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

As its most direct piece of evidence supporting this claim, the Government relies on Petitioner's statement in his ARB proceeding that Al Farouq leaders "ordered us to move from one place to another. They told us to go to Tora Bora so that is where we went." JE 6 at 8-9. Petitioner also stated that "[a]t the time, you could not ask them why and where we were going. You cannot refute them. You had to do what they told you to do." Id. at 9.

Petitioner does not dispute that when he left he traveled with a group of Al Farouq camp members, "staying in a series of safehouses and a campsite until eventually reaching Tora Bora." Gov's Stmt. of Undisputed Facts ¶ 50. Instead, Petitioner argues that there might have been mistranslations at the ARB proceeding so that a voluntary, mass evacuation from Al Farouq appears on the record to have been the result of orders handed down by al-Qaida leadership. The quoted portion of the transcript from the ARB proceeding, however, leaves little doubt that Petitioner meant he "had to do" what the camp's leadership told him. Moreover, Petitioner's self-serving argument rests on pure speculation, with no facts to support it.

Petitioner also argues that he had no choice but to remain in the camp, since those who left were often considered spies and treated harshly. Pet.'s Mot. at 11 n.5. In the absence of any

-36-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

evidence at all that Petitioner attempted to leave Al Farouq at any point or to disobey the order to leave, or even that he desired to do so, this argument cannot be credited. The Court also notes that petitioners in other cases before this Court have successfully left Al Farouq without repercussion. See, e.g., Al-Adahi, 2009 WL 2584685, at *9; Transcript of Oral Ruling at 40-41, Anam, No. 04-1194 (D.D.C. Dec. 14, 2009) (finding not credible petitioner's claim that he wanted to leave Al Farouq but could not); Anam, 2010 WL 58965, at *10 (same).

Thus, the Court finds it more likely than not that Petitioner left Al Farouq and traveled to Tora Bora pursuant to a specific order from the camp's al-Qaida leadership. This alone would be sufficient under both Al-Bihani, 590 F.3d at 870-74, and Gherebi, 609 F. Supp. 2d at 70-71, to conclude that Al-Nahdi functioned or participated within or under the command structure of the organization. However, the Government additionally alleges that, while at Tora Bora, Al-Nahdi guarded a rear-echelon position pursuant to orders from senior al-Qaida leaders.

> 4.    Guarding of Rear-Echelon Position at Tora Bora, Injury While Retreating, and Capture

Perhaps the most serious allegation against Petitioner is that, upon arriving at Tora Bora, he guarded a rear-echelon

-37-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

position at Camp Thabit.[18]   The principal evidence to support this

claim comes in the form of Petitioner's own statements at his ARB

proceeding that, for the ten to fourteen days he was at Tora Bora,

---

[18]   At this point in the chronology, the Court has absolutely
no doubt that Al-Nahdi knew he was consorting with al-Qaida
members.   It is undisputed that he learned of the September 11,
2001 attacks shortly after arriving at Tora Bora.   When he arrived
at the base of the mountains, Usama Bin Laden and Ayman al-Zawahiri
spoke to Al-Nahdi's group--all of whom were armed with Kalashnikov
rifles--for an hour about jihad.   Gov's Stmt. of Undisputed Facts
¶¶ 52-56.   Bin Laden al-Zawahiri also appear to have told the group
that they were at war with the United States.   JE 7 at 2.   It is
simply not credible that Petitioner had no knowledge that he was
traveling with al-Qaida in the face of these undisputed facts.

In direct testimony at his Merits Hearing, Al-Nahdi claimed
that any prior statements he made to United States authorities
admitting that he heard Bin Laden speak at Tora Bora were made as
a result of torture.   Tr. (Jan. 5, 2010) at 53.   This claim has
been raised only once before--at Petitioner's CSRT--and has not
been raised at any point in these judicial proceedings prior to the
Merits Hearing.   JE 5 at 2.   Al-Nahdi alleges he was tortured by
Afghan forces in Kabul before being placed in United States
custody; he does not allege any torture while in United States
custody.

This Court has recognized that credible allegations of torture
can destroy the reliability of certain evidence.   See Mohammed v.
Obama, 2009 WL 4884194, at *48-70; Ali-Ahmed v. Obama, 613 F. Supp.
2d 51, 58 (D.D.C. 2009).   However, as this Court explained in
Mohammed, "[t]he use of coercion or torture to procure information
does not automatically render subsequent confessions of that
information inadmissible."   Mohammed, 2009 WL 4884194, at *23
(citing United States v. Bayer, 331 U.S. 532, 540-41 (1947)).
Instead, any subsequent confessions must be shown to have been
tainted by the coercion or torture.   Petitioner has offered no
evidence that his statements at the CSRT were tainted by his
torture in Pakistan.   Given the late hour at which Petitioner
asserts this claim, the detail in which Petitioner previously
described Bin Laden's speech, and the fact that those details match
other detainees' accounts, his recent recantations of his prior
statements on this issue are found to be not credible.   Cf. Anam,
2009 WL 58965, at *8.

-38-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

he "took turns with others standing guard" in front of a foxhole.[19]
At the Merits Hearing, Petitioner gave completely contradictory
testimony and denied ever having been ordered to guard anything at
Tora Bora.  Tr. (Jan. 5, 2010) at 28.

However, the detailed account given by Petitioner when
interrogated about the camp's operations, including the procedures
followed by the camp's guards, lends credence to the allegation
that he functioned as a guard within a command structure.  JE 25 at
4.  For example, he stated that guards were posted every night at
approximately 4:00 p.m. until 12:00 local time the following day,
that shifts rotated every couple of hours, and that passwords--
determined by camp leaders--were used to identify approaching
personnel.  Significantly, if an approaching individual did not
know the password, the guards were instructed to shoot that person
in the leg if he ran.  Id.  Al-Nahdi also explained the command
structure of the camp in detail, which indicates his knowledge of,
and also his role within, the military hierarchy.  JE 25 at 2-4.
In light of this evidence, the Court concludes it is more likely

---

[19]   Petitioner has placed great weight on whether he said he
was guarding a cave, a foxhole, a bunker, or a ditch.   While
evidence in the record describing the camp would suggest that he
was, in fact, guarding a bunker, JE 25 at 2, it is a distinction
without meaning.   What matters is that Al-Nahdi was guarding an
area which his superiors thought was of military value pursuant to
an order from al-Qaida leadership; the precise nature of that area
is irrelevant.

-39-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

than not that Al-Nahdi executed orders to guard a rear-echelon position at Tora Bora.

Nor is there any evidence that Petitioner attempted to dissociate himself from this group before being captured. Petitioner does not dispute that he waited at Tora Bora for a guide for twenty-five days before attempting to cross the border. Gov's Stmt. of Undisputed Facts ¶ 69. He then left with a group which, after walking for five hours, was bombed by Coalition forces. Petitioner was injured by shrapnel and shortly thereafter captured by Coalition forces. Id. at ¶¶ 70-71.

The Government's allegations, if credited, would overwhelmingly establish Al-Nahdi's membership in al-Qaida under Al-Bihani and Gherebi, given his role within the command structure and his execution of orders to guard the rear-echelon position. See Al-Bihani, 590 F.3d at 870-75; Gherebi, 609 F. Supp. 2d at 70-71. In order to dispute the Government's characterization of his activities at Tora Bora, Petitioner points to evidence that many, including himself, were scared and only wanted to go home after the fighting began, but could not because their passports and money had been taken. JE 7 at 2. Al-Nahdi argues that, when placed in context, the evidence could reasonably lead to the conclusion that he was present at Tora Bora, but was not an active participant in the hostilities. Instead, according to Al-Nahdi, he was simply

-40-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

trying to escape with his life when he was captured.

However, since the Taliban and al-Qaida leadership had already ordered a staggered retreat weeks before Al-Nahdi left his guard post, it is more likely than not that Al-Nahdi left Tora Bora under orders from al-Qaida, or at least without objection. Thus, while it may be true that Petitioner was happy to leave Tora Bora when he did, his attempt to cross back into Pakistan does not demonstrate an effort to dissociate himself from al-Qaida. See Al-Ginco v. Obama, 626 F. Supp. 2d 123, 129 (D.D.C. 2009) (describing factors that would indicate dissociation from al-Qaida). Moreoever, it is undisputed that, in his only prior attempt to leave Tora Bora, Al-Nahdi acted in proper "command mode": he asked his commander, Abul Qudoz, if he could leave, and after being rebuked did not attempt to do so. Gov's Stmt. of Undisputed Facts ¶ 66. Given this evidence, the Court concludes that it is more likely than not that Al-Nahdi was a part of al-Qaida's forces at Tora Bora and did not dissociate himself from al-Qaida before being captured.

IV. CONCLUSION

To summarize, the Government has met its burden to demonstrate by a preponderance of the evidence that Petitioner heard a fatwa that called on him to fight alongside the Taliban, that he subsequently traveled--at no cost to himself and while staying at al-Qaida-associated guesthouses--to Afghanistan, that he watched a

-41-

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

jihadist video at one such guesthouse, that he received military training at al-Qaida's Al Farouq camp, that he left Al Farouq after a few weeks under orders from al-Qaida leadership, that he traveled to Tora Bora and assumed a role guarding a rear-echelon position at Camp Thabit, again subject to the command of al-Qaida leadership, and that, after leaving Tora Bora, he was injured by Coalition bombs and captured.

First, given the evidence establishing the clandestine manner in which much of his travel occurred, as well as the fact that Petitioner twice heard Usama Bin Laden speak about jihad--once while armed--and attended camps that provided ideological indoctrination to attendees, the Government has established that, at a minimum, it is more likely than not that Petitioner knew he was associating with al-Qaida. Second, the Government has carried its burden to prove Petitioner's membership in or substantial support of al-Qaida. In the absence of an official membership card, the key inquiry in determining whether an individual is a part of the Taliban or al-Qaida is whether the individual functions or participates within or under the command structure of the organization. Al-Bihani, 590 F.3d at 872-73; Gherebi, 609 F. Supp. 2d at 68-69. The Government has shown that it is more likely than not that Petitioner both departed from Al Farouq and guarded a rear-echelon position at Tora Bora pursuant to al-Qaida's orders.

-42-

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

Moreover, the fact that al-Qaida leaders permitted Petitioner to train at Al Farouq and to be in the close presence of Usama Bin Laden twice--once while armed--in addition to feeding, sheltering, and protecting him during the battle of Tora Bora, demonstrates that they considered Al-Nahdi a loyal and trustworthy supporter. See Anam, 2010 WL 58965, at *13.

For all the reasons discussed herein, the Court **denies** the petition for a writ of habeas corpus.


February __, 2010                     /s/_____
                                      Gladys Kessler
                                      United States District Judge


Copies to: Attorneys of Record via ECF

-43-

UNCLASSIFIED//FOR PUBLIC RELEASE