UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MOHAMMED AL-ADAHI, et al., :
:
:
Petitioners, :
:
v. : Civil Action No. 05-280 (GK)
:
BARACK H. OBAMA, et al., :
:
Respondents. :
:

FILED WITH THE
COURT SECURITY OFFICER
CSO:
DATE:

## MEMORANDUM OPINION

Petitioner Fahmi Salem Al-Assani ("Al-Assani" or "the Petitioner") has been detained since 2002 at the United States Naval Base at Guantanamo Bay, Cuba. Respondents ("the Government") argue that his detention is justified under the Authorization for the Use of Military Force, Pub. L. No. 107-40 § 2(a), 115 Stat. 224, 224 (2001) ("AUMF"), which grants the Executive the power to detain individuals engaged in certain terrorist activities. The Petitioner disagrees, and has, along with four other petitioners, filed a petition for a writ of habeas corpus [Dkt. No. 1].[1]

---

[1] To date, one of the five petitions has been decided on the merits: Mohammed Al-Adahi's petition and Motion for Judgment on the Record were granted by this Court on August 17, 2009 [Dkt. No. 459]. The Government filed an appeal on September 21, 2009, and the Petitioner cross-appealed other aspects of the Order on October 5, 2009 [Dkt. Nos. 463, 473]. On December 22, 2009, Muhammad Ali Abdullah Bawazir's petition was dismissed without prejudice after he chose not to proceed with a merits hearing scheduled for January 2010 [Dkt. No. 526]. Two other Petitioners—Suleiman Awadh Bin Aqil Al-Nahdi and Zahir Omar Khamis

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

The matter is before the Court on Cross-Motions for Judgment on the Record [Dkt. Nos. 493 and 496]. On December 22, 2009, Petitioners filed a Supplemental Brief ████████████ ████████████████████████ and the Government responded [Dkt. Nos. 527 and 539]. Upon consideration of the Motions, the Oppositions, extensive oral argument and accompanying exhibits, and the entire record herein, Al-Assani's habeas corpus petition and Motion are hereby **denied**.

I.   **BACKGROUND**

A.   **Procedural History**

Petitioner filed his habeas corpus petition on February 7, 2005. After filing, there was extensive preliminary litigation regarding the Court's jurisdiction to entertain detainees' petitions, the applicability of various statutes, and the appropriate procedures to be used.

After more than six years of litigation, the most important legal issue was resolved by the Supreme Court in Boumediene v. Bush, 553 U.S. __, 128 S. Ct. 2229 (2008). The Court ruled that detainees at Guantanamo Bay, none of whom are citizens of the United States, are entitled to bring habeas petitions under Article

---

Bin Hamdoun--have filed Motions for Judgment on the Record. On October 7, 2009, Hamdoun's petition was stayed for 120 days [Dkt. No. 476]. On January 4-5, 2010, a merits hearing was held on Al-Nahdi's petition and Motion, which are addressed in a separate opinion.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

I of the Constitution, and that the federal District Courts have jurisdiction to hear such petitions.

The Court did not define what conduct the Government would have to prove in order to justifiably detain individuals--that question was left to the District Courts. Id. at 2240 ("We do not address whether the President has the authority to detain these petitioners nor do we hold that the writ must issue. These and other questions regarding the legality of the detention are to be resolved in the first instance by the District Court."). Nor did the Supreme Court lay down specific procedures for the District Courts to follow in these cases.

Boumediene was, however, definitive on at least two points: first, that the detainees are entitled to a prompt hearing, 128 S. Ct. at 2275 ("The detainees in this case are entitled to a prompt habeas corpus hearing."), and, second, that the District Courts are to shape the contours of those hearings, id. at 2276 (finding that balancing protection of the writ and the Government's interest in military operations, "and the other remaining questions[,] are within the expertise and competence of the District Court to address in the first instance.").

In an effort to provide the prompt hearings mandated by the Supreme Court, many of the judges in this District agreed to consolidate their cases before former Chief Judge Thomas Hogan in

-3-

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

order to streamline procedures for, and management of, the several hundred petitions filed by detainees. See Order (July 1, 2008) [Civ. No. 08-442, Dkt. No. 1]. On November 6, 2008, after extensive briefing from Petitioners' counsel and the Government, Judge Hogan issued a Case Management Order ("CMO") to govern the proceedings. This Court adopted, in large part, the provisions of that Order, while modifying it somewhat, as noted in Appendix A to Dkt. No. 283.

Much pre-hearing activity has taken place under this Court's Case Management Order. The Government has filed the exculpatory evidence, automatic discovery, and additional discovery required under the CMO. The Government filed its Factual Return for Al-Assani on August 1, 2005, and amended it on October 30, 2008. The Petitioner responded by filing Traverses on July 2, 2008, July 9, 2008, and November 3, 2008. After a period of extensive discovery, both parties filed substantial briefs accompanied by extensive exhibits.

On December 16, 2009, the Court set January 4, 2010, as the date for the "Merits Hearing" on the Cross-Motions for Judgment on the Record for all three Petitioners who planned to go forward to challenge their detention. On December 22, 2009, Petitioner Bawazir's case was dismissed without prejudice after he instructed his counsel to not proceed with litigating his Motion. Order

-4-

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

(December 22, 2009) [Dkt. No. 526]. Al-Nahdi's case, including the Petitioner's live direct and cross-examination on January 5, 2010, was presented to the Court over a two-day period. Al-Assani's case was presented to the Court on January 7, 2010.

## II. STANDARD OF REVIEW

The Government bears the burden of establishing that detention is justified. See Boumediene, 128 S. Ct. at 2270; Hamdi, 542 U.S. 507, 533-34 (2004). It must do so by a preponderance of the evidence. Order, Appendix A at § II.A (Feb. 12, 2009) [Dkt. No. 283-2]; see also Al-Bihani v. Obama, 590 F.3d 866, 878 (D.C. Cir. 2010); ▮▮ v. Obama, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Initially, the Government took the position that Article II of the Constitution and the AUMF granted the President the authority to detain individuals. See Gherebi v. Obama, 609 F. Supp. 2d 43, 53 n.4 (D.D.C. 2009). The Government asserted, "[a]t a minimum, . . . the ability to detain as enemy combatants those individuals who were part of, or supporting, forces engaged in hostilities against the United States or its coalition partners and allies." Resp't's Statement of Legal Justification For Detention at 2 [Dkt. No. 205].

Since the change in administrations, the Government has abandoned Article II as a source of detention authority, and relies solely on the AUMF. Gherebi, 609 F. Supp. 2d at 53 n.4. Further, it no longer uses the term "enemy combatant." Its refined position

-5-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

is:

> [t]he President has the authority to detain persons that
> the President determines planned, authorized, committed,
> or aided the terrorist attacks that occurred on September
> 11, 2001, and persons who harbored those responsible for
> those attacks.  The President also has the authority to
> detain persons who were part of, or substantially
> supported, Taliban or al-Qaida forces or associated
> forces that are engaged in hostilities against the United
> States or its coalition partners, including any person
> who has committed a belligerent act, or has directly
> supported hostilities, in aid of such enemy armed forces.

Resp't's Revised Mem. Regarding the Govt.'s Detention Authority
Relative to Detainees Held at Guantanamo Bay at 3 [Dkt. No. 306].

In Gherebi, Judge Reggie B. Walton of this District Court
ruled that the Government has the authority to detain individuals
who were part of, or substantially supported, al-Qaida and/or the
Taliban, provided that those terms "are interpreted to encompass
only individuals who were members of the enemy organization's armed
forces, as that term is intended under the laws of war, at the time
of their capture." Gherebi, 609 F. Supp. 2d at 70-71. However, in
Hamlily v. Obama, 616 F. Supp. 2d 63 (D.D.C. 2009), Judge John
Bates of this District Court concluded that, under the law of war,
the Government has the authority to detain individuals who were
"part of . . . Taliban or al Qaida forces" or associated forces,
but not the authority to detain those who are merely "substantial

-6-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

supporters of those groups."[2]   Id. at 74, 76.   As Judge Urbina

succinctly stated, "the crux of the distinction between the two

approaches lies in whether the government has the authority to

detain individuals who substantially supported enemy forces and/or

directly supported hostilities against the United States.   Judge

Walton has concluded that the government does have this authority,

. . . while Judge Bates has held that it does not."   Hatim v.

Obama, No. 05-1429, 2009 WL 5191429, at *3 (D.D.C. Dec. 15, 2009)

(citations omitted).   This Court concluded that, "[w]hile [it] has

great regard for the scholarship and analysis contained in both

decisions, . . . Judge Walton's opinion presented a clearer

approach," and adopted the reasoning and conclusion in Gherebi.

Al-Adahi v. Obama, No. 05-280, 2009 WL 2584685, at *3 (D.D.C. Aug.

21, 2009).

Recently, the Court of Appeals considered the scope of the

President's detention authority under the AUMF and related statutes

in Al-Bihani, 590 F.3d at 870-75.[3]   The Court of Appeals rejected

---

[2]     The Court agrees with Judge Bates' comment that the
determination of who was a "part of" the Taliban and/or al-Qaida,
under Judge Walton's approach, rests on a highly individualized and
case-specific inquiry; as a result, the "concept [of substantial
support] may play a role under the functional test used to
determine who is 'part of' a covered organization," and the
difference in the two approaches "should not be great."   Hamlily,
616 F. Supp. 2d 63, 76 (D.D.C. 2009).

[3]     To the extent that Gherebi or Hamlily are inconsistent
with the analysis set forth in Al-Bihani, the decision of the Court

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

Al-Bihani's argument "that the war powers granted by the AUMF and other statutes are limited by the international laws of war," and held that the sources courts must look to are "the text of relevant statutes and controlling domestic caselaw." Id. at 871-72.

The Court of Appeals then examined the various "relevant statutes," including the AUMF, the 2006 Military Commissions Act, Pub.L. No. 109-366, 120 Stat. 2600 (codified in part at 28 U.S.C. § 2241 & note), and the 2009 Military Commissions Act, Pub.L. No. 111-84, tit. XVIII, 123 Stat. 2190, 2575-76. It concluded that a lawfully detained person could be defined as "an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners" or "an individual 'substantially support[ing] enemy forces." Id. at 872 (internal quotation omitted). The Court made clear that this two-pronged definition (membership and substantial support) included "those who are part of forces associated with Al Qaeda or the Taliban or those who purposefully and materially support such forces in hostilities against U.S. Coalition partners." Id. Finally, the Court concluded that "both prongs are valid criteria that are independently sufficient" to justify detention. Id. at 874.

---

of Appeals controls.

-8-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

III. ANALYSIS

A.

-9-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET



The separate question of whether the petitioner poses a threat to the United States' national security is one the district courts have not found determinative, or even relevant, in ruling on the merits of habeas petitions. See Awad v. Obama, 646 F. Supp. 2d 20, 24 (D.D.C. 2009); Anam v. Obama, No. 04-1194, 2010 WL 58965, at *14 (D.D.C. Jan. 6, 2010) (denying petition for habeas corpus despite explicit finding that petitioner "does not currently pose a threat

-10-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

to the security of the United States"). <u>See also</u> <u>Al-Bihani</u>, 590 F.3d at 870-75 (not considering whether petitioner posed future threat in upholding district court's denial of the writ).

Arguing that the threat posed by petitioner is relevant to this Court's inquiry, Petitioner points to language in the Supreme Court's decision in <u>Hamdi</u> that "[t]he purpose of detention is to prevent captured individuals from returning to the field of battle and taking up arms once again." <u>Hamdi</u>, 542 U.S. at 518.

████████████████████████████████████████████████████

████████████████████████ However, the <u>Hamdi</u> Court made clear that, under the AUMF, the President possesses "[t]he authority to detain for the duration of the relevant conflict . . . based on longstanding law-of-war principles." <u>Id.</u> at 521. Thus, the President is authorized to detain Petitioner for the duration of the conflict in Afghanistan, even if Petitioner poses no threat of returning to the field of battle. <u>See also</u> Transcript of Oral Ruling at 12-13, <u>Anam v. Obama</u>, No. 04-1194 (D.D.C. Dec. 14, 2009); <u>Awad v. Obama</u>, 646 F. Supp. 2d 20, 24 (D.D.C. 2009); <u>but see</u> ███ v. <u>Obama</u>, █ ██████████████████████ (concluding that "the AUMF does not authorize the detention of individuals beyond that which is necessary to prevent those individuals from rejoining the battle").

████████████████████████████████████████████████████

-11-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET



In short, the question of whether Petitioner poses a threat is not relevant under the AUMF to this Court's review of his continued detention.

-12-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~



## B.   Evidentiary Presumptions

As a preliminary matter, some attention must be given to the nature of the evidence that has been presented in this case, and how the Court, as fact-finder, will go about evaluating that evidence.  In attempting to meet its burden, the Government has provided evidence in the form of classified intelligence and interview reports that it believes justify the Petitioner's detention.  The reports contain the statements of Petitioner, as well as statements made by other detainees, that the Government argues demonstrate the Petitioner's status as a member or substantial supporter of al-Qaida and/or the Taliban.[4]

The Government requested that a rebuttable presumption of

---

[4]      Petitioner argues that the Government's evidence should be excluded under the Geneva Conventions, because the evidence was collected in violation of various articles of the Third Geneva Convention. Pet.'s Response to Gov's Mot. for J. on the Record at 3-5.  The parties previously had briefed this issue in the weeks following Petitioner Al-Adahi's Merits Hearing [Dkt. Nos. 435, 441, 442, and 481].   The Court agrees with the Government that the evidence need not be excluded.   Section 5 of the Military Commissions Act of 2006 ("MCA"), Pub. L. 109-366, § 5, Oct. 17, 2006, 120 Stat. 2631 (codified at 28 U.S.C. § 2241 & note), which was not altered by the MCA of 2009, precludes Petitioner from relying on the Geneva Conventions "as a source of rights."   In addition, this Circuit held in Al-Bihani, 590 F.3d at 875, that "[t]he AUMF, DTA, and MCA of 2006 and 2009 do not hinge the government's detention authority on . . . compliance with international law . . . ." Petitioner therefore cannot rely on the Geneva Conventions to carve out an exclusionary rule for evidence.

-13-

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

authenticity be granted to all the exhibits it intends to introduce.[5] Petitioner objected to this request. See Pets.' Joint Opp'n to the Government's Memo. and Supplement Regarding Presumptions, Hearsay and Reliability of Intelligence Information at 3-10 ("Pets.' Presumptions Memo.") [Dkt. No. 400]. In the Order granting Petitioner Al-Adahi's petition for a writ of habeas corpus, the Court ruled that, "[g]iven the Government's representations that the specific documents included in its case against Petitioner, as well as the documents provided to Petitioner's counsel in discovery, have all been maintained in the ordinary course of business, the Court will presume, pursuant to Fed. R. Evid. 803(6), that its documents are authentic." Al-Adahi v. Obama, 2009 WL 2584685, at *3. As provided for in the CMO, the Government's exhibits will be granted a rebuttable presumption of authenticity and will be deemed authentic in the absence of any rebuttal evidence to the contrary.

In Petitioner Al-Assani's case, the Government also requested that a rebuttable presumption of accuracy be granted to all the exhibits it intended to introduce. The Petitioner objected to this request as well. See Pets.' Presumptions Memo. at 3-10. This

---

[5]     Ordinarily, "the requirement of authentication requires that the proponent, who is offering a writing into evidence as an exhibit, produce evidence sufficient to support a finding that the writing is what the proponent claims it to be." 2 K. Broun, McCormick on Evidence § 221 (6th ed.).

-14-

~~SECRET~~

request is denied for several reasons.

First, there is absolutely no reason for this Court to <u>presume</u>
that the facts contained in the Government's exhibits are accurate.
The accuracy of much of the factual material contained in those
exhibits is hotly contested for a host of different reasons,
ranging from the fact that it contains second-level hearsay, to
allegations that it was obtained by torture, to the fact that no
statement purports to be a verbatim account of what was said.

Second, given the fact that this is a bench trial, the Court
must, in any event, make the final judgment as to the reliability
of these documents, the weight to be given to them, and their
accuracy.   Those final judgments will be based on a long, non-
exclusive list of factors that any fact-finder must consider, such
as:  consistency or inconsistency with other evidence, conditions
under which the exhibit and statements contained in it were
obtained, accuracy of translation and transcription, personal
knowledge of declarant about the matters testified to, levels of
hearsay, recantations, etc.[6]

Denial  of  the  Government's  request  for  a  rebuttable
presumption of accuracy does not mean, however, that the Government

---

[6]     While the Supreme Court did suggest in <u>Hamdi</u> that a
rebuttable presumption "in favor of the Government's evidence"
might be permissible, 542 U.S. at 534, it did not mandate it.   In
<u>Boumediene</u>, the Court clearly left it to the District Courts to
craft appropriate procedures.   <u>Boumediene</u>, 128 S. Ct. at 2272.

-15-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

must present direct testimony from every source, or that it must offer a preliminary document-by-document foundation for admissibility of each exhibit. As the Supreme Court noted in Hamdi, 542 U.S. at 533-34, hearsay may be appropriately admitted in these cases because of the exigencies of the circumstances. See also Al-Bihani v. Obama, 590 F.3d at 879-80.

Finally, while parties always retain the right to challenge the admissibility of evidence, the Court will be guided by the Federal Rules of Evidence, in particular Rule 402, providing that "[a]ll relevant evidence is admissible." Once all evidence is admitted into the record, the Court will then, in its role as fact-finder, evaluate it for credibility, reliability, and accuracy in the manner described above. Id.

C. **Mosaic Theory**

The Government advances several categories of allegations which, in its view, demonstrate that the Petitioner was detained lawfully. Above all, its theory is that each of these allegations -- and even the individual pieces of evidence supporting these allegations -- should not be examined in isolation. Rather, "[t]he probity of any single piece of evidence should be evaluated based on the evidence as a whole," to determine whether, when considered "as a whole," the evidence supporting these allegations comes together to support a conclusion that shows the Petitioner to be

-16-

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

justifiably detained. Govt.'s Mot. for J. Upon the R. and Mem. in Supp. at 7 (internal citation omitted) [Dkt. No. 496]. While the Government avoids an explicit adoption of the mosaic theory, it is, as a practical matter, arguing for its application to the evidence in this case. Cf. Hatim v. Obama, No. 05-1429, 2009 WL 5191429, at *3 n.1 (D.D.C. Dec. 15, 2009); Ali Ahmed v. Obama, 613 F. Supp. 2d 51, 55-56 (D.D.C. 2009).

The Court understands from the Government's declarations, and from case law,[7] that use of this approach is a common and well-established mode of analysis in the intelligence community. This may well be true. Nonetheless, at this point in this long, drawn-out litigation the Court's obligation is to make findings of fact and conclusions of law which satisfy appropriate and relevant legal standards as to whether the Government has proven by a preponderance of the evidence that the Petitioner is justifiably detained. The kind and amount of evidence which satisfies the intelligence community in reaching final conclusions about the value of information it obtains may be very different from, and certainly cannot determine, this Court's ruling.

Even using the Government's theoretical model of a mosaic, it

---

[7]     See, e.g., McGehee v. Casey, 718 F.2d 1137, 1149 (D.C. Cir. 1983) (recognizing that the "mosaic-like nature of intelligence gathering" requires taking a "broad view" in order to contextualize information) (internal citations and quotations omitted).

-17-

UNCLASSIFIED//FOR PUBLIC RELEASE

-SECRET-

must be acknowledged that the mosaic theory is only as persuasive as the tiles which compose it and the glue which binds them together -- just as a brick wall is only as strong as the individual bricks which support it and the cement that keeps the bricks in place.  Therefore, if the individual pieces of a mosaic are inherently flawed or do not fit together, then the mosaic will eventually split apart, just as the brick wall will eventually collapse.

A final point must be kept in mind.  One consequence of using intelligence reports and summaries in lieu of direct evidence is that certain questions simply cannot be answered, i.e., there are no deposition transcripts to consult and few if any witnesses are available for cross-examination.  Sizeable gaps may appear in the record and may well remain unfilled; each party will attempt to account for these deficiencies by positing what they think are the most compelling logical inferences to be drawn from the existing evidence.  Accordingly, that existing evidence must be weighed and evaluated as to its strength, its reliability, and the degree to which it is corroborated.  In any event, the Government always bears the ultimate burden of showing by a preponderance of the evidence that Petitioner's detention is lawful.  Just as a criminal defendant need not prove his innocence, a detainee need not prove that he was acting innocently.   In sum, the fact that the

-18-

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

Petitioner may not be able to offer neat answers to every factual question posed by the Government does not relieve the Government of its obligation to satisfy its burden of proof.

**D.   Legal Standard Governing Petitioner's Knowledge and Intent**

Petitioner relies heavily on the argument that, assuming arguendo that he was recruited through an al-Qaida network to train in Afghanistan, the Government has not proved by a preponderance of the evidence that he knew that the facilitators, guesthouses, and training camp that he encountered along the way were associated with al-Qaida.  Instead, Petitioner argues, he decided to travel to Afghanistan to receive military training, which he considered a sort of rite of passage, for its own sake.  Pet.'s Mot. for J. on the Record at 3 [Dkt. No. 493] ("Pet.'s Mot.").

This argument raises the important question of what level of knowledge or intent is required under the relevant caselaw.  Given how central this question is to Petitioner's defense, the Court will address the legal standard first,[8] before evaluating the evidence offered by the Government to prove its allegations.

Under the standard adopted in this Circuit, the President may

---

[8]    On January 6, 2010, at the end of the Merits Hearing, the parties were ordered to file supplemental briefs on the knowledge and intent issues and the degree, if any, to which Al-Bihani addressed them.   Order  (Jan.   6,   2010)   [Dkt.   No.   531].  Unfortunately, the Court of Appeals had no occasion in the Al-Bihani opinion to address the issues of knowledge and intent.

-19-

SECRET

detain persons who were part of, or substantially supported, Taliban or al-Qaida forces or associated forces. Al-Bihani, 590 F.3d at 871-74. Although there is no explicit scienter requirement, the District Court in Hamlily concluded that this framework "does not encompass those individuals who unwittingly become part of the al Qaeda apparatus." Hamlily, 616 F. Supp. at 75. Instead, "some level of knowledge or intent is required," at least under the membership prong. Id.

First, given the tenor of some of Petitioner's arguments it bears emphasis that the Government is not required to prove that Petitioner had reason to know specifically that Coalition forces would enter the conflict in Afghanistan, or that Petitioner had the specific intent to fight against the United States or its allies. See, e.g., Pet.'s Mot. at 4. Instead, the knowledge or intent that must be shown relates to Petitioner's decision to become a part of or to substantially support al-Qaida and/or the Taliban. Thus, even a recently recruited, low-ranking Taliban and/or al-Qaida member who had no reason to suspect the United States' entrance into the conflict is detainable, so long as the decision to "function[] or participate[] within or under the command structure of the organization" was made with some knowledge or intent, and so long as the individual was functioning or participating within the command structure at the time of capture. Gherebi, 609 F. Supp. 2d

-20-

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

at 68-69.

Second, the Government need not show that a petitioner knew or intended from the moment his journey began that it would end in al-Qaida and/or Taliban membership. See Pet.'s Supp. Brief at 6 [Dkt. No. 537]. It is both possible and probable that an individual would obtain such knowledge or form such intent over the course of a journey, as training and indoctrination are undertaken and political views are crystallized. The fact that an individual may have been initially motivated to travel abroad for innocent reasons, or that an individual's knowledge or intent was less than clear at the inception of his journey, does not defeat the Government's case. Instead, it is sufficient for the Government to prove by a preponderance of the evidence that, at some point before capture, it is more likely than not that Petitioner knew he was becoming or intended to become a part of or substantial supporter of al-Qaida and/or the Taliban.

Finally, as this Circuit has explained, albeit in the criminal context, "[e]xcept in extraordinary circumstances, [] intent cannot be proved by direct evidence," and "it is therefore not only appropriate but also necessary for the [fact-finder] to look at 'all of the circumstances.'" United States v. Haldeman, 559 F.2d 31, 115-16 (D.C. Cir. 1976); see also United States v. Rhodes, 886 F.2d 375 (D.C. Cir. 1989) (citation omitted). The Government need

-21-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

not always have direct evidence of a petitioner's knowledge that an organization is, or is associated with, al-Qaida and/or the Taliban, or of a petitioner's intent to become a part of or to substantially support such an organization. In such cases, an inference of knowledge or intent may be drawn from indirect and circumstantial evidence. See, e.g., Anam, 2010 WL 58965, at *11.

**E. Government Allegations**

In narrowing the issues for trial, the parties focused on six broad factual areas that are in dispute. The Court then heard arguments and evidence on whether Petitioner (1) was recruited by an al-Qaida operative and traveled to Afghanistan to join al-Qaida forces; (2) stayed at al-Qaida guesthouses and knew the guesthouses were affiliated with al-Qaida; (3) received military training at al-Qaida training camps and knew the camps were operated by al-Qaida; (4) served as a bodyguard for Usama Bin Laden; 5) knowingly served with an al-Qaida unit at Tora Bora and participated in hostilities against the United States or its allies;[9] and 6) was

---

[9]     In preparation for the Merits Hearing, Petitioner identified as a factual issue in dispute "[w]hether Mr. al-Nahdi ever participated in hostilities against the United States or its allies." Pet.'s Stmt. of Main Issues in Dispute ¶ 9 [Dkt. No. 515]. However, the Court of Appeals' subsequent decision in Al-Bihani has made clear that the legal standard governing the President's detention authority under the AUMF is whether Petitioner was a member or substantial supporter of al-Qaida and/or the Taliban. Al-Bihani, 590 F.3d at 870-74. While participation in hostilities is certainly relevant to the legal inquiry into membership and/or substantial support, it is not controlling.

-22-

-SECRET-

captured on or near the battlefield at Tora Bora.  Because issues

five and six are closely related, they will be considered together.

    1.   **Recruitment by al-Qaida Operative and Travel to Afghanistan**

The Government seeks to show that it is more likely than not

that Al-Assani was being recruited by an al-Qaida operative when he

decided to travel to Afghanistan, and that his motivation in

traveling there was to fight alongside al-Qaida and/or the Taliban.

It is undisputed that a man named ███████ approached Al-Assani

at the Taqwa Mosque, where Al-Assani worked as a chanter, in the

Mukalah region of Hadramout, Yemen.  Gov's Statement of Material

Facts Not in Dispute ("Gov's Stmt. of Undisputed Facts") ¶ 1.  Al-

Assani and ████ became friends, discussing religion, the problems

related to Palestine, and the Russian invasion of Afghanistan.

████ encouraged Petitioner to receive military training, which he

agreed to in August 2001.  ████ then gave Al-Assani 3,000 riyals[10]

----

Thus, this issue has been incorporated into the broader discussion
in this section of whether Petitioner was a member or substantial
supporter of al-Qaida and/or the Taliban.

[10]   The interrogation report from which this information was
gathered states that Al-Assani was given 3,000 Yemeni riyals,
which, according to representations made by the Government at the
Merits Hearing, would have equaled about $20 in 2001.  JE 14 at 2.
However, the Government argued at the Merits Hearing that, because
individuals being recruited by al-Qaida are typically given much
more money than this, the Court should infer that the report is
mistaken.  The Government asks the Court to conclude instead that
Al-Assani was given 3,000 Saudi riyals, which would have equaled
about $800 in 2001.  In essence, the Government asks the Court to

-23-

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

for travel money, took his passport to obtain the appropriate visas, and advised him that he would be met at the Sanaa, Yemen bus station and taken to ████ friend, ████ Id. ¶¶ 5-8.

The Government alleges, relying principally on statements made by other Guantanamo Bay detainees, that ████ was "an al-Qaida recruiter, travel facilitator, and commander in Usama Bin Laden's 55th Arab Brigade." Gov's Stmt. of Undisputed Facts ¶ 2. According to intelligence reports, Fahd Umr Abd Al-Majid (Al-Sharif) (ISN 215) stated that he met a man named Salam in Kabul, Afghanistan in 2001 on the "front lines," and that Salam had received all training available at al-Qaida's Khaldan and Al Farouq camps. JE 18.[11] ISN 28 described a Salam Al Hadrami[12] as having commanded Arab fighters in the Kabul area. JE 31 at 5. ISN 44 also named a Salam Al

---

assume the accuracy of that which it sets out to prove. The Court rejects this assumption. It is the Government's job to introduce evidence it believes to be probative of its allegation that Al-Assani was being recruited to join al-Qaida, not to introduce evidence and then ask the Court to discount it and substitute some more favorable interpretation of it.

[11]     Parties submitted one volume of Joint Exhibits, which comprise the vast majority of evidence presented during trial. Unless otherwise indicated, citations to "JE" refer to the universe of Joint Exhibits.

[12]     The Government explained at the Merits Hearing that identifying an individual as "Al Hadrami"--as ISN 28 and ISN 44 did--signifies that the individual is from Hadramout, Yemen, which is where Petitioner was approached by the man he knew as Salam. See also Decl. of ████ JE 3 at 3. Petitioner did not object to this explanation.

-24-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

Hadrami as his recruiter. JE 33 at 1. He later stated that he met

Salam at the Said Center, a rest area that serviced the Taliban

front lines outside of Kabul, where Salam encouraged him to remain

in Afghanistan and fight with the Taliban.   JE 34.

Given this evidence, and considering Salam's role in arranging

Al-Assani's travel to Afghanistan, the Court finds it more likely

than not that the Salam who befriended Al-Assani was an al-Qaida

member active in recruiting young men to fight.

Petitioner argues, however, that none of this evidence

establishes that Al-Assani ever knew of Salam's connection to al-

Qaida.[13]   The Government replies that the unusual generosity

exhibited by Salam in arranging Petitioner's travel must have led

Al-Assani to at least suspect that Salam was associated with al-

Qaida.   The Government's argument is unpersuasive.   First, it is

conceded that the two men considered each other to be friends.

Second, the Government's evidence which has been admitted

establishes that Salam gave Al-Assani the equivalent of around $20

which, while not insignificant in a country as poverty-stricken as

Yemen, is not so staggering a sum that Al-Assani could have been

---

[13]   Al-Assani also questions the reliability of JE 26 and JE
28, which the Government initially used to support the allegation
that Salam was an al-Qaida recruiter. Pet.'s Response to the Gov's
Mot. for J. on the Record at 8-9. Because the Court finds that the
Government has met its burden on this issue through the use of
other evidence, Petitioner's objections to JE 26 and JE 28 need not
be addressed.

-25-

~~SECRET~~

expected to infer Salam's connection to al-Qaida. Without more persuasive evidence that Al-Assani knew or suspected Salam's al-Qaida connection, the circumstances are not suspicious enough to warrant the inference that he did.

In addition, the record supports Petitioner's claim that he was motivated to travel to Afghanistan to receive military training, and not to fight. In 2001, military service was compulsory in Yemen, but Al Assani had been rejected ███████████ ███████████████████████████████ He stated before the Combatant Status Review Tribunal ("CSRT") that he felt training was "important in coming of age." Because he could not receive military training in Yemen, he claims he was persuaded to go to Afghanistan. JE 35. Petitioner's other statements in the record, including those made at his Administrative Review Board ("ARB") proceeding, are consistent with these statements. JE 36 at 4; JE 14 at 2; JE 15.

The Government responds that the evidence suggests that Al-Assani intended to stay in Afghanistan for much longer than would be necessary to receive training. ███████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

-26-

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~



Thus, while the Government has proven that it is more likely than not that Salam was an al-Qaida recruiter, it has not shown that Al-Assani knew of the connection when he left for Sanaa in August 2001, or that Al-Assani's initial motivation in traveling to Afghanistan was to fight with al-Qaida and/or the Taliban.

The parties do not dispute the facts of Petitioner's travel to Al Farouq, with one exception that will be discussed below. At the Sanaa bus station, Petitioner met two other men--one of whom was Petitioner ███████--and the three proceeded together to an apartment where they stayed for several days. ███████████

-27-

~~SECRET~~

friend, brought Petitioner his passport and visa for Pakistan and provided all three men with plane tickets to Karachi, Pakistan. The three men were also given the name of a contact in Karachi. Gov's Stmt. of Undisputed Facts ¶¶ 9-13.

At the Karachi airport, the three men were met by the contact, ███████ and traveled with him and three other Yemeni men by taxi to a Karachi guesthouse.   This guesthouse was run by a man named ███████ who is currently a detainee at Guantanamo Bay.   Id. ¶¶ 14-20. The Government claims, based upon admissions made by Riyadh, that he is "an admitted mujahadeen [known as "Riyadh the Facilitator"] who facilitated travel for al-Qaida members and was an associate of Usama Bin Laden."[14]   Id. ¶ 21.

From Riyadh's guesthouse, the seven Yemeni men took a cab to the Karachi bus station, where they were met by ████ a Pakistani

---

[14]    Petitioner argues that any admissions made by ███████ ████ are unreliable because he was rendered to Jordan and tortured before arriving at Guantanamo. Pet.'s Response to Gov's Stmt. of Material Facts Not in Dispute ¶ 21.  As this Court explained in Mohammed v. Obama, No. 05-1347, 2009 WL 4884194, at *22-27 (D.D.C. Dec. 16, 2009) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)), courts apply a "totality of the circumstances" test, considering "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators" in determining whether prior coercion carries over into a second confession.   However, Petitioner has presented no information on the extent of torture suffered by Riyadh or its impact on his statements.   Without such information, the Court is not prepared to reject the Government's evidence as unreliable. Cf. id.  Therefore, the Government's evidence stands as unrebutted and must be accepted as credible.

-28-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

man who took them by bus to Quetta, Pakistan.  There, the group
separated and Al-Assani, along with his two original travel
companions, rested at a safehouse for a few hours.  An Afghani
youth they met there next took them to the Afghan border, where
they evaded a border checkpoint by traveling on motorcycles, only
to reconvene with the taxi on the Afghanistan side of the border.
Id. ¶¶ 22-25.

      Once  in  Afghanistan,  they  traveled  to  the  al-Nebras
guesthouse, arriving after dark.  At al-Nebras, Al-Assani and his
companions were required to turn in their bags, passports, money,
and all other forms of identification, which were inventoried.  The
men were told they were supposed to pick up these items when they
returned to al-Nebras after completing their training at Al Farouq.
After  a  few  days  at  al-Nebras,  a  bus  took  Al-Assani  and
approximately forty-five other men to Al Farouq.  Id. ¶¶ 26-30.

      The Government alleges that the fact that Petitioner's travel
was so coordinated and closely controlled, that it was fully paid
for by virtual strangers, and that it was arranged in such a
secretive and evasive manner compels the inference that he likely
knew he was being recruited by al-Qaida.  While the Court agrees
that  the  manner  in  which  Petitioner  traveled  to  Al  Farouq  is
suspicious, it need not decide whether the Government, as of this
point  in  the  evidence,  has  produced  sufficient  evidence  to

-29-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

establish that it is more likely than not that Al-Assani knew he was associating with al-Qaida, since it is clear that he became aware of that connection after arriving at Al Farouq.

### 2.    Guesthouse Stay

The Government produced evidence that Al-Assani stayed in four guesthouses during the period in question: 1) Riyadh the Facilitator's guesthouse in Karachi, Pakistan; 2) a guesthouse in Quetta, Pakistan; 3) the al-Nebras guesthouse in Afghanistan; and 4) a guesthouse in Kabul, Afghanistan. Petitioner does not deny that he stayed at these guesthouses, but does dispute whether they were al-Qaida safehouses and, even if they were, whether he knew it.

The Government argues that these guesthouses differed from those typically frequented by young Yemeni men traveling abroad, which resemble youth hostels. See Decl. of Dr. Sheila Carapico, JE 53 ¶ 4 (describing typical guesthouse).



-30-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

██████████████████████████████

██████████████████ Significantly, Al-Qaida safehouses were not open to the public, but were restricted to individuals who either had connections to al-Qaida or had been brought there by al-Qaida supporters.  JE 8 at 3.

Ample evidence has been produced in this case to support the conclusion that the Karachi and al-Nebras guesthouses were al-Qaida safehouses.[15]  See Al-Nahdi v. Obama, No. 05-280 (Feb. 24, 2010).  There is far less evidence, however, to support the claim that Al-Assani knew he was staying at al-Qaida guesthouses.

There are relatively few statements by Al-Assani in the record concerning his guesthouse stays, especially when compared to Petitioner Al-Nahdi's account.[16]  With respect to the Riyadh and Quetta guesthouses, Al-Assani says little more than that he stayed

---

[15]   The Government has provided little evidence about the Quetta or Kabul guesthouses.

[16]   On several occasions, the Government relies on statements by Petitioner Al-Nahdi to demonstrate that Al-Assani was staying in an al-Qaida safehouse and, more problematically, that he was aware of it.  As discussed above, Petitioner must have had some knowledge or intent to become a part of al-Qaida and/or the Taliban for his continued detention to be justified.  See Hamlily, 616 F. Supp. 2d at 75.  While the Court credits the Government's evidence with respect to the issue of whether the guesthouses were al-Qaida safehouses, admissions made by Al-Nahdi as to his personal knowledge of the guesthouses' operations or experiences while staying there cannot be considered evidence of Al-Assani's state of mind.

-31-

SECRET

at them.  With respect to his stay at al-Nebras, the guesthouse

notorious for housing recruits on their way to Al Farouq, Al-Assani

described how his possessions--including his passport--were taken

and inventoried.  He identified the man running the guesthouse as

a man named ▮▮▮▮▮▮ which matches other intelligence regarding

the al-Nebras guesthouse.  JE 14 at 3; JE 20 at 2.  He also stayed

there for two days without leaving the house, although it is

unclear whether he felt he was required to remain inside.  In one

interrogation, he stated that there were no rules preventing him

from leaving the guesthouse, although on another occasion he said

he was not allowed to come and go from the house at will.  JE 14 at

3; JE 15.[17]  Finally, he stated that no training video or audiotapes

were seen or heard there.  JE 14 at 3.  While this evidence

provides some support for the inference that Al-Assani was aware of

the al-Nebras guesthouse's connection to al-Qaida, it does not

establish Al-Assani's knowledge by a preponderance.

Merely staying at an al-Qaida safehouse is typically

insufficient to satisfy the detention standard.  See Ali Ahmed, 613

---

[17]  Petitioner argued at the Merits Hearing that his
statements in JE 14 should be given more weight than those in JE
15, since the latter were tangential to the purpose of the
interview and because other details in JE 15 indicate some
confusion over Al-Assani's alias.  However, JE 15 also describes a
test conducted by the interrogators of Al-Assani's veracity, which
he passed.  On balance, there is no reason to suspect that the
statements captured in this report--while not consistent with those
in JE 14--are less trustworthy.

-32-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

F. Supp. 2d at 65 (finding guesthouse stay insufficient to justify detention); but see Al-Bihani, 590 F.3d at 873 n.2 (suggesting in dicta that the "military's reasonable belief" of a non-citizen's guesthouse stay alone would "overwhelmingly" justify the government's detention). Still, the fact that Petitioner willingly stayed in houses where he was either advised not to go outside or felt it better not to, and where his passport and other personal belongings were taken and held, adds strength to the inference that he knew he was associating with al-Qaida, and, in turn, the inference that he was intentionally taking steps to join al-Qaida's ranks. Cf. Razak Ali v. Obama, No. 09-745, 2009 WL 4030864, at *3-4 (D.D.C. Nov. 19, 2009).

### 3.   Attendance at Al Farouq

Al-Assani does not deny that he spent approximately two weeks at the Al Farouq training camp in order to receive training on the Kalashnikov rifle.    In addition, Petitioner admitted in interrogations to having heard Usama Bin Laden speak about jihad at Al Farouq before the September 11, 2001 attacks. JE 14 at 4; JE 20 at 2. He stated that he knew who Usama Bin Laden was at the time, as he had seen news reports about him in Yemen.   Gov's Stmt. of Undisputed Facts ¶¶ 38-40. However, Petitioner claims that he was not aware of Al Farouq's al-Qaida affiliation during his time spent there.   That claim is patently not credible, and the Court rejects

-33-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

it.

According to Government experts, Al Farouq was al-Qaida's "primary Afghan basic-training facility, providing ideological indoctrination and [weapons and other] training." Id. ¶ 31. It is undisputed that Petitioner spent a little over two weeks at Al Farouq, where he focused on the use and maintenance of small arms, including Kalashnikov rifles, and physical fitness. Id. ¶ 35. He appears to have had some knowledge of the camp's hierarchy, as he stated that he was trained by two men--one whose "code name" was ████████ and the other whose name was ██████ -and identified the commander of the camp as ████████ His statements indicate that he was assigned to a "unit," in which he and other members were subjected to a structured training regime beginning every morning at 3:45 a.m. before being "released on their own." JE 14 at 4.

Even if the evidence leading up to Al-Assani's attendance at Al Farouq does not clearly establish that he knew he was associating with al-Qaida, the Court finds that it is definitely more likely than not that he became aware of that connection while at Al Farouq. It is simply not credible that he would have attended the camp, which subjected its trainees to ideological indoctrination for two full weeks, without realizing with whom he was dealing. That Petitioner heard Usama Bin Laden--whom he recognized--speak about jihad at Al Farouq resolves any remaining

-34-

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

doubt, especially in light of the way in which Al-Assani was led to the camp. Cf. Transcript of Oral Ruling at 48-50, Anam v. Obama, No. 04-1194 (D.D.C. Dec. 14, 2009) (concluding petitioner had to have known Al Farouq was an al-Qaida training camp).

### 4. Bodyguard for Usama Bin Laden

Having established that it is more likely than not that Petitioner knew he was associating with al-Qaida by this point, the next issue in dispute is whether a preponderance of the evidence establishes he was a part of or substantially supported al-Qaida. While Petitioner's guesthouse stays and training at Al Farouq alone might suffice to justify detention, the Government makes far stronger allegations of membership and substantial support. One of the Government's key allegations is that Al-Assani served as a bodyguard for Usama Bin Laden after September 11, 2001.

As its only piece of evidence supporting this important claim, the Government points to an identification of Petitioner from a photograph by ███████████████████████ identified Al-Assani as one of fifty individuals who served as Usama Bin Laden's bodyguards, and said that he saw Al-Assani driving a Toyota pick-up truck with other bodyguards to Tora Bora. JE 17. These individuals were said to have weapons and to have received "specialized" training. Id. The Government points out that Al-Assani admitted to being driven in cars with approximately

-35-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

fifty other men to Tora Bora.  JE 14 at 4; JE 21 at 2.

It seems exceedingly unlikely that Usama Bin Laden would, in the wake of the September 11, 2001 attacks, when he was probably the most hunted man in the world, call on an unknown, brand-new recruit with two weeks of rifle training to serve as his bodyguard. See Al-Adahi, 2009 WL 2584685, at *12-14.  Moreover, certain details of ▓[6]▓ identification--such as the statement that Bin Laden's bodyguards had "specialized training"--do not appear to fit what is known about Al-Assani.  Finally, as Petitioner points out, there is some question as to ▓[6]▓ credibility.  First, there is no indication of what personal knowledge he had of who was present in the Tora Bora mountains after September 11, 2001 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Pet.'s Mot. at 12-13.  Given these doubts, the Court concludes that the Government's evidence, an identification contained in a single paragraph and made on the basis of a photograph, does not make it more likely than not that Al-Assani served as Usama Bin Laden's bodyguard.

     5.   Role at Tora Bora, Injury, and Capture

The Government claims that Petitioner's conduct after leaving

_____

18 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

-36-

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

Al Farouq and upon arriving at Tora Bora demonstrates that it is more likely than not that he was a part of or substantially supported al-Qaida. Petitioner stated in interrogations that he and a group of fifty other men, led by ███████ the commander of Al Farouq, left Al Farouq by car in the middle of his training. The group stopped for one night at the al-Nebras guesthouse in Kandahar, and for a second night at a guesthouse in Kabul. Outside of Kabul, they were taken to an area with little construction, where Al-Assani stated he received additional training[19] on the Kalashnikov and on "long-distance walking" for ten to fifteen days. Gov's Stmt. of Undisputed Facts ¶ 51-52; JE 14 at 4-5.

Al-Assani was then driven to a forested area around Jalalabad, where ████ informed the group of the events of September 11, 2001. Petitioner does not deny that, by this point, he knew that Al Farouq was "sponsored" by Usama Bin Laden. Gov's Stmt. of Undisputed Facts ¶ 53. After one or two days, the group drove

---

[19]     In a sworn declaration submitted by Al-Assani's counsel, Brian Spahn, at the Merits Hearing, Mr. Spahn declared that Al-Assani stated on January 4, 2010 that he did not receive any additional training after Al Farouq. JE 61. While this Court agreed to admit Mr. Spahn's sworn declaration, over the Government's objection, it did so with the understanding that it would be evaluated for its reliability and credibility, just as any other piece of evidence would be. Given the lack of detail supporting Petitioner's last-minute claim, especially when compared to the detail supporting his previous account, the late hour at which Petitioner chose to raise this claim, and the lack of opportunity for the Government to test or respond to this evidence, the Court will credit the account given in JE 14.

-37-

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

through Jalalabad to Tora Bora, where they were split into groups
of eight to ten people.   JE 14 at 5.

Al-Assani stated in interrogations that his "group leader" or,
according to other accounts, "commander," was Azuber, although
Abdel Kadus remained in charge of the group as a whole.   Id. at 5;
JE 21 at 2.     Al-Assani gave a detailed description of the
commanders of different camps at Tora Bora, indicating his position
as an al-Qaida foot solder.   JE 21 at 2-3.   He also reportedly
stated that when he arrived at Tora Bora, "positions were already
dug," and that "his group was used to augment the groups already in
place in Tora Bora."[20]   Id. at 2.

Of significance is the account of another Guantanamo Bay
detainee, ███████████████████████████████████████████████████
stated in an interrogation that he was assigned to ███████ unit,
and, although he did not name Al-Assani as a member of his unit, he
claimed their role was "to fight against the Northern Alliance" on
the front line of Tora Bora.   According to ███████ each position
on the front line consisted of about fifteen fighters.   JE 10 at 3.

_____

[20]      Petitioner denied being "assigned to augment Taliban and
al Qaida forces already in defensive positions in Tora Bora,
Afghanistan" at his 2005 Administrative Review Board proceeding.
In response to that allegation, he said that his purpose in being
in Afghanistan "was not to be with the Taliban or the al Qaida."
JE 36 at 2.   Considering the Government's evidence as a whole,
however, it appears more likely than not that Petitioner knowingly
and intentionally did augment al-Qaida forces at Tora Bora.

-38-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

At some point, Azuber told Petitioner that a withdrawal of troops was taking place from the North. From his location at Tora Bora, Al-Assani, who was armed with a Kalashnikov rifle,[21] watched people moving below him on the mountains. When the bombing began, █████ moved the group on foot to Pakistan. On the way, they met up with "other groups of soldiers," and █████ had them split into two groups. JE 14 at 5; JE 20 at 2. Al-Assani was injured after his group was bombed, he was escorted and turned over to Afghani forces, and eventually--after over a month of recuperation in a hospital--was turned over to U.S. custody.[22]

Petitioner claims that the evidence fails to establish that he was a part of al-Qaida. In the words of Petitioner's counsel, "[b]y the time Mr. Al-Assani learned that al-Farouq was run by al-Qaida, he had surrendered his passport and his money, and had no

---

[21]   Al-Assani admitted before the Combatant Status Review Tribunal that he had a weapon in Tora Bora, but said he had no bullets. JE 35 at 3. However, Mr. Spahn declared that Al-Assani stated on January 4, 2010 that he was offered a weapon without bullets at Tora Bora, but declined. JE 61. For the reasons given above, the Court will credit Petitioner's prior statement at the ARB, and not those contained in Joint Exhibit 61.

[22]   The Court does not find credible Petitioner's statement that his leaving Tora Bora was an effort to dissociate himself from al-Qaida and/or the Taliban. See Pet.'s Mot. at 14. Al-Qaida had begun to retreat from Tora Bora weeks before, and Petitioner left when his commander, Azuber, told him to, following his instructions to split into two groups. While it may be true that Petitioner wanted to flee out of fear for his life, he made no effort to abandon his position or leave the al-Qaida command structure.

-39-

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

means of transporting himself out of Afghanistan. Thus, when he and his training class were taken to Tora Bora, he had no choice but to go along. He was not willingly accepting and executing orders." Pet.'s Response to Gov's Mot. for J. on Record at 16.

While it might be true that Al-Assani had a practical motive in deciding to remain with his group and to accept and execute Azuber's orders, the legal inquiry remains whether he functioned or participated within the command structure of the organization, not why he did so. In addition, there is some doubt as to whether Petitioner was truly seeking to flee the country, as there is no evidence that he attempted to retrieve his passport from al-Nebras during his stay there after leaving Al Farouq. Indeed, there is only one indication that Al-Assani ever wanted to retrieve his belongings: in his 2005 ARB proceeding, he said that he wanted to go back to get his passport, but never did. JE 36 at 4. In any event, while abandoning the group might have been dangerous and difficult, there is no evidence that he made any attempt to do so or that he had any choice in the matter.

In sum, the Government's evidence supports the conclusion that it is more likely than not that Al-Assani was both a member of al-Qaida and executing al-Qaida's orders. After realizing that Al Farouq was sponsored by Usama Bin Laden, Petitioner continued to travel under the leadership of camp commander Abdel Kadus. Cf.

-40-

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

Anam, 2010 WL 58965, at *11 (finding that voluntary association with al-Qaida members after leaving Al Farouq supported denial of habeas petition). He was able to provide concrete details about the "leaders" or "commanders" at Tora Bora. He--as well as every other individual in his group--was armed with a Kalashnikov rifle. He followed Azuber's directions to join groups of varying sizes at different points in his travel. Finally, he was told in advance that al-Qaida forces were retreating while he was armed. It is not credible that the al-Qaida leadership would inform Al-Assani of the retreat in advance unless he was a part of the organization.[23] See, e.g., id., at *13 (finding it "telling" that al-Qaida behaved as though the petitioner were a member).

In addition, the Court concludes that it is more likely than not that Al-Assani was following orders when he traveled from place

---

[23]     Petitioners claim that Hammamy v. Obama, 604 F. Supp. 2d 240 (D.D.C. 2009), stands for the proposition that a petitioner's "mere presence" at Tora Bora is insufficient to support detention. Pet.'s Mot. at 11. To the contrary, in Hammamy, the Court denied the writ after having concluded that, in light of petitioner's prior connection to terrorist organizations, the mere fact that his identity papers were recovered at Tora Bora was sufficient to establish his presence there. Because the Court found that Hammamy was present at Tora Bora, it concluded that it was more probable than not that he was part of or supporting Taliban or al-Qaida forces.

In any event, this case is a far cry from Hammamy. Al-Assani has not only admitted to his presence at Tora Bora, but the evidence establishes much more than "mere presence"; it gives a detailed account of what Petitioner was doing, and with whom he was associating, at the time.

-41-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

to place with Kadus and Azuber. Cf. id. (finding that petitioner participated within al-Qaida command structure by attending training camp and following orders from instructors). That armed al-Qaida leaders would merely "ask" that Petitioner accompany them, arm him with a Kalashnikov rifle, or assign him to different groups of armed men without any expectation of Al-Assani's compliance or of his support in future hostilities is not credible. Cf. Mohammed v. Obama, No. 05-1347, 2009 WL 4884194, at *11 (D.D.C. Dec. 16, 2009). In Anam, Judge Hogan relied in part on the fact that al-Qaida treated the petitioner "as reliable and as a member" in concluding that the Government had shown it more likely than not that he was a member of al-Qaida at the time of capture. See Transcript of Oral Ruling at 51, Anam v. Obama, No. 04-1194 (D.D.C. Dec. 14, 2009). Similarly, al-Qaida provided Al-Assani with training, permitted him to be in close proximity to Usama Bin Laden, and housed, fed, and armed him throughout his journey to Afghanistan, travel to Tora Bora, and retreat to Pakistan. When combined with the Government's other evidence, the fact that Petitioner was clearly accepted by al-Qaida, at a minimum, as a substantial supporter of the organization further supports the conclusion that it is more likely than not that Petitioner knowingly was a part of or substantially supported al-Qaida.

-42-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

## IV. CONCLUSION

To summarize, the Government has met its burden of demonstrating that Petitioner was recruited by al-Qaida members in Yemen, that he subsequently traveled--at no cost to himself, and through al-Qaida-associated guesthouses--to Afghanistan, that he received military training at al-Qaida's Al Farouq camp, that while at the camp he became aware of its connection to al-Qaida and Usama Bin Laden but did not dissociate himself from camp commanders or al-Qaida, that he left Al Farouq and received further training from Al Farouq leaders, that he traveled to Tora Bora under the command of ▮▮▮▮▮▮ and ▮▮▮▮ that he obeyed orders intended to organize his group into distinct units, and that, after leaving Tora Bora under ▮▮▮▮ command, he was injured by Coalition bombs and captured.

First, the Government has established that it is more likely than not that Petitioner knew he was associating with al-Qaida. Petitioner's travel was conducted in a tightly controlled and clandestine manner, he trained for two weeks at Al Farouq, and he admits that he knew the camp was sponsored by Usama Bin Laden before arriving at Tora Bora. Second, the Government has carried its burden of proof with regard to Petitioner's membership in or substantial support of al-Qaida. The touchstone inquiry in determining whether an individual is a part of the Taliban or al-

-43-

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

Qaida is "whether the individual functions or participates within or under the command structure of the organization--i.e., whether he receives and executes orders or directions." Gherebi, 609 F. Supp. 2d at 68-69. The Government has shown that it is more likely than not that Petitioner followed orders from the al-Qaida leadership when he traveled to Tora Bora and, under the leadership or command of ███████ followed orders to join certain units of soldiers and travel with them until he was wounded by Coalition bombing.

For all the reasons discussed herein, the Court **denies** the petition for a writ of habeas corpus.

February __, 2010

/s/_____
Gladys Kessler
United States District Judge

Copies to: Attorneys of Record via ECF

-44-

UNCLASSIFIED//FOR PUBLIC RELEASE