**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MOHAMMED AL-ADAHI, et al., | |
| *Petitioner*, | |
| v. | CIVIL ACTION FILE NO. 05-280 (GK) |
| BARACK H. OBAMA, et al., | |
| *Respondents*. | |

**MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PETITIONER'S
MOTION TO REOPEN CASE AND FOR JUDGMENT ON
PETITION FOR WRIT OF *HABEAS CORPUS***

For more than twelve years, Petitioner Mohammed Al-Adahi ("Petitioner") has been held in the Guantánamo Bay Military Detention Facility ("Guantánamo").  No charges have been levied against him, and he has been conditionally cleared for release by the Obama Administration.  Nonetheless, the United States Government has continued to detain Petitioner as an alleged "enemy combatant" under the authority granted the President by the Authorization for Use of Military Force (the "AUMF"), Pub. L. 107-40 § 2(a), 115 Stat. 224, 224 (2001).  The Government's power to detain Petitioner under the AUMF, however, is not unfettered.  Instead, the Government may only detain Petitioner for the limited purpose of preventing him from taking up arms against the United States.  Petitioner's health, however, is such that any significant physical activity—much less any involvement in the hostilities—is virtually impossible.  There is, therefore, no legitimate basis for Petitioner's continued detention, and he should be released and repatriated to Yemen.

## BACKGROUND

### I.      Procedural History

Petitioner filed a petition for *habeas corpus* with the Court in February 2005.  Pet. for

Writ of *Habeas Corpus*, Feb. 7, 2005, ECF No. 1.  In August 2009, after an evidentiary hearing,

this Court held that there was "no reliable evidence in the record that Petitioner was a member of

al-Qaida" and ruled that he should be released.  *Al-Adahi v. Obama*, No. 05–280, 2009 WL

2584685, at *16 (D.D.C. Aug. 21, 2009); Order, Aug. 21, 2009, ECF No. 459.  The Government

filed an appeal on September 21, 2009 (ECF No. 463), and the United States Court of Appeals

for the District of Columbia Circuit, applying a "more likely than not" standard, overturned the

Court's Order.  *Al-Adahi v. Obama*, 613 F.3d 1102, 1111 (D.C. Cir. 2010); Mandate of U.S.C.A.,

Sept. 13, 2010, ECF No. 577.

In 2010, the Guantánamo Task Force Review Panel ("Review Panel") determined that

Petitioner should be in detention, but only on a "conditional basis" and only in light of the

"current security situation in Yemen."  Jan. 22, 2010 Review Panel Final Dispositions at 7,

attached as Exhibit A.  The Review Panel also determined that, should the security situation in

Yemen improve, Petitioner could be released from Guantánamo and repatriated to Yemen.  *Id.*

Despite this recommendation, almost four years later, Petitioner remains in Guantánamo, and

Respondents have refused to provide Petitioner or his counsel any timeline for when Petitioner

will be allowed to return to his wife and two children in Yemen.

### II.     Petitioner's Declining Health

Petitioner suffers from an array of debilitating health issues.  *See* February 12, 2014

Declaration of John A. Chandler ("Chandler Decl.") ¶ 5, attached hereto.  He is obese and

continuing to gain weight.  *Id.* ¶ 6.  His blood pressure and cholesterol are dangerously high.  *Id.*

He is diabetic.  *Id.*  He is asthmatic.  *Id.*  And his doctors suspect that he has kidney disease.  *Id.*  Despite daily medication and treatment, Petitioner has, on numerous occasions, suffered severe cardiac episodes resembling heart attacks, in which he struggles to breathe, becomes dizzy, and experiences a sharp pain "like a fork in [his] chest."  *Id.* ¶ 7.

For the past several years, Petitioner has (with the assistance of Guantánamo physicians) attempted to maintain a record of his heart rate, cholesterol, blood pressure, and blood sugar.  *Id.* ¶¶ 9, 15.  During a recent trip to Guantánamo in October 2013, counsel learned that, on more than one occasion, Petitioner (or his physicians) had recorded dramatic swings in Petitioner's blood pressure and heart rate.  *Id.* ¶¶ 8-9.  Indeed, Petitioner showed counsel documentation of two episodes in the weeks prior to counsel's visit, during which Petitioner's heart rate and blood pressure would, within a matter of minutes, rollercoaster from dangerously high to dangerously low levels.  *Id.* ¶ 9.  Petitioner explained that, during these episodes, he cannot walk or stand, is incredibly dizzy, and has even lost consciousness.  *Id.*  Petitioner's symptoms are not the product of significant exercise or any other notable stress.  *Id.* ¶ 10.  Instead, they often follow basic physical activity, such as walking from his cell to the restroom.  *Id.*

On February 5, 2014, during a telephone call with counsel, Petitioner informed counsel that his health has continued to deteriorate since counsel's visit in October.  *Id.* ¶ 15.  Petitioner apparently had another cardiac episode, during which he struck his head against the wall of his cell.  *Id.*  And, at Petitioner's last blood-pressure and heart-rate reading, approximately ten days before the telephone call with counsel, Petitioner's blood pressure was approximately 180/120 and his heart-rate 130 beats-per-minute.  *Id.*  Petitioner described these readings as "average" for him.  *Id.*  A blood pressure of 120/80 or less is considered "normal."  Nat'l Inst. of Health, *What is High Blood Pressure?*, *available at* http://www.nhlbi.nih.gov/health/health-topics/topics/hbp/

(last visited Feb. 11, 2014).  And a resting heart-rate below 80 beats-per-minute is considered

healthy.  *See* Shigetoh et al., *Higher Heart Rate May Predispose to Obesity and Diabetes*

*Mellitus: 20-year Prospective Study in a General Population*, 22 Am J. Hypertens. 151 (2008),

*available at* http://ajh.oxfordjournals.org/content/22/2/151.abstract?sid=67270e87-4fd8-4401-

bd31-b28b668e7c06.

During the telephone call with counsel, Petitioner asked counsel for assistance addressing

certain matters related to his estate.  Chandler Decl. ¶¶ 12-13.  And throughout the conversation,

it became increasingly clear to counsel that Petitioner is preparing for the very real possibility

that he will die in Guantánamo in the near future.  *Id.*[1]

## ARGUMENT AND CITATION OF AUTHORITIES

### I.  Pursuant to the Plain Language of the AUMF, Respondents Must Release Petitioner Because He is Too Sick to Participate in Future Hostilities.

Respondents' authority to detain an alleged "enemy combatant" at Guantánamo is

derived from the AUMF.  *See, e.g.*, Resp'ts' Mem. at 7, *In re Guantanamo Bay Detainee Litig.*,

Misc. No. 08-442 (TFH) (D.D.C. Mar. 13, 2009) (ECF No. 1689), attached as Exhibit B.  And,

in *habeas* proceedings (such as this one) in which an alien seeks release from detention, the

Government bears the burden to prove that the alien's detention falls within the scope of the

President's authority under the AUMF.  *See, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 533-34

(2004); *Al Warafi v. Obama*, 716 F.3d 627, 631 (D.C. Cir. 2013).  The AUMF authorizes the

President:

> to use all necessary and appropriate force against those nations,
> organizations, or persons he determines planned, authorized,

---

[1] Given the urgency of the present motion, counsel for Petitioner has been unable to obtain access to Petitioner's full medical records, and have instead relied upon the attached Declaration and the information obtained from Petitioner by counsel.  Should this Court believe further evidence of Petitioner's debilitating health issues is needed, Petitioner requests the Court require Respondents to provide an immediate and comprehensive independent medical examination of Petitioner.

> committed, or aided the terrorist attacks that occurred on
> September 11, 2001, or harbored such organizations or persons, ***in
> order to prevent any future acts*** of international terrorism against
> the United States by such nations, organizations or persons.

AUMF § 2(a) (emphasis added).  The statutory language speaks to the prevention of "*future*

acts."  *Id.* (emphasis added).  It does not authorize unlimited, unreviewable detention without

charge for alleged *prior* acts.  *See id.*

In *Hamdi*, 542 U.S. at 525-35 (plurality opinion), the United States Supreme Court

recognized this important limitation to the President's authority under the AUMF.  The Court

explained that, under the AUMF, the Government may detain an enemy combatant for the

limited purpose of "prevent[ing] captured individuals from returning to the field of battle and

taking up arms[.]"  *Id.* at 518.  "[I]ndefinite detention for the purpose of interrogation," the Court

explained, "is not authorized" under the statute.  *Id.* at 521.  Nor does the AUMF permit

detention for any penal purpose.  *Id.* at 518 (citation omitted).  Instead, the President has the

limited power to place a detainee in "protective custody, the ***only purpose*** of which is to prevent

the prisoners of war from further participation in the war."  *Id.* (emphasis added; citation

omitted).

When a detainee's continued confinement is not necessary to prevent the detainee from

future participation in hostilities against the United States, the AUMF requires the Government

to release and repatriate the detainee.  In *Basardh v. Obama*, 612 F. Supp. 2d 30 (D.D.C. 2009),

for example, this Court ordered the release of a Yemeni national (Basardh) when the prospect

that Basardh would take up arms "[was], at best, a remote possibility."  *Id.* at 35.  Basardh had

garnered international notoriety as a Government informant, who provided the Government with

information and testimony on other detainees and made a good number of enemies in the

process. *See* Del Quentin Wilber, *Detainee-Informer Presents Quandary for Government*, Washington Post, Feb. 3, 2009, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2009/02/02/AR2009020203337.html (last visited Feb. 11, 2014). In considering Basardh's *habeas* petition, this Court noted that "the AUMF does not authorize the detention of individuals **beyond that which is necessary to prevent those individuals from rejoining the battle**." *Basardh*, 612 F. Supp. 2d at 34 (emphasis added). Accordingly, since "any ties" Basardh may have had with the enemy were "severed" during his detention, the Court held that the Government failed to meet its burden to establish that Basardh's continued detention was "necessary to prevent [him] from rejoining the battle." *Id.* at 34, 35. In 2010, Basardh was released from Guantánamo and sent to Spain. *See The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/guantanamo/detainees/252-yasim-muhammed-basardah (last visited Feb. 11, 2014).

Here, Petitioner's significant physical and medical issues make it virtually impossible for Petitioner to "tak[e] up arms" and "rejoin[] the battle" against the United States. *Basardh*, 612 F. Supp. 2d at 34-35.[2] Petitioner cannot engage in even moderate physical exercise without a significant risk of a cardiac or respiratory episode. Chandler Decl. ¶ 10. Basic tasks—such as walking to the restroom—can result in symptoms resembling a heart-attack, including dizziness, shortness of breath, nausea, vomiting, and a sharp pain in Petitioner's chest. *Id*. ¶¶ 7, 9-10. The Government cannot therefore meet its burden to establish that Petitioner's continued detention is "**necessary** to prevent [Petitioner] from rejoining the battle." *Basardh*, 612 F. Supp. 2d at 34 (emphasis added).

---

[2] Petitioner's conduct prior to his detention in Guantánamo is not relevant to this motion. Petitioner maintains that he never participated in any "battle" or other hostilities with the United States or its allies (making it impossible for Petitioner to "rejoin" that battle). Nevertheless, Petitioner employs this language in keeping with the relevant case law.

This is particularly true given that Petitioner is highly unlikely to receive medical care in Yemen that would make him able to be of danger.  *See generally* World Health Org., World Health Statistics (2013), attached as Exhibit C.  In fact, in light of the scarcity of medical services available in Yemen and their relative expense, Petitioner may receive ***no health care at all*** much less the array of medicine he needs to control his diabetes, heart disease, blood pressure, cholesterol, and asthma.  *See id.* at 126-27.  Yet he wants to return home and believes that his health will improve there to some limited extent.

In light of Petitioner's debilitating medical issues and the scarcity of any medical care in Yemen, the chance that Petitioner could have any future involvement with the relevant hostilities is "at best, a remote possibility."  *Basardh*, 612 F. Supp. 2d at 35.  Therefore, the Government cannot meet its burden to show that Petitioner's continued detention is "necessary," and Petitioner should be promptly released and returned to his family in Yemen.  *See id.* at 34.

## II.     Pursuant to Army Regulation 190–8, A Seriously Ill Detainee (Such as Petitioner) Must Be Repatriated.

"Army Regulation 190–8 is domestic U.S. law, and in a *habeas* proceeding such as this, a detainee may invoke Army Regulation 190–8 to the extent that the regulation explicitly establishes a detainee's entitlement to release from custody."  *Al Warafi*, 716 F.3d at 629.  The regulation applies to all branches of the military, which "implements international law, both customary and codified, relating to EPWs [Enemy Prisoners of War] . . . and ODs [Other Detainees] which includes those persons held during military operations other than war."  Army Regulation 190–8 at ch. 1, § 1(b).  With respect to injured or ill detainees, Army Regulation 190–8 states that "the following EPW and RP [Retained Personnel] are eligible for direct repatriation . . . [s]ick or wounded EPW and RP whose conditions have become chronic to the extent that prognosis appears to preclude recovery in spite of treatment within 1 year from the

inception of disease or date of injury." *Id.* at ch. 3, § 12(*l*). Thus, like the AUMF, Army Regulation 190–8 requires a seriously ill detainee whose condition "appears to preclude recovery in spite of treatment within 1 year" from inception to be "direct[ly] repatriated." *See id.*

As discussed above, despite years of medication, Petitioner's health only continues to deteriorate. Thus, pursuant to Army Regulation 190–8, Petitioner should be "direct[ly] repatriated" to his home country of Yemen, so that he may live the rest of the life he has left with his family.

### III.    The Third Geneva Convention Supports Petitioner's Request for Repatriation.

Finally, the Third Geneva Convention bolsters the conclusion that Plaintiff must be repatriated under the AUMF and Army Regulation 190–8. While Petitioner is not directly invoking the protections of the Third Geneva Convention in support of this motion, *see* Military Commissions Act of 2006, Pub. L. 109-366 § 5(a), 120 Stat. 2600, 2631 (2006), the Supreme Court in *Hamdi* recognized that courts can and should look to the international law of war (such as the Third Geneva Convention) in determining the rights of a detainee and the Government's authority under the AUMF. *Hamdi*, 542 U.S. at 520-21. The Government has acknowledged this directive in other litigation before this Court: "Principles derived from law-of-war rules governing international armed conflicts, therefore, ***must inform*** the interpretation of the detention authority Congress has authorized for the current armed conflict." Ex. B at 1 (emphasis added); *see also id.* at 6, 9 (citing the Third Geneva Convention). Respondents likewise recognized that they were detaining Petitioner pursuant to "the [AUMF] ***as informed by law-of-war principles***." *Id.* at 8 (emphasis added).

Much like both the AUMF and Army Regulation 190–8, the Third Geneva Convention requires the release of seriously ill and wounded prisoners of war, including the:

(1)    [i]ncurably wounded and sick whose mental or physical fitness seems to have been gravely diminished[;]

(2)    [w]ounded and sick who, according to medical opinion, are not likely to recover within one year, whose condition requires treatment and whose mental or physical fitness seems to have been gravely diminished[; and]

(3)    [w]ounded and sick who have recovered, but whose mental or physical fitness seems to have been gravely and permanently diminished.

Geneva Convention (III) Relative to the Treatment of Prisoners of War art. 110, Aug. 12, 1949, 6 U.S.T. 3316.   Under this provision, when, as here, a detainee's illness makes it "no longer likely [the detainee will] take part in hostilities against the Detaining Power," the detainee should be released and repatriated. 1 Jean-Marie Henckaerts & Louise Doswald-Beck, *Customary International Humanitarian Law: Rules* 345 (2006).   Thus, the Third Geneva Convention further supports Petitioner's request for *habeas* relief and confirms the limited power of the Government to detain Petitioner under the AUMF.

## CONCLUSION

For the reasons stated herein, Petitioner respectfully asks this Court to reopen the current civil action, grant his petition for the writ of *habeas corpus*, and order Respondents to take all necessary and appropriate steps to facilitate his immediate repatriation to Yemen.

Respectfully submitted,

This 12th day of February, 2014.

KING & SPALDING LLP

  /s/ John A. Chandler
John A. Chandler (Pursuant to LCvR 83.2(g))
David M. Barnes (Admitted *pro hac vice*)
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309
Tel:  (404) 572-4600
Fax: (404) 572-5139
jchandler@kslaw.com
dbarnes@kslaw.com
*Counsel for Petitioner Mohammed Al-Adahi*

## CERTIFICATE OF SERVICE

I hereby certify that on February 12th, 2014, the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system, which shall send notice to all counsel of record.


/s/ John A. Chandler
John A. Chandler, Esq.